**Additional Documentation**

**Since March/April 2004**

# Descriptive Cover

Included in this documentation is a workers compensation package. In late March 2004, I officially submitted a workers compensation package willing to let the Department of Labor representative sort-through this case; which seems to have mysteriously disappeared.

By late August 2004; I confidentially learned from one of my fellow coworkers (by their understanding and if true); that the supervisor (Mr. Bent) refused to submit this workers compensation package because after he had read through it. It appeared to him that there was; one if not several contradictions with the material.

I tried my best to develop an accurate outline of events/activities for the Department of Labor representative(s) to sort-through and provided copies of essential records; that I logically thought would be needed for his/her evaluation. If the Court believes I should reconstruct or clarify any information in the workers compensation package more accurately. Then I will be happy to do so. Since I would have to go through all this pile of work just to get workers compensation for a job-related injury; it would be seriously stupid on my part to mislead, falsify, and/or provide contradictory information in my report – for it would cause me "more work" in the long-run. Which is the primary point of this entire case – whom has been wasting who's time, effort and energies on what; and at what cost. After thinking about the above missing workers compensation package; I came to the conclusion that if the above is true. There could be a number of reasons why it was retracted.

In light that the workers compensation package details a history of the Passport Office; it is appropriate as an attachment for this case. I will let the Court decide its' final disposition for I tried to be sincere with its' original submittal.

Concerning the injury which occurred; I basically had to take care of it myself - by performing hours and hours of physical therapy exercises – which continues. By September 2005; I am physically able to get around/walk pretty well. If I physically over exert myself by lifting heavy objects, running short distances and/or walking up steep inclines or steps; then pain re-occurs where I need to take pain relievers until the pain disappears. In brief, I am reminded daily that I am partially handicapped – no matter where I go – not matter what I am doing.

Eddie Cheris
U.S. Department of State
Bureau of Consular Affairs, Passport Services
Records Services Division and Liaison
CA/PPT/IML/R/RP/QA, SA-17, Room 520
1111—19th Street, N.W., Washington, D.C. 20522

SSAN: 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
Tel: (202) 955-0248
Fax: (202) 955-0256
Email: CherisES@state.gov

| Attachment 01 | ■ | Employment Outline |
| Attachment 02 | ■ | SF-50's |
| Attachment 03 | ■ | Current Appraisal |
| Attachment 04 | ■ | Affidavit of Accident |
| Attachment 05 | ■ | GWU Medical Center (Medical Exam) |
| Attachment 06 | ■ | Topology Chart of Office Relocation |
| Attachment 07 | ■ | Medical Records (Dr. Nascone) |
| Attachment 08 | ■ | Exercise Chart |
| Attachment 09 | ■ | Athletic Shoe Purchase |
| Attachment 10 | ■ | Medical Records (Arlington Hospital) |
| Attachment 11 | ■ | Medical Records (Dr. Danziger) |
| Attachment 12 | ■ | Contacts Pertaining to this Report |
| Attachment 13 | ■ | Documentation: The Other Side of this Case |

Between 1994 through 1997; my primary job was accountability of thousands of boxes containing thousands of processed passport applications. Each box was assigned a particular number, which was then recorded in an accountability log. These boxes were shipped to the Passport facility to be microfilmed and then forwarded onto the National Archives Records Center in Maryland. Each of these boxes weighed differently depending on how many applications were assigned to an entire batch being microfilmed. By FY 2001, this microfilming storage process was replaced by newer data storage technology of scanning all documents into electronic databases; which is currently in use. Moving hundreds of these boxes each day was a routine process, which extend over a 3 – 4 year period. Basically I was physically overworked and was the only individual doing this particular job on a daily basis.

### ■ Attachment 01 ■ / ■ Attachment 02 ■ / ■ Attachment 03 ■

By mid-1996, I began using Ben-Gay paste on my shoulders, shoulder blades and sternum/chest area where I frequently felt pain due to the moving of thousands of boxes. I honestly did my job well; but had a lot of pulled muscles. I repeatedly informed my 1st level supervisor, Steve Cox that I seriously needed to slow down on the amount of moving I was doing on a daily basis

because I frequently felt pain around my back, shoulder blades and chest area. Other personnel on the floor repeatedly told me that, I was way overdoing the job, saw I was experiencing pain and told me to stop doing so much before I got hurt – 'I should have listened to them.'

With one particular situation a woman named Angi repeatedly ran into me while I arranged boxes on the shelves. These collisions occurred a number of times and I soon discovered it was being done intentionally. It was reported to both the 1st and 2nd level supervisors. With the last collision I encountered with this woman I was in the process of placing a box on the upper shelf with my left arm when she collided into me. Instantly, I felt something tear in my upper left shoulder area adjacent to the neck. The pain was bad and I confronted this woman why she intentionally collided with me. My conclusion was that she had a sexual problem – which I did not want anything to do with. This woman never collided with me again; but, since that time, I have had a rotary cup problem in my left shoulder – many, many times I have to cock my shoulder backwards to align it with the right shoulder – sometimes its' painful and sometimes its' not.

With this particular incident, the 1st level supervisor, Steve Cox told me that I was responsible for the woman, Angi. I seriously thought this guy was off his rocker since I am a file clerk and not a supervisor and had no obligation to the woman at all. At this point in time, I came to recognized that there was something 'odd' about the 1st level supervisor. Either he can't do his job properly, or he was afraid of blacks, or possibly hiding something, or just maybe his superiors treated him like a dog and so he decided to treat me like a dog. At this time I could only guess, but realized something was not right.

The above incident is one of a number of personnel conflicts at the workplace –which will be explain in further detail and has direct bearing on this workers' compensation case.

I repeatedly informed the 1st level supervisor that I frequently felt pain due to the moving of thousands of boxes especially between my shoulder blades and my sternum. It was like to guy could care less. I started making it a practice that when I pushed myself to hard and felt pain I would take a break – even if it was not break time. I eventually discovered that I have that chest muscle syndrome where the muscles on the left side of the sternum if over-worked appears to simulate a heart condition. Weightlifters at gymnasium are well aware of this muscle syndrome.

By 1997, twice I encountered something strange. My feet swelled up like balloons. The first time this happen the swelling lasted two days and then disappeared. The second time it occurred I could barely get my shoes on and needed to leave them untied. I got scared that I might have to go to the hospital. I immediately reported and showed this condition to my 2nd level supervisor, Tasha Thian. Nothing was done. I tried a number of things to get the swelling down. First ice packs. Then soaking my feet in warm/hot water. Then used Ben-Gay paste. This swelling lasted for a week and never re-surfaced

Also, somewhere around this timeframe I had an accident in the building. One day on my way to lunch; I was leaving through the back exit of the building. As, I walked through the back hallway I slipped and fell squarely on my back (hard). One older woman approached me and asked if I was "ok". It took me a few minutes to get up and walk out of the building. As I got on my feet I noticed my pants were wet and I then noticed that the floor was wet. Water leaked from a pipe aligned in the ceiling. I informed the 2nd level supervisor of this incident. Later, I asked the older woman if she would sign an affidavit to what she had seen.

### ■ Attachment 04 ■

About 6 to 8 months later, stranger things began surfacing. One day after lifting boxes all morning and feeling pain -- I went to lunch as usual and walked to a bookstore, which was located at K and 18th Street. I was almost at the bookstore when all of a sudden spiking pain ripped down through the left side of my body. I thought, I was in cardiac arrest and immediately sat down on the street curb of K and 18th and rested for about 20 minutes trying to calm myself. Shaken up; I monitored my heartbeat which basically seem normal. I returned to the office and reported this to my 2nd level supervisor. I could tell she was sensitive to the situation but nothing was done immediately and I returned to doing my job. About a month or so later, I again experienced this spiking pain while pulling boxes from the top of the shelf downward to the floor; shaken-up I immediately went home on sick leave.

Some months later, the 2nd level supervisor assigned me to do data entry work – setting at a desk and typing. Once I began doing this job which I did very efficiently and a lot of it -- I began experiencing other physical symptoms. Reoccurring pain around the sternum – especially the left side. Left shoulder rotary cup problem. And frequently, as I spent hours and hours data entering my left leg and foot would fall asleep. Nothing unusual about the right leg or foot; but always the left leg and foot. As time past, this left leg and foot problem become more apparent – for each and every time I sat down on the toilette immediately the left leg and foot fell asleep. Since pain was not a factor, I overlooked it.

By 1998, I finally went and got a full medical exam by a Dr. Charles Faselis, at George Washington Medical Center. The doctor could not find anything wrong and told me I was in good health for my age.

August 1998, I took my 11-day holiday vacation to Greece. I just wanted to see once where my grandfather came from 100 years ago. On the 9th day I took the morning tour to the Acropolis and then in the early afternoon I walked around a suburb of Athens called Plaka (a great tourist attractions). Around 2:30-3:00 o'clock I was walking around Plaka taking pictures and all of a sudden spiking pain jumps through my left side of my body. Shaken up – thinking I was having a heart attack; I sat down at a café for a long while and then went back to my hotel room; spending the evening watching Greek TV. The next morning I got up, everything seemed fine; and so I went out exploring Athens – no problem. As time past, I again experienced several

more of these spiking pain surges.  As I learned to react to these fast spiking surges – I discovered that it was not heart trouble; but something with the back, pelvis or maybe an Achilles Heal problem.  The pain would erupt and then fade away in a short amount of time without any crippling effects.  My initial hope that given time this condition would properly heal over.  I did tell me supervisors several times that there was something physically wrong with me but I was sure not, what.

1999 - as time past, I encountered another problem, severe ringing in my ear(s).   For approximately 2 years after this I did not knew if the symptoms mentioned above were one in the same or separate problems – only time would tell.  This ringing in my ear was severely painful for 2 years.  At first I could not figure-out what was causing the problem.  I eventually got a medical examination and then a head and shoulder MRI at George Washington University Hospital.  The result was that I had an inflamed cyst in my left nasal passage – which in turn blocked the ear canal.  I then visited a Dr. Coyne whom thoroughly cleaned my left eye.  The end result -- do to the stress/pressure of the job I was smoking way too many cigarettes and drinking way to much coffee – which highly agitated the cyst and caused the ear problem.  The doctor told me to stop smoking and drinking stimulants: such as coffee and tea and the problem should disappear.  After going to Greece, I began using the Necoret Gum to stop smoking – which I now believe added significantly to the cyst being irritated.

■ ■ 100 – 600 hours annual & sick leave used

■ **Attachment 05** ■

## **Crippling Pain Eruption – 1**

2000/2001  My supervisor (Steve Cox) requested I move furniture do to an office relocation.  I told this supervisor that I have some kind of back problem – which he was previously told about.  And that I can't move much.  Why the supervisor particularly picked me for this specific task

and not someone else is highly questionable; but, I felt the supervisor was taking advantage of my services "again."  The supervisor kept on being persistent.  Instead of fighting this issue with him, I thoroughly help the supervisor with this difficult task.  Our agreement was, we were to move the furniture in my office and that in his office, only.  That was our initial agreement.  'Man', was I in for a surprise.  This guy tried to coerce me into moving all kinds of furniture, equipment and supplies.  It took more than a week to relocate all of this material.  By the 3rd day I was having pain in my back, left leg, left shoulder blade and had to go to the nearest drug store and get Ben Gay Paste and Tiger Balm patches.  By day 5, I am grabbing my left buttocks and limping from pain and this supervisor kept pressing me to move more and more furniture.  I seriously thought this guy was a nut-case.  Once, I almost fell down from pain, I told the supervisor I can't do this no longer and walked away from him – which he expressed disappointment with. (Note for my reader – I previously had a number of negative encounters

with this particular supervisor – concerning abuse and negligence). I briefly reported this above situation to the 2nd level supervisor Tasha Thian, and took leave. I was more than angered that this supervisor was abusing my services and he was well aware of my back injury. I walked around with severe pain for at least 2 weeks and I had to sleep in a chair for several nights; in the reverse position. 'Oh', and I can't forget those other personnel in the office repeatedly complaining about the Ben Gay smell. I reported this abuse to several State Department personnel – nothing was done about it. But, five different people seriously wondered why the supervisor did not just get the moving people to move all this furniture – thats' what their job is. By end of 2001, Tasha Thian relocated to a new job somewhere else in the State Department. By mid-2003, Steve Cox permanently retired. Their positions, were soon replaced by other individuals.

■ ■ 100 – 400 hours annual & sick leave used

My supervisor specifically requested me to help him with this relocation project. No one else was helping us accomplish this task. In any case, I thoroughly assisted the supervisor without complaint, and to the point where I could not longer physically stand up. I thoroughly assisted my supervisor in this relocation project (as requested), even though 6 months earlier the supervisor required me to set at my workstation and endure pain in another incident. And approximately a month after this relocation project, I encountered abuse from the supervisor in another incident. Approximately 6 months after this relocation project, I find myself in a fight with the supervisor concerning another incident. And approximately a year after this relocation project, a report is filed with the Inspector General concerning abuse. If it is not evident to my reader let me explain this in a different way. My supervisor (repeatedly) pushed the envelope between; ensuring I performed by job duties vs. critically abusing my services. When this envelope was pushed to the point that my supervisor had the intent to hit me (to conform); I was left with no alternative except to fight back. Once I informed my 2nd and 3rd level supervisors that I had the intent to place the 1st level supervisor under arrest – I encountered hard resistance from the 2nd and 3rd level supervisors as detailed in Attachment 13. In addition, there are two previous incidences involving myself, and the supervisor; where my civil and constitutional rights were violated.

Note: if a workers' compensation claim was officially required at this point in time then I should have been told to complete it by one of my supervisors or at least by the Personnel Department. Until 2 week ago; I honestly had no idea what a workers' compensation claim was; besides how to apply for one. Additionally, the last section of this report may explain why this report is now being submitted.

■ Attachment 06 ■

June 2001 – this crippling spiking pain eruption happened again, when I began moving furniture around in my office. As soon as it erupted, I back-off fast – the pain lasted for a few days then disappeared. A note to my reader – within my office environment, there has been several relocations of personnel and equipment – this seems to be an ongoing task since we just relocated again in February 2004.

### Crippling Pain Eruption – 2

2002 - Frequently I used to help my landlord with miscellaneous tasks around the rental property. The landlord had a new deck put onto the house and I decided to help pick up pieces of the excess lumber. I picked up small pile of wooden boards and all of a sudden it felt like I was being cut in half at the waist. I screamed out loudly and fell to the ground – face down – (severe pain). One gentleman who was across the street ran over and asked if I was all right. It took me a few minutes to get up on my feet – limping over to the new porch. I had a very hard time for 4 weeks just simply being able to walk. In fact, I fell down several times do to the severe pain and was able to get up by my own mobility. At this point I absolutely needed a doctor and visited the offices of Dr. Nascone. Dr. Nascone gave me an anti-inflammatory drug (Meloxicam). I used Motrin and Ben Gay paste to relieve the pain. I spoke with the acting supervisor (Mr. Crawford) about this injury and who could plainly see that I was having a terrible time just walking. The supervisor basically told me about his sciatic/back condition and how he handles it. But nothing officially was done/reported and I had to take care of myself and had hoped that this injury would eventually heal and disappear. The above condition was the worst I had experienced. For 4 days I had to sleep in a chair in the reverse position because setting down was impossible. I should mention here that the 3rd level supervisor (Tim Martin) give my a very difficult time about this condition and told me I was pretending my injury.

■ **Attachment 07** ■

After 6 weeks of severe pain, I gradually put myself through a 5 months physical therapy regime -- I had to do something to get this injury healed up and it took some solid effort. As time past I was capable of doing a lot of physical activities, normally.

■ ■ 100 – 400 hours annual & sick leave used

■ **Attachment 08** ■

Before visiting Dr. Nascones' office I called my HMO Blue Cross/Blue Shield to double-check if I could use the health insurance with this particular doctor. It was confirmed over the phone, yes. After several months I received a bill from Dr. Nascones' office – which I discovered Blue Cross/Blue Shield refused to pay. Out of shear frustration I cancelled my insurance coverage. I had intended to re-up for new coverage; but missed the window for open season signup.

### Crippling Pain Eruption – 3

Around February 25, 2004, I previously moved some office furniture, boxes and in one particular incident tripped over the leg of my desk chair – which was a little painful. I could feel tension in my back area and tingling in my left leg and foot and it would not go away. Finding a way to relieve this problem I decided to stop wearing my heavy winter boots and purchased some lightweight athletic shoes to cushion my feet.

### ▪ Attachment 09 ▪

By the 1st of March I was having severe pain around my left buttocks area down through my left leg and foot and used Ben Gay past to relieve this pain. On March 2nd, I became paralyzed – I could not move. It took 6 medical technicians to pick me up off the floor and put me on a gurney and then rush me to the emergency room. I was screaming all the way. Approximately, eight hours latter I was worse-off leaving the emergency room; than when I arrived. The best way I can describe this constant re-occurring pain is like someone thrusting a wide-blade knife deep into my left pelvis/buttocks area and repelling lightning streaks down my left leg and foot.

### ▪ Attachment 10 ▪

The pain spikes hard and fast and is immediately crippling. By experience I can tell you that when this happens, if you don't have some type of pain reliever such as motrin or utracet; you will be crying like a baby – this is how terrible the pain is. It then takes between 6 to 8 weeks to so called re-cooperate from this spiking pain. I am referring to being able to walk normally without pain or discomfort and without any form of pain reliever. Basically, you are left to grunt and groan until everything levels-out.

On March 9th, unable to endure the pain, I re-visited Dr. Nascones' office and met with a Dr. Danziger, who examined my condition and prescribed additional pain relievers.

### ▪ ▪ 100 – 400 hours annual & sick leave used

### ▪ Attachment 11 ▪

Each and every time this spiking pain erupts, I am not able - (can not) set down nor lay down – its' to painful. Standing in one place for long periods of time is the best position to maintain. For 3 to 6 days; once this initial eruption takes place I sleep with a chair propped against my kitchen counter. I place a pillow on top of the counter and kneel into the chair with my feet/legs hanging off the front of the chair. Basically, I sleep in a kneeling (praying) position with a blanket hanging; over me like a poncho. Improvising during these periods is an essential survival tool. During and after this 6 to 8 weeks re-cooperation period the best and also very painful "remedy" is to get out and walk. This is the first step in regaining mobility. Attached is a chart detailing additional exercises to be performed after the 6 to 8 week period. I am now entering this therapy process "again", for the next 5 to 6 months.

## ■ Attachment 08 ■

I am a 45 years old man having experienced at least 8 of these spiking pain eruptions over the past seven years; and each time this condition gets worse. If I don't pay close attention on how much pressure (high impact activity), I put on my body; I may end up needing surgery or worse being assigned to a wheelchair.

I have accepted the fact that I am now (partially) handicapped for life. There is too much re-occurring pain to endure to deny that this condition will ever heal. The bottom line is either continue suffering the consequences; or make some solid life-style changes.

■   ■   ■   ■   ■   ■    **The other side of this Case**    ■   ■   ■   ■   ■   ■

Over the past 8 years within this Passport facility there has been a number of personnel conflict issues among a number of personnel covering a wide-range of topics. This has not been a minor problem – this stuff has gone to extremes. Attachment 13 outlines just a few of these many conflicts. For approximately the past 8 years I have "repeatedly" informed my superiors that I am a file clerk. It is not my job to manage (baby set) my fellow co-worker(s) – this is the supervisors' responsibility. And, time after time, the supervisors have failed to perform their jobs duties. If my reader is use to military jargon the above (mismanagement issue) is commonly referred to as screw-ups. And, I am not the only individual whom has complained about this issue.

When you report abuse you are then confronted with suppressive activities such as that contained in Attachment 13.



**Eddie Cheris**

925 North Jackson Street
Arlington, Virginia 22201
CherisES@state.gov
(202) 955-0248

## Employment History

### U.S. Department of State, Passport Services, Washington, D.C. 20521

Desc. Previously my duties included the coordination, extracting and indexing of information between microfilm storage cartridges and electronic databases. Presently my duties pertain to thorough reviews and modifications of thousands of batches of passport applications and related documents that have been digitally scan into electronic databases. Frequently use Microsoft Word and Excel. Information Assistant, Nov 1994 – Present, Supervisor: Mr. Bent, (202) 955-0233 — [Work Schedule: 07:30 – 16:15/ Monday through Friday] — Current typing speed: 85 WPM.

### National Center for Human Genome Research, Bethesda, Maryland 20892

Desc. Administrative support included: establishing, maintaining, distributing and tracking grant award files -- duties related to all phases of the grants management process. Frequently prepared travel and training orders and time cards. Updated office filing system and fully developed office library which encompassed several thousand's grant award folders. Grants Clerk, Jun 1990 - Apr 1991, Supervisor: Ms. Thomas, (301) 402-0782

### U.S. Library of Congress, Information Technology Services, Washington, D.C. 20540

Desc. Prepared a variety of correspondence for the signature(s) of the Director, Administrative officer and technical staff. Assembled many daily and weekly information project packages for the administrative officer and director. Performed monthly security and safety checks of this facility. Routinely made proper distribution of a very large quantity of mail. Typed and prepared the 1990/1991 Library of Congress Budgetary Document for Congressional Review. Administrative Secretary, May 1989 - Jan 1990, Supervisor: Mr. Katz, (202) 707-5114

### U.S. Department of Transportation, Maritime Administration, Washington, D.C. 20590

Desc. Duplicated large volumes of documentation ranging from memorandums, manuals, survey reports and legal briefs. Administrative support provided for examiners; whose responsibilities pertaining to Maritime ship financial policies for domestic and international sales of vessels and larges. Prepared numerous forms and other documents such as travel and acquisition orders, memorandums, telecom and telecopier messages and information notices. Maintained weekly time and attendance sheets. Award presented for designing/developing a (multi-copy) sales briefing books which greatly exceeded and mobilized expected sales of very large seafaring vessels Secretary/Typing, Apr 1988 - May 1989, Supervisor: Mr. Haskins, (202) 366-1895

### U.S. Department of Defense, Joint Chiefs of Staff, Pentagon, Washington, D.C. 20301

Desc. Provided administrative support to action officers pertaining to nuclear weapons, safety, security, contingency planning and employment policies. Monitored (receipt and distribution of) a large volume of classified documents. Escorted incoming personnel to briefings, ceremonies and meetings. As a consistent standard, I prepared many top quality forms, travel and training orders, memorandums, telecom messages and requests for supplies and computer maintenance. Provided typing support for 'special (technical) projects' development. Secretary/Steno, Nov 1987 - Apr 1988, Supervisor: Col Byers, (202) 695-3432

■ **Attachment 01** ■

# **Recent Education**

Strayer University, Washington, D.C. 20005
Apr 1997 - Mar 1999  - Information Systems Degree Program

- Microcomputer Applications in Business I
- Using & Programming Access
- Supporting Windows 95
- Distributed Communications Systems
- Unix Operating System
- Introduction to Business

- Microcomputer Applications in Business II
- Introduction to Networking
- Internet Topics
- Fundamental of Mathematics
- Systems Analysis & Design


Marymount University, Arlington, Virginia 22207
Sep 1999 - Dec 1999  - Introduction to Computer Information Systems


U.S. Department of State, Foreign Service Institute, Washington DC 20522
Aug 2003 – Aug 2004  - Application Software & Clerical-related Courses

- Introduction to Windows NT 4.0
- Open-Net+ & the Internet
- Adobe Photoshop 7 – current working

- Intermediate Microsoft Access 2000
- Introduction to Microsoft Access 2000


U.S. Department of the Army, Training Support Center, Newport News, Virginia 23628
Jul 2003 – Jul 2004  - Photography Training (General & Technical)

- Field Television Production
- Introduction to Basic Color Photography
- Photographic Documentation-Admin. & Prep.
- Copy Photography I
- Copy Photography II
- Documentation Cinematography
- Basic Lighting Techniques
- Tactical Documentation Photography
- Audio Production Principles
- Filming Uncontrolled Action
- Television Lighting, Audio, & Scenery
- Photographic Filters & Techniques
- Principles of Photography
- Operation of Electronic News Gathering System

- Photography in Climatic Extremes
- Introduction to Special Photographic Assignments
- Video Tape Editing & Character Generator Ops
- Laboratory Procedures
- Introduction to Portrait Photography
- Photographic Quality Control
- Printing Color Negatives
- Operation of Automatic Film Processors
- Operation of Automatic Print Processors
- Filming Controlled Action
- Fundamentals of Video Tape Recorders
- Operation & Maintenance of Photographic Equip
- Organizational Maintenance of Laboratory Equip

■ **Attachment 01** ■

## Department of the Army (continued)

Projected courses to be taken between: 2004 – 2006

**Program: RC Basic Journalist MOS Qualification Course
(MOS 46Q10) (Course Number: 212 M11)**

■ Introduction to Public Information / PA0120. Desc: Introduction to public information, one of the three functional areas of public affairs. Crd/Hr: 10.

■ Introduction to Community Relations / DI0130. Desc: Presents many of the community relations programs practiced both in CONUS & overseas. Also presents the basics of community relations, understanding the local community power structure, planning & conducting special events & operating a speakers' bureau. Crd/Hr: 8.

■ Public Affairs & the Law / DI0140. Desc: Overview of legal concepts & procedures used in public affairs programs. Structure of law in the United States & the content of key laws affecting public affairs activities. Crd/Hr: 7.

■ Introduction to Journalism / DI0200. Desc: Elements of journalism both in the civilian world and, specifically, within the military. Covers news gathering & interviewing techniques commonly practiced by journalists today. Crd/Hr: 4.

■ Fundamentals of News Writing / DI0210. Desc: The differences between literary & newspaper English, the inverted pyramid style of presenting information, objective news writing, datelines, bylines, & the newspaper date week. Variations of the straight news story & accurate preparation & presentation of the accident news story. Mechanics & structure of writing sports stories. Crd/Hr: 12.

■ Copy Editing / DI0220. Desc: Teaches entry-level journalists the fundamentals of editing their own & other journalists' writing. Covers basic English grammar & common errors that occur in Army publications. Also fundamentals of reviewing copy for security, accuracy, propriety, & policy. Crd/Hr: 10.

■ Writing Headlines / DI0230. Desc: Basic procedures involved with newspaper design as it relates to headlines. Specific information is provided on headline types, headline styles, word usage, punctuation & how to count characters in headlines to make them fit the design of the page. Crd/Hr: 5.

■ Feature Writing & Editorials / DI0240. Desc: Basic procedures & tasks related to writing feature stories & editorials. Crd/Hr: 10.

■ Still Photography for Journalists / DI0250. Desc: Provides general knowledge & understanding of using a 35mm camera, film & exposure, controlling light, film development & making prints. Crd/Hr: 10.

■ Photojournalism I / DI0251. Desc: Provides understanding of photojournalism, knowledge of obtaining, recording & writing a photo cut-line, cropping & scaling a photograph, & establishing a field photographic darkroom. Crd/Hr: 5.

■ Photojournalism II / DI0252. Desc: Advanced information for the trained photojournalist. Provides an understanding of photojournalism, preparing a shooting script, shooting a picture story & producing a 35mm color slide presentation. Crd/Hr: 5.

■ Photojournalism III / DI0253. Desc: Advanced information for the trained photojournalist. Provides an understanding of sports photography, shooting a spot news photograph & shooting a personality feature photograph. Crd/Hr: 5.

■ Newspaper Design & Layout / DI0260. Desc: Basic procedures involved with the design & layout of a newspaper. Instruction on flags, mastheads, folios, headlines, typeset copy, photographs & line art, measurements, types of layouts, advertising, copy logs, dummy layout sheets, & field-expedient production techniques. Crd/Hr: 15.

**Program: RC Basic Broadcaster MOS Qualification Course
(MOS 46R10) (Course Number: 212 M13)**

■ Introduction to Broadcasting / DI0300. Desc: Provides entry-level understanding of broadcast history, the operational structure of a broadcast station & how military public affairs practitioners should approach the civilian broadcast media to help accomplish their information goals. Includes information on the military broadcast chain of command, mission, operation, & history. Crd/Hr: 5.

■ Techniques of Broadcast Journalism / ID0310. Desc: As part of the broadcast journalist MOS qualification course, this subcourse provides an entry level understanding of the techniques for writing effective broadcast news & sports, feature & spot announcement copy, rewriting & editing broadcast copy and print releases for electronic media, administering traffic & continuity, & using public affairs files. Crd/Hr: 5.

■ Basic Announcing Skills / DI0320. Desc: Gives an entry level understanding of radio & television announcing. Crd/Hr: 5.

■ Radio & Television Interviewing / ID0330. Desc: Provides entry level understanding of interviewing techniques in radio & television. Offers in depth study of the various types of broadcast interviews. Also covers methods, preparation, formulating questions, & the techniques used for both the radio & television interviews. Crd/Hr: 5.

■ Radio Broadcasting Techniques / ID0340. Desc: Provides broadcasters with an entry level understanding of the performance of a radio music program, audio production techniques & the production of a radio news insert. Also teaches how to compile a newscast & sportscast. Crd/Hr: 10.

■ Radio II / DI0345. Desc: Maintaining radio program materials, operating audio control room equipment & editing audio tape. Crd/Hr: 5.

■ Electronic Journalism / DI0350. Desc: As part of the MOS qualification course, this subcourse introduces the entry level broadcaster to electronic news gathering (ENG) & electronic field equipment, lighting for ENG, framing & composition, video script writing & electronic editing. Crd/Hr: 10.

■ Electronic Journalism II / DI0351. Desc: Provides an entry level understanding of the operation of electronic news gathering (ENG) & electronic field production equipment; the selection & set up of microphones; the preparation & performance of TV news inserts; videotape editing; & the responsibilities & functions of an ENG team chief. Crd/Hr: 10.

■ Television Lighting, Audio, & Scenery / DI0370. Desc: The basic concepts & principles of lighting, providing proper audio, & furnishing a television production set with the proper scenery described in detail. Crd/Hr: 10.

■ Television Graphics for Broadcast Journalists / DI0390. Desc: Entry level understanding of television graphics. Crd/Hr: 3.

**Program: Visual Information Officer Course (Course Number: 113 Q11)**

■ Audiovisual Resources Management / SS0105. Desc: Audiovisual equipment control & management, coordinating & budgeting for audiovisual equipment & software, and software management within DA/DOD. Crd/Hr: 8.

■ Script-Writing for Educational Visual Information Programs / SS0519. Desc: Writing scripts for educational programs including research techniques, training objectives, writing outlines, screen treatments, basic principles of script writing, camera movements that support a presentation, & story board layout leading to final script development. Crd/Hr: 2.

■ **Attachment 01** ■

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name   (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| CHERIS, EDDIE SPERO | 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 | 02-08-1959 | 07-30-2000 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 721 | Reassignment | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N7M | Reg 335.102 Reclass | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | S5138902 | 15. TO: Position Title and Number | S7946700 |
|---|---|---|---|
| FILE CLERK | | FILE ASSISTANT | |

| 8.Pay Plan | 9.Occ. Code | 10.Grade or Lvl | 11.Step or Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. Code | 18.Grade or Lvl | 19.Step or Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 00305 | 05 | 10 | $30,292.00 | PA | GS | 00305 | 05 | 10 | $30,292.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $27,778.00 | $2,514.00 | $30,292.00 | $0.00 | $27,778.00 | $2,514.00 | $30,292.00 | $0.00 |

| 14. Name and Location of Position's Organization      281235 | 22. Name and Location of Position's Organization      281235 |
|---|---|
| MANUAL RECORDS BRANCH<br>RECORDS SERVICES DIVISION<br>OFFICE OF INFORMATION MANAGEMENT AND LIA<br>DEP ASST SEC FOR PASSPORT SERVICES | MANUAL RECORDS BRANCH<br>RECORDS SERVICES DIVISION<br>OFFICE OF INFORMATION MANAGEMENT AND LIA<br>DEP ASST SEC FOR PASSPORT SERVICES |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. DoS Tenure | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1   1-None   3-10 Point/Disability   5-10 Point/Other<br>2-5 Point   4-10 Point/Compensable   6-10 Point/Compensable/30% | 1   0-None   2-Conditional<br>1-Permanent   3-Indefinite | 21 | YES   X   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   Basic Only | 9   9 - Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| C   C - FICA and CSRS (Partial) | 12-05-1984 | F   Full Time | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1-Competitive Service   3-SES General<br>2-Excepted Service   4-SES Career | N   E-Exempt<br>N-Nonexempt | 0113.0-1097 1111 0000 | 0070 |

| 38. Duty Station Code | 39. Duty Station   (City-County-State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON, DIST OF COLUMBIA |

| 40. DOG | 41. WGI Due | 42. Prim Skill | 43. HR Processor | 44. |
|---|---|---|---|---|
| 30-JUL-2000 | N/A | | CAEXSLW | EMPLID 109799 |

45. Remarks

- FULL PERFORMANCE LEVEL OF EMPLOYEE'S POSITION IS GS-6.
- RESULT OF POSITION REVIEW.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF STATE | |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | WELCH, GRETCHEN GERWE<br>ACTING |
|---|---|---|---|
| ST00 | 2951 | 08-10-2000 | |

Editions Prior to 7/91 Are Not Usable After 6/30/93

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

■ **Attachment 02** ■

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name   (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| CHERIS, EDDIE SPERO | | 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 | 02-08-1959 | 01-11-2004 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 894 | Pay Adjustment | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| QWM | Reg 531.205 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| ZLM | E.O. 13322 DTD 12/30/2003 | | |

| 7. FROM: Position Title and Number | | S8437500 | 15. TO: Position Title and Number | | S8437500 |
|---|---|---|---|---|---|
| INFORMATION ASSISTANT | | | INFORMATION ASSISTANT | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Lvl | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Lvl | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 00303 | 06 | 09 | $37,315.00 | PA | GS | 00303 | 06 | 09 | $38,106.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $33,098.00 | $4,217.00 | $37,315.00 | $0.00 | $33,594.00 | $4,512.00 | $38,106.00 | $0.00 |

| 14. Name and Location of Position's Organization | 281232 | 22. Name and Location of Position's Organization | 281232 |
|---|---|---|---|
| RECORDS PROCESSING BRANCH<br>RECORDS SERVICES DIVISION<br>OFFICE OF INFORMATION MANAGEMENT AND LIA<br>DEP ASST SEC FOR PASSPORT SERVICES | | RECORDS PROCESSING BRANCH<br>RECORDS SERVICES DIVISION<br>OFFICE OF INFORMATION MANAGEMENT AND LIA<br>DEP ASST SEC FOR PASSPORT SERVICES | |

| EMPLOYEE DATA | | | | | | |
|---|---|---|---|---|---|---|
| 23. Veterans Preference | | | 24. Tenure | | 25. DoS Tenure | 26. Veterans Preference for RIF |
| 1 | 1-None<br>2-5 Point | 3-10 Point/Disability<br>4-10 Point/Compensable | 5-10 Point/Other<br>6-10 Point/Compensable/30% | 1 | 0-None  2-Conditional<br>1-Permanent  3-Indefinite | 21 | YES    X   NO |
| 27. FEGLI | | | 28. Annuitant Indicator | | | 29. Pay Rate Determinant |
| C0 | Basic Only | | 9 | 9 - Not Applicable | | 0 |
| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | | 33. Part-Time Hours Per Biweekly<br>Pay Period |
| C | C - FICA and CSRS (Partial) | 12-05-1984 | F | Full Time | | |

| POSITION DATA | | | | | |
|---|---|---|---|---|---|
| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | | 37. Bargaining Unit Status |
| 1 | 1-Competitive Service  3-SES General<br>2-Excepted Service  4-SES Career | N   E-Exempt<br>N-Nonexempt | 0613.0-1097  1111, 0000 | | 0070 |
| 38. Duty Station Code | | 39. Duty Station   (City-County-State or Overseas Location) | | | |
| 110010001 | | WASHINGTON, DIST OF COLUMBIA | | | |
| 40. DOG | 41. WGI Due | 42. Prim Skill | 43. HR Processor | 44. | |
| 27-AUG-2000 | 20-AUG-2006 | | COLA | EMPLID 109799 | |

| 45. Remarks |
|---|
| - Salary includes general increase of 1.5 percent and a locality payment (or other geographic adjustment) applicable in this area. |

| 46. Employing Department or Agency | | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|
| DEPARTMENT OF STATE | | |
| 47. Agency Code | 48. Personnel Office ID   49. Approval Date | PEARSON, W ROBERT |
| ST00 | 2951            01-10-2004 | DIR GEN OF FS /DIR OF PERS |

Editions Prior to 7/91 Are Not Usable After 6/30/93

■ Attachment 02 ■

■ Attachment 03 ■

U.S. Department of State

# EMPLOYEE PERFORMANCE PLAN, PROGRESS REVIEW AND APPRAISAL REPORT
## GENERAL SCHEDULE, SENIOR LEVEL AND PREVAILING RATE EMPLOYEES

### SECTION I - EMPLOYEE DATA

Employee Name (Last, First, Middle)
CHERUS          Eddie          S.

Position Title File Assistant

Office Symbol CA/PPT/IML/R/P/QA.

Pay Plan, Series, and Grade GS-06

Social Security Number 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

Period Covered

From: (mm-dd-yyyy)    01-01-2003
To: (mm-dd-yyyy)      12-31-2003

Type of Report:  ☒ Rating of Record or  Interim Rating:   ☐ (a) Change of Rating Official   ☐ (b) Change of Employee/Departure   or  ☐ (c) Other  ☐

### SECTION II - PERFORMANCE PLAN - JOB ELEMENTS AND PERFORMANCE STANDARDS

#### PART 1 -- CERTIFICATION OF PERFORMANCE PLAN -- JOB ELEMENTS and PERFORMANCE STANDARDS:

A. ☒ The rating official and employee agreed to the Performance Plan on    05-01-2003    (Date (mm-dd-yyyy))

B. ☐ If changes were made to the performance plan during the rating period, explain the change below and specify the date of the change.

C. ☐ The rating official and the employee did not agree to the Performance Plan, therefore, the rating official has informed the employee of this decision to establish the Plan and provided a copy of the Plan to the employee on _____ (Date (mm-dd-yyyy))

Stephen G. Cox
Type Name of Rating Official

_(signature)_    05-01-2003
Signature of Rating Official    Date (mm-dd-yyyy)

_(signature)_    05-01-2003
Signature of Employee    Date (mm-dd-yyyy)

_(signature)_    05-01-2003
Signature of Reviewing Official    Date (mm-dd-yyyy)

#### PART 2 -- GENERIC PERFORMANCE STANDARDS:  The Generic Performance Standards are the primary basis for assigning element ratings in the Department of State. The Generic Performance Standards define levels of performance in terms of quality and quantity and level of supervision required. The following definitions have been condensed. For the complete Generic Performance Standards (including standards for supervisory positions), refer to form DS-1986A, Generic Performance Standards.

**Outstanding:** This is a level of exceptionally high-quality performance. The quality and quantity of the employee's work substantially exceeds the fully successful standard and rarely leave room for improvement.

**Excellent:** This is a level of unusually good performance. The quality and quantity of work under this element are consistently above average.

**Fully Successful:** This is a level of good, sound performance. The quality and quantity of the employee's work under this element are those of a fully competent employee. The performance represents a level of accomplishment expected of a great majority of competent employees.

**Unacceptable:** The quality and quantity of the employee's work under this element are not adequate. The employee's work products fall short of requirements.

DS-1980
04-2001

---

Name of Employee    CHERUS, Eddie S.    SSN:  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

#### PART 3A -- CRITICAL & NON-CRITICAL JOB ELEMENTS:  A job element is a statement of the major work assignments and responsibilities. Job elements should be clear, concise and consistent with the objectives of the organization and the requirements established for other employees with similar responsibilities. Once the job elements are established, they must be designated as critical or non-critical. (At least one element must be critical.) A critical job element is a work assignment or responsibility of such importance that unacceptable performance on this element would result in a determination that an employee's overall performance is unacceptable. A Performance Plan may contain up to a combined maximum of five critical and non-critical job elements (including mandatory elements such as "Supervision and Office Management", "Internal Controls", and/or "Security Awareness"; and no more than two "additional" elements.  (See instructions for definitions of non-critical and "additional" job elements.)

**ELEMENT APPRAISAL:** Assess the employee's performance and assign an appraisal level that best describes the level achieved.   O = Outstanding; E = Excellent; FS = Fully Successful; U = Unacceptable.

|  | ELEMENT APPRAISAL |
| --- | --- |
| | O     E     FS     U |

#### JOB ELEMENT DESCRIPTION:

**JOB ELEMENT 1**
☒ Critical   ☐ Non-Critical

Reviews PPM logs of processed batches and performs verification from microfilm to the PPM database of each batch's completeness and accuracy. Provides referrals to a Quality Assurance Specialist for higher level reviews, suggesting further corrections to PPM. Performs structured BBUILD.PR data entry or QUERY.PR modify to SQI databases directly controlled and supervised by the Records Services Division. The performance standards are as follows for Fully Successful: 1) for QUERY.PR modifies an average 500 per day/2,500 entries per week for completion of the CARF field only or 2) for BBUILD.PR an average 300 entries per day/1,500 entries per week for complete data entry. An accuracy rate of 98% is the standard for this job element.

The incumbent was not required to perform this job element during the rating period.

ELEMENT 1:  ☐ O   ☐ E   ☐ FS   ☐ U

**JOB ELEMENT 2**
☒ Critical   ☐ Non-Critical

Performs structured PRISM Data Entry to SQI databases directly controlled and supervised by the Records Services Division. The performance standard for PRISM Data Entry is as follows for Fully Successful: an average 300 entries per day/1,500 entries per week for complete data entry. An accuracy rate of 98% is the standard for this job element.

ELEMENT 2:  ☐ O   ☒ E   ☐ FS   ☐ U

**JOB ELEMENT 3**
☒ Critical   ☐ Non-Critical

Performs PRISM MPDQA reviews for the detection of incorrectly referenced images, making corrections as appropriate. The performance standards for PRISM MPDQA work are as follows: 1) Fully Successful is an hourly box rate of 1 an hour/7.5 per day/37.5 per week, 2) Excellent is an hourly box rate of 1.28 an hour/9.5 per day/48 per week and 3) Outstanding is an hourly box rate of 1.6 and above an hour/12 per day/60 per week. An accuracy rate of 98% is the standard for this job element.

ELEMENT 3:  ☐ O   ☒ E   ☐ FS   ☐ U

DS-1980

| Name of Employee | Cheirs, Eddie S | SSN: | 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 |
|---|---|---|---|

## SECTION III - NARRATIVE SUMMARY

The rating official must provide narrative that assesses the employee's accomplishments for each critical and non-critical job element. Describe how the employee's performance exceeded, met or did not meet the Generic or other approved performance standard.

Mr. Eddie Cheris's performance was critical to the proper operation and monitoring of the division's Passport Information Electronic Records System (PIERS) and Passport Records Imaging System Management (PRISM) databases. His overall rating this period is Outstanding.

Mr. Cheris did not perform any critical Job Element 1 this rating period since we no longer update the Passport File Minimization (PFM) database with microfilm cartridge numbers or perform data entry from PFM batch logs.

Mr. Cheris performed Job Element 2 at the outstanding level. He used the PRISM Data Entry software to enter passport and CRBA records into Passport Services databases. The period of using the PRISM Data Entry software ended on 18 April 2003 with the release 2.0.11. Mr. Cheris quickly and accurately learned to perform data entry of CRBA, with the new software. The quality of his work with this software was not easy well and continuously improved throughout the rating period. He also identified to his supervisors and useful potential enhancements (e.g., hot-keys, default values and improved set focus to Enter).

Mr. Cheris performed Job Element 3 at the excellent level. He used the PRISM Multi-page Data Quality Assurance (MPDQA) software to perform reviews of digital images and detect incorrectly referenced images, making corrections as appropriate. He performed this function at an hourly rate of 1.4 boxes per hour with an accuracy rate of 98%.

Mr. Cheris performed Job Element 4 at the outstanding level. He was always eager to perform other duties as assigned by the supervisors. His performance of QA reviews and final reviews of CRBA data records helped the CRBA Team during the transition period from PFM to PIERS. Mr. Cheris showed initiative by investing a layout for a Foreign Service Posts help books. He also gave valuable administrative skills. He assisted the supervisor in investing a layout for a Foreign Service Posts help books. He was instrumental in assigning a special exercise of PIERS records to locate issuance dates for TI-series passports. Mr. Cheris provided valuable information for performing User Acceptance Test of the PIERS 2.0.2 and 2.0.3 software releases. Mr. Cheris provided valuable information for improving the graphical-user interface (GUI) of the new software.

Mr. Cheris performed Job Element 5 at the outstanding level. He was fully aware of his responsibilities for security awareness. He demonstrated consistent attention to all internal control measures, complete confidentiality with Privacy Act-considerations and through reliability in taking the appropriate course of action to maintain the highest standards possible. His attention to a "clean-desk" policy is admirable.

---

| Name of Employee | CHEIRS, Eddie S. | SSN: | 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 |
|---|---|---|---|

**JOB ELEMENT 4**
☐ Critical   ☒ Non-Critical

Assists in the performance of other duties assigned the Quality Assurance Section and/or the Records Services Division as needed.

| | O | E | FS | U |
|---|---|---|---|---|
| | ☒ | ☐ | ☐ | ☐ |

**JOB ELEMENT 5**
☐ Critical   ☒ Non-Critical

SECURITY AWARENESS: Complies with all appropriate controls and procedures to protect organizational integrity and prevent unauthorized use or misappropriation of all classified and sensitive (but unclassified) material and equipment in assignment area(s); reports instances of security violations/problems to the appropriate supervisor/management official; assumes personal responsibility for safeguarding classified and sensitive (but unclassified) material and equipment within assignment area(s).

| | O | E | FS | U |
|---|---|---|---|---|
| | ☒ | ☐ | ☐ | ☐ |

**PART 3B -- ADDITIONAL JOB ELEMENTS:** Rating officials have an option of using "additional" job elements. Please read the paragraph below on the appropriate use of "additional" elements before proceeding.

"Additional" job elements are an aspect of individual, team, or organizational performance. "Additional" elements are not used in assigning the overall summary level. "Additional" job elements may be used to: communicate work objectives; performance expectations for teams, groups or organizations; and to provide feedback to employees on their individual performance of developmental assignments and on details that are less than 120 days. "Additional" elements need not be appraised at any particular level, or be included in the initial Performance Plan. No more than two "additional" elements can be used in an appraisal period. The Unacceptable level is not used when "additional" elements are appraised.

**ADDITIONAL JOB ELEMENT 1**

| | O | E | FS |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

**ADDITIONAL JOB ELEMENT 2**

| | O | E | FS |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

DS-1905

Name of Employee: Cherls, Eddie S.    SSN: 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

**SECTION IV – SUMMARY LEVEL DETERMINATION, RATING OFFICIALS APPROVAL, AND EMPLOYEE COMMENTS**

**PART 1 – SUMMARY LEVEL DETERMINATION:** When a rating of record or an interim performance rating is prepared, an overall summary level must be assigned to the rating. Base it on the level assigned to each critical and non-critical job element, rating official/s must use the instructions below to determine the summary level. Prior to documenting the summary level determination on the appraisal form, the rating official must share and discuss a draft of the appraisal report and the proposed summary level determination with the employee. The employee must also have an opportunity to comment formally on his/her final appraisal report in Part 3 below. (See Instructions for additional guidance.)

☒ **Outstanding:** The majority of elements (critical and non-critical) have been rated at the Outstanding level with the remainder being rated no lower than Excellent.

☐ **Excellent:** The majority of elements (critical and non-critical) have been rated at the Excellent level or above, with the remainder being rated no lower than Fully Successful. Exceptions: (1) When one of two or two of four elements are rated at the Outstanding level and the remainder are rated no lower than Successful, the overall rating would be Excellent; (2) When a majority of elements (critical and non-critical) are rated at the Outstanding level and a remaining non-critical element is rated Unacceptable, the overall summary level is Excellent (this should rarely occur).

☐ **Fully Successful:** All critical elements have been rated at least Fully Successful. Unacceptable on a non-critical element results in an overall summary level of Fully Successful.

☐ **Unacceptable:** One or more critical elements has been rated Unacceptable.

**PART 2 – RATING OFFICIAL'S APPROVAL OF THE RATING OF RECORD or INTERIM PERFORMANCE RATING** (See Type of Appraisal Report in Section I)

Signature of Rating Official _Cory A. Bint_    Date (mm-dd-yyyy) _02/10/2004_

**PART 3 – EMPLOYEE COMMENTS** (Optional). You may use this section to comment on your performance for this appraisal period. You may also indicate the extent to which your supervisor helped develop your knowledge, skills and abilities.

---

Name of Employee: Cherls, Eddie S.    SSN: 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

**SECTION V – CERTIFICATION OF PROGRESS REVIEW, REQUEST FOR HIGHER LEVEL REVIEW, APPROVAL BY THE REVIEWING OFFICIAL AND APPRAISAL DISCUSSION**

**PART 1 – PROGRESS REVIEW CERTIFICATION:** The supervisor is required to have at least one progress review during the appraisal period, usually in mid-cycle. This discussion should involve a review of the employee's job elements and performance standards, strengths, weaknesses, performance deficiencies, recommendations for improvement, developmental training and assignments, and supervisory expectations for the remainder of the appraisal period. (The optional Progress Review form DS-1967 may be used to facilitate discussion, but it does not become part of this appraisal report.) Indicate Date(s) (mm-dd-yyyy) of Progress Review(s) and sign below:

(1) _08-20-2003_    (2) _____    (3) _____

Signature of Rating Official _Cory A. Bint_    Date (mm-dd-yyyy) _08/20/2004_

**PART 2 – EMPLOYEE'S REQUEST FOR A HIGHER LEVEL REVIEW BY THE REVIEWING OFFICIAL:** I understand that I may request a higher level review of my appraisal report by the reviewing official.

☐ I do    ☐ I do not request a higher level review.

Signature of Employee _____    Date (mm-dd-yyyy) _____

**PART 3 – REVIEWING OFFICIAL'S APPROVAL OF RATING OF RECORD or INTERIM PERFORMANCE RATING:** Reviewing official completes this section when the employee opts for a higher level review. Comments are required when the rating is changed or the overall summary rating is unacceptable.
The Final Summary Level Determination is:

☐ OUTSTANDING    ☐ EXCELLENT    ☐ FULLY SUCCESSFUL    ☐ UNACCEPTABLE

REVIEWING OFFICIAL'S COMMENTS (Use continuation sheet for additional comments):

**PART 4 – APPRAISAL DISCUSSION:** We acknowledge that an appraisal discussion was held and that the employee has been provided with a copy of his/her appraisal report. The employee's signature on this appraisal report acknowledges receipt of the rating and does not constitute agreement with the rating.

Signature of Rating Official _Cory A. Bint_    Date (mm-dd-yyyy) _02/10/2004_

Signature of Reviewing Official _____    Date (mm-dd-yyyy) _____

☒ The employee has not signed this appraisal report. This appraisal is being submitted in accordance with 3 FAM 2820, and the employee has received a copy of it.

**SECTION VI – TECHNICAL REVIEW**

A technical review of this rating has been completed in accordance with 3 FAM 2827.3.

Signature of Executive Director/Designate _____    Date (mm-dd-yyyy) _____

■ **Attachment 03** ■

# / / / / / / / / / / / / / / / /    Affidavit

Approximately four/five years ago, I happen to see, Eddie Cheris slip and fall onto the wet (hallway) floor leading out to the back of the building at 1111 – 19th Street). Mr. Cheris landed squarely on his back and I asked him if he was all right. He said yes, but he had a difficult time getting up and walking away.

Over time, I have become friends with Mr. Cheris, whom I have noticed has been walking with a limp.

I understand from Mr. Cheris that ever since this floor accident occurred he has had back problems; which have gotten worse.

On 11 June 2002, Mr. Cheris approached me, to ask, if I would provide an affidavit or written description of the floor accident.

Name: EMMA FRANCES CAlwell

Address: 4801 Connecticut Ave N.W #11 DC

Telephone Number: office (202) 833-1111

Signature: C. Frances Calwell

Date: 6/14/02

# / / / / / / / / / / / / / / / /    Source

**■ Attachment 04 ■**

The George
Washington
University
WASHINGTON DC

MEDICAL CENTER

DIVISION OF OTOLARYNGOLOGY/HEAD AND NECK SURGERY

OTOLARYNGOLOGY/
HEAD AND NECK SURGERY
William R. Wilson, M.D., F.A.C.S.
PROFESSOR AND CHIEF
(202) 994-4008

Steven Bielamowicz, M.D.
ASSISTANT PROFESSOR AND
DIRECTOR, VOICE TREATMENT CENTER
(202) 994-4918

NEUROTOLOGY
David A. Schessel, Ph.D., M.D.
ASSISTANT PROFESSOR
(202) 994-5926

July 5, 2001

Charles J. Faselis, M.D.
Assistant Professor of Medicine
Division of General Internal Medicine
#3-426

RE:     Eddie Cheris
MR#:   231710 0
DOB:   2/8/59

Dear Dr. Faselis:

This letter is in reference to Eddie Cheris, a 42-year-old gentleman who I saw in my office for a complaint of tinnitus. This is in the left ear. It is a continuous tone that is occasionally bothersome. It seems to get louder when he is in background noise. This has been going on for a year, and initially he would lose sleep because of the sound. At this point, he is tolerating it much better. He does not really notice significant hearing loss, but does recognize that things like certain bird sounds are not coming through in this left ear at times. He has no dizziness, no imbalance, no vertigo, no history of ear infections, pain or pressure in either ear. He also works in a loud office place, but it is usually people's voices with a lot of screaming and yelling. However, he has used protection for the last year or so. He has not suffered a major trauma. He does not use Q-tips excessively, has had no barotrauma and no ototoxic substance exposure that I can determine. He has no history of bruxism. He does have a history of diplopia with a left eye muscle problem but no symptoms referable to other cranial nerves. Past medical history is uncomplicated. He takes no medications regularly. Social history is significant for three cups of caffeinated coffee a day, two packs of cigarettes a day, but no excessive use of alcohol. Family history is uncomplicated.

DEPARTMENT OF SURGERY
2140 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, DC 20037 • (202) 994-4608 • FAX (202) 994-4596

---

Page Two
RE:   Eddie Cheris
July 5, 2001

On physical exam, the head and neck are normal. The head is normocephalic and atraumatic. The ears demonstrate normal pinnae, external auditory canals, tympanic membranes, and middle ear structures. The tympanic membranes are mobile on insufflation. Tuning fork testing at 512 Hz demonstrates a nonlateralizing Weber and Rinne with air greater than bone conduction bilaterally. The nose demonstrates normal mucosa, no significant rhinorrhea, nasal polyps, or masses. The septum is midline. Oral examination demonstrates a midline uvula and tongue. The mucosa is normal. Salivary ducts and glands are normal, as is dentition, grossly. Pharyngeal examination demonstrates a normal naso-, oro-, and hypopharynx. In the latter, the vocal cords are mobile and no lesions are observed. The neck is without masses. Thyroid appears normal and anatomic landmarks are correct. Temporomandibular joints are normal. Cranial nerves are also normal including an absence of spontaneous and gaze-associated nystagmus with and without visual fixation and mental alerting.

An audiogram was performed recently which demonstrates a unilateral high-frequency sensorineural hearing loss localized to the left ear. This does not affect speech understanding though and would not be expected to affect understanding of hearing of spoken words as the primary hearing loss really cuts in above the speech frequencies, and it only drops to about 30 dB at its worst, which is only a borderline abnormal number. Given the unilateral hearing loss and tinnitus in this ear, it is important to rule out some lesion and, therefore, we have gone on and ordered an MRI. The patient expressed some discomfort with the MRI. I have reassured him that it is a very safe study. In addition, we talked about treatment of tinnitus. At this point, I think the only thing I would consider doing is getting a white noise masker. We talked about using this in quiet situations to block out background noise, and, in addition, to continue his efforts towards noise suppression in the workplace. His hearing loss does look very much like a right-handed individual who has used rifles, but it may easily/be augmented by the high level of background noise, and certainly this increases his stress which unquestionably increases the intensity of tinnitus. But we will see how he does and I will keep you apprised. Please let me know if you have any recommendations or questions. I would suggest he get a hearing test in one year's time pending a normal MRI. Thanks very much for this referral and the opportunity to assist in this pleasant patient's care.

Respectfully,

David A. Schessel, Ph.D., M.D.
Associate Professor
Otolaryngology - Head and Neck Surgery

DAS:sti

■ Attachment 05 ■

# The George Washington University

## MEDICAL CENTER

### DIVISION OF GENERAL INTERNAL MEDICINE

Date: 2/13/01

Dear Mr. Chung

Here are the results of the laboratory tests we obtained during your last visit at GW:

Blood Count (CBC): _A BIT LOW_ (PROBABLY BENIGN) COMMON IN MEN OF AFRICAN DESCENT

Sugar (glucose): _Normal_

Kidney Blood Tests: _Normal_

Liver Blood Tests: _Normal_

Urinalysis: _Normal_

Chest X-ray: _Normal_

EKG: _Normal_

PSA (Prostate Specific Antigen): _Normal_

HIV: _NEGATIVE_

Sigmoidoscopy:

Mammogram:

Total Cholesterol: _236_ (A BIT HIGH)

LDL ("bad" subfraction): _147_ (A BIT HIGH)

HDL ("good" subfraction): _39_ (OK)

Triglycerides: _240_ (A BIT HIGH)

Thyroid Blood Tests: _Normal_

RECOMMENDATIONS:

① STOOL ANALYSIS NOT DONE

② EAR PROBLEM NEEDS TO BE ASSESSED BY ENT SPECIALIST. AS DISCUSSED DURING YOUR 10/5/01 APPOINTMENT KEEP TO REVISIT DR. FARRIS (MY SLIDE) FOR WORKUP OF LOW BLOOD COUNT (ANEMIA) AND HIGH CHOLESTEROL.

If you have any additional questions concerning the above information, please feel free to contact me at 202-994-4321.

Sincerely,

Gary Malakoff, MD, FACP
Associate Professor of Medicine
Director, Division of General Internal Medicine

THE H.B. BURNS MEMORIAL BUILDING • 2150 PENNSYLVANIA AVE., N.W. • WASHINGTON, DC 20037

DEPARTMENT OF MEDICINE
(202) 994-4834
FAX (202) 994-2936

---

## QUEST DIAGNOSTICS INCORPORATED

1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (U-14408)
4TH FLOOR SOUTH
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHUNG, EDDIE R
PATIENT ID #: 2262220
MED REC #: 237100

SPECIMEN COLLECTED: 06/14/2001  17:20
COMPLETED REPORT: 06/15/2001  08:03

### CHUNG, EDDIE S        06/14/2001    42  M  QA1534861

CONTINUATION OF REPORT - PAGE 2

CHEMISTRY:

| | | | | ** Reference Values ** | |
|---|---|---|---|---|---|
| AGE (YEARS) | 18 | YR | 8-45 | | |
| AGE (GOUT) | 31 | U/L | 30-130 | | |
| ALK PHOS- | 93 | U/L | 30-120 | | |
| TUV. BILI- | 0.4 | MG/DL | 0.1-1.2 | | |
| DIR. BILI- | 0.1 | MG/DL | 0.0-0.3 | | |
| TOT.PROT.- | 7.1 | G/DL | 6.0-8.5 | | |
| ALBUMIN--- | 4.5 | G/DL | 3.3-5.0 | | |
| GLOBULIN-- | 2.6 | G/DL | 1.9-4.5 | | |
| A/G RATIO- | 1.7 | | 0.9-2.6 | | |

| | | | | ** Interpretation Guidelines ** | |
|---|---|---|---|---|---|
| GLUCOSE--- | 91 | MG/DL | 65-115 | | |
| BUN------- | 14 | MG/DL | 8-25 | | |
| CREATININE | 1.3 | MG/DL | 0.5-1.6 | | |
| BUN/CREAT RATIO | 14.9 | | | | |
| CALCIUM--- | 9.6 | MG/DL | 8.6-10.6 | | |
| SODIUM---- | 143 | MMOL/L | 130-146 | | |
| POTASSIUM- | 4.7 | MMOL/L | 3.5-5.5 | | |
| CHLORIDE-- | 108 | MMOL/L | 95-108 | | |
| CO2------- | 23 | MMOL/L | 18-30 | | |

*CHOLESTEROL------------ | 236 | MG/DL
*TRIGLYCERIDES---------- | 240 | MG/DL
HDL CHOLESTEROL-------- | 39 | MG/DL
*LDL CHOLESTEROL, CALCULATED-- | 147 | MG/DL
CHOLESTEROL/HDL RATIO-- | 6.38 |

** Interpretation Guidelines **

Chol:
| Desirable/Optimal: | <200 |
| Near Optimal/Above Optimal: | 200-239 |
| High: | ≥239 |

Trig:
| Desirable/Optimal: | <150 |
| Borderline High: | 200-499 |
| High: | 200-499 |
| Very High: | ≥500 |

Relative Risk:
| Desirable/Low: | <3.43 |
| Average: | 3.43-4.96 |
| Above Average: | 4.97 |
| High/Major: | 59.55 |

LDL:
| | <100 |
| | 100-129 |
| | 130-159 |
| | 160-189 |
| | >190 |

HDL:
| | >60 |

Chol/HDL Ratio:
| | <3.43 |
| | 3.43-4.96 |
| | 4.97 |
| | 59.55 |

| | ( 0.4-5.5 ) |

TSH- | 1.3 | uIU/mL | ( 0.4-5.5 )

IMMUNOLOGY/VIROLOGY/IMMUNOCHEMISTRY:

HIV-1 AB, EIA- | NONREACTIVE

■ Attachment 05 ■



QUEST DIAGNOSTICS INCORPORATED
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (R-153358)
4TH FLOOR SOUTH
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 2362520
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S          06/14/2001  42  M  QA1534861

HEMATOLOGY:

| | | N/CMM | | |
|---|---|---|---|---|
| *WBC------ | (6.3) | N/CMM( 4.4-9.3) | | |
| *RBC------ | 4.41 | M/CMM(4.0-5.5) | | |
| HGB------ | N | (40.0-52.0) | | |
| HCT------ | N | 0-100) | | |
| *MCV------ | N | (80-100) | | |
| *MCH------ | N | (26.0-34.0) | | |
| MCHC----- | 31.3 | (31.0-36.0) | | |

COMMENT:
Slight Microcytosis.
Slight Hypochromasia.
The results of this hematology testhave been confirmed by review of a peripheral blood smear.
Platelets appear adequate.

| | | N/CMM | | M/CMM( 3.9-11.3) |
|---|---|---|---|---|
| WBC------ | 11.4 | | | |
| NEUT----- | 70 | N | | 0-10 |
| BANDS---- | 30 | N | | 15-45 |
| LYMPHS--- | 31 | N | | 15-45 |
| MONOS---- | 9 | N | | 0-12 |
| EOS------ | 3 | N | | 0-7 |
| BASO----- | 1 | N | | 0-2 |
| ATYP LYMPH| 0 | N | | 0-4 |

| PLATELET COUNT------- | 171 | K/CMM | ( 140 440 ) |
|---|---|---|---|
| *MPV | 10.0 | FL | ( 6.3 10.3) |

| MONOCYTES, ABSOLUTE------ | 1026 | /CMM | ( 0-1356) |
| LYMPHOCYTES, ABSOLUTE---- | 0514 | /CMM | ( 850 4100) |
| BASOPHIL ABSOLUTE------- | 114 | /CMM | ( 0-226 ) |
| SEGMENTED NEUTROPHILS, ABSOLUTE-- | 8564 | /CMM | (1639-8814) |
| EOSINOPHIL, ABSOLUTE----- | 46% | /CMM | ( 0-791 ) |
| RDW | 14.2 | N | (11.5 14.5) |

---

QUEST DIAGNOSTICS INCORPORATED
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (R-153358)
4TH FLOOR SOUTH
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 2362520
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S          06/14/2001  42  M  QA1534861

CONTINUATION OF REPORT -- PAGE 3

No HIV-1 antibodies detected.
A nonreactive test result does not completely exclude the possibility of HIV-1 infection since the time for seroconversion is variable. If clinically indicated, repeat testing in three months is suggested.

■ Attachment 05 ■

QUEST DIAGNOSTICS INCORPORATED
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (B-153398)
4TH FLOOR SOUTH
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 2362520
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S                          06/14/2001    42    M    QA1534861

CONTINUATION OF REPORT - PAGE 4

SEMEN ANALYSIS

LIQUEFACTION------------------------------------------------ NT (NOT TESTED)
An appropriate specimen was not submitted to perform the requested analysis.

TIME SPECIMEN COLLECTED------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

TIME SPECIMEN TESTED--------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

TOTAL VOLUME----------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

VISCOSITY-------------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

SPERM ANALYSIS

PH------------------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

---

QUEST DIAGNOSTICS INCORPORATED
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (B-153398)
4TH FLOOR SOUTH
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 2362520
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S                          06/14/2001    42    M    QA1534861

CONTINUATION OF REPORT - PAGE 5

LIQUEFACTION----------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

RAPID FORWARD PROGRESSION---------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

MOTILITY-FORWARD PROGRESSION------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

NON-PROGRESSIVE-------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

SPERM IMMOTILITY------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

ABNORMAL FORMS--------------------------------------------- NT
An appropriate specimen was not submitted to perform the requested analysis.

■ Attachment 05 ■



**QUEST DIAGNOSTICS INCORPORATED**
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (D-153398)
4TH FLOOR SOUTH            (33,A)
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 23625250
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S            06/14/2001    42    M    QA1534861

CONTINUATION OF REPORT -- PAGE 6.
An appropriate specimen was not submitted to perform the requested analysis.

MICROSCOPIC:
An appropriate specimen was not submitted to perform the requested analysis.

SPERM COUNT---------------------------------------NT

An appropriate specimen was not submitted to perform the requested analysis.

SPERM---------------------------------------------NT

An appropriate specimen was not submitted to perform the requested analysis.

MICROSCOPIC:
An appropriate specimen was not submitted to perform the requested analysis.

CLINICAL MICROSCOPY:
* COLOR---------------- DK YELLOW     (YELLOW, STRAW OR AMBER)
  CLARITY-------------- CLEAR         (CLEAR)
  SPECIFIC GRAVITY----- 1.027         (1.005-1.030)
  PH------------------- 5.5           (5.0-8.0)
  PROTEIN-------------- NEG.          (NEG.)
  GLUCOSE, QUAL-------- NEG.          (NEG.)
  KETONES-------------- NEG.          (NEG.)
  BILIRUBIN------------ NEG.          (NEG.)
  BLOOD---------------- NEG.          (NEG.)
  LEUKOCYTE ESTERASE--- NEG.          (NEG.)
  NITRITE-------------- NEG.          (NEG.)
  UROBILINOGEN/MG/DL--- 1.0           (0.2-1.0)

MICROSCOPIC:

---

**QUEST DIAGNOSTICS INCORPORATED**
1901 SULPHUR SPRING ROAD
BALTIMORE, MD 21227
(410) 247-9100

GARY MALAKOFF, M.D. (D-153398)
4TH FLOOR SOUTH            (33,A)
2150 PENNSYLVANIA AVE NW
WASHINGTON DC 20037

CHERIS, EDDIE S
PATIENT ID #: 23625250
MED REC #: 2317100

SPECIMEN COLLECTED: 06/14/2001 17:20
COMPLETED REPORT: 06/15/2001 08:03

CHERIS, EDDIE S            06/14/2001    42    M    QA1534861

CONTINUATION OF REPORT -- PAGE 7

MICROSCOPIC:
EPITHELIAL CELLS/HPF------- 0-2
NORMAL VALUES              0-2
WBC                                    RBC/HPF------- 0-2
                          (0-5)
EPITHELIAL CELLS          (0-5)     RBC          (0-2)

RESULTS WERE FAXED ON: 07/30/2001 10:53          (COMPLETED)          08/06/2001 11:12

■ Attachment 05 ■

Vent rate    88   BPM
PR interval    56   ms
QRS dura    94   ms
QT/QTc    334/404   ms
P–R–T axes    56   56    54

oc:5    Option:4

Technician:PATRICK GORMAN M.D.



marquette electronics inc.      JUPITER, FLORIDA U.S.A.



DAVID R. GROVER
MANAGER

The George Washington University
MEDICAL FACULTY ASSOCIATES

DEPARTMENT OF SURGERY
2150 PENNSYLVANIA AVE., N.W.
SUITE: 6B-403
WASHINGTON, DC 20037
PHONE: (202) 994-7640
FAX: (202) 994-4396
E-MAIL: surdrg@gwumc.edu

11/20/01



DAVID A. SCHESSEL, PH.D., M.D.
ASSOCIATE PROFESSOR OF SURGERY
OTOLARYNGOLOGY/NEUROSURGERY

The George Washington University
MEDICAL CENTER

DEPARTMENT OF SURGERY
2150 PENNSYLVANIA AVE, N.W.
WASHINGTON, DC 20037

(202) 994-9926
E-MAIL: surdss@gwumc.edu

OTOLARYNGOLOGY/NEUROSURGERY/SKULL BASE
SURGERY
DIZZINESS/VERTIGO/HEARING LOSS



The George Washington University   Health Plan
VIRGINIA • WASHINGTON DC • MARYLAND

Member ID #:
0101944115*01
Option: HIGH

THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.

Member Name: EDDIE S CHERIS
Sex: M   Date of Birth: 02/08/1959
Group #: 183*049H
Medical Record#: 2317100
Primary Care Provider:
CHARLES FASELIS
After Hours #: 202/994-2222

HMO 9/98

Copays:
PCP: $10
Spec: $10
Rx: $5-$15

PHARMACARE

Attachment 05

**THIS IS NOT A BILL**

PAGE 1

The George Washington University
**Health Plan**

SUBSCRIBER: CHERIS, EDDIE S

P. O. BOX 65035
WASHINGTON, DC 20035

VENDOR:  MEDICAL FACULTY ASSOC

PROVIDER:  01902   LONDUGANN COVOR

DOCUMENT NAME: 117800063
MEMBER CONTRACT NO. 010194415*01
MEMBER NAME: CHERIS, EDDIE S
REPORT DATE: 07-03-01

**EXPLANATION OF BENEFITS**

| SERVICE CODE & DESCRIPTION | SUBMITTED CHARGE | MAXIMUM ALLOWABLE AMOUNT | REASON CODE | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|
| 93000  ELECTROCARDIOGRAM, COMPLE | 92.00 | 32.74 | | | 0.00 |
| TOTAL | 92.00 | 32.74 | | | 0.00 |

**DETAILED BENEFIT INFORMATION**

| SERVICE CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|
| 93000  06/14/01-06/14/01 | 32.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL | 32.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**THIS IS NOT A BILL**

THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

---

**THIS IS NOT A BILL**

PAGE 1

The George Washington University
**Health Plan**

SUBSCRIBER: CHERIS, EDDIE S

DOCUMENT NAME: 117000095
MEMBER CONTRACT NO. 010194415*01
MEMBER NAME: CHERIS, EDDIE S
REPORT DATE: 05-26-01

**EXPLANATION OF BENEFITS**

| SERVICE CODE & DESCRIPTION | SUBMITTED | MAXIMUM ALLOWABLE | REASON CODE | | TOTAL BENEFIT |
|---|---|---|---|---|---|
| | 90.00 | 59.22 | | | 0.00 |
| | 0.00 | 37.22 | | | 0.00 |

99213  OFFICE/OUTPATIENT VISIT,

**DETAILED BENEFIT INFORMATION**

| SERVICE CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|
| 99213  05/14/01-05/14/01 | 59.22 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 |

**THIS IS NOT A BILL**

THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

■ Attachment 05 ■

THIS IS NOT A BILL

**Health Plan**
VIRGINIA • WASHINGTON, DC • MARYLAND

PAGE 1

SUBSCRIBER: CHERIS, EDDIE S

DOCUMENT NAME: 118700065

P. O. BOX 65685
WASHINGTON, DC 20035

MEMBER CONTRACT NO. 010194415901

MEMBER NAME: CHERIS, EDDIE S

VENDOR: MEDICAL FACULTY ASSOC

REPORT DATE: 07-10-01

PROVIDER: 06485    SCHESSEL, DAVID A.

EXPLANATION OF BENEFITS

| SERVICE CODE & DESCRIPTION | SUBMITTED CHARGE | MAXIMUM ALLOWABLE AMOUNT | REASON CODE | TOTAL BENEFIT |
|---|---|---|---|---|
| 99243   OFFICE CONSULTATION | 197.00 | 141.00 | | 0.00 |
| TOTAL | 197.00 | 141.00 | | 0.00 |

DETAILED BENEFIT INFORMATION

| SERVICE CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|
| 99243   06/26/01-06/26/01 | 141.00 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 |
| TOTAL | 141.00 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 |

THIS IS NOT A BILL
**THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.**
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

PO8008 (11/98)

---

THIS IS NOT A BILL

**Health Plan**
VIRGINIA • WASHINGTON, DC • MARYLAND

PAGE 1

SUBSCRIBER: CHERIS, EDDIE S

DOCUMENT NAME: 117700105

P. O. BOX 65685
WASHINGTON, DC 20035

MEMBER CONTRACT NO. 010194415901

MEMBER NAME: CHERIS, EDDIE S

VENDOR: MEDICAL FACULTY ASSOC

REPORT DATE: 07-03-01

PROVIDER: 10187    KARCHER, DONALD S.

EXPLANATION OF BENEFITS

| SERVICE CODE & DESCRIPTION | SUBMITTED CHARGE | MAXIMUM ALLOWABLE AMOUNT | REASON CODE | TOTAL BENEFIT |
|---|---|---|---|---|
| 36415   DRAWING BLOOD | 15.00 | 5.00 | | 5.00 |
| TOTAL | 15.00 | 5.00 | | 5.00 |

DETAILED BENEFIT INFORMATION

| SERVICE CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|
| 36415   06/14/01-06/14/01 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| TOTAL | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |

■ **Attachment 05** ■

THIS IS NOT A BILL
**THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.**
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

PO8008 (11/98)

## Health Plan (The George Washington University)

**THIS IS NOT A BILL**

PAGE 1

SUBSCRIBER: CHERIS, EDDIE S

DOCUMENT NAME: 117610967

MEMBER CONTRACT NO: 010194415901

MEMBER NAME: CHERIS, EDDIE S

P. O. BOX 65685
WASHINGTON, DC 20035

VENDOR: COYNE, MD, PATRICK A.

PROVIDER: 00558    COYNE, PATRICK A

REPORT DATE: 07-17-01

EXPLANATION OF BENEFITS

| SERVICE CODE & DESCRIPTION | SUBMITTED CHARGE | MAXIMUM ALLOWABLE AMOUNT | REASON CODE | TOTAL BENEFIT |
|---|---|---|---|---|
| 99214 OFFICE/OUTPATIENT VISIT | 195.00 | 97.93 | | 77.93 |
| 92557 COMPREHENSIVE HEARING TES | 95.00 | 55.63 | | 55.63 |
| 92567 TYMPANOMETRY | 50.00 | 24.41 | | 24.41 |
| 92568 ACOUSTIC REFLEX TESTING | 20.00 | 17.71 | | 17.71 |
| 92569 ACOUSTIC REFLEX DECAY TES | 20.00 | 18.98 | | 18.98 |
| TOTAL | 290.00 | 204.66 | | 204.66 |

DETAILED BENEFIT INFORMATION

| SERVICE | CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|---|
| 99214 | 06/18/01-06/18/01 | 97.93 | 0.00 | 0.00 | 10.00 | 0.00 | 77.93 |
| 92557 | 06/18/01-06/18/01 | 55.63 | 0.00 | 0.00 | 0.00 | 0.00 | 55.63 |
| 92567 | 06/18/01-06/18/01 | 24.41 | 0.00 | 0.00 | 0.00 | 0.00 | 24.41 |
| 92568 | 06/18/01-06/18/01 | 17.71 | 0.00 | 0.00 | 0.00 | 0.00 | 17.71 |
| 92569 | 06/18/01-06/18/01 | 18.98 | 0.00 | 0.00 | 0.00 | 0.00 | 18.98 |
| TOTAL | | 204.66 | 0.00 | 0.00 | 10.00 | 0.00 | 194.66 |

THIS IS NOT A BILL
THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

■ Attachment 05 ■

---

## Health Plan (The George Washington University)

**THIS IS NOT A BILL**

PAGE 1

SUBSCRIBER: CHERIS, EDDIE S

DOCUMENT NAME: 117012356

MEMBER CONTRACT NO: 010194415901

MEMBER NAME: CHERIS, EDDIE S

P. O. BOX 65685
WASHINGTON, DC 20035

VENDOR: COYNE, MD, PATRICK A.

PROVIDER: 00558    COYNE, PATRICK A

REPORT DATE: 07-10-01

EXPLANATION OF BENEFITS

| SERVICE CODE & DESCRIPTION | SUBMITTED CHARGE | MAXIMUM ALLOWABLE AMOUNT | REASON CODE | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|
| 99205 OFFICE/OUTPATIENT VISIT | 155.00 | 155.00 | | 0.00 | 145.00 |
| TOTAL | 155.00 | 155.00 | | 0.00 | 145.00 |

DETAILED BENEFIT INFORMATION

| SERVICE | CODES & DATES | MAXIMUM ALLOWABLE AMOUNT | DEDUCT. | COPAY | COINS. | OTHER INS. | TOTAL BENEFIT |
|---|---|---|---|---|---|---|---|
| 99205 | 06/15/01-06/15/01 | 155.00 | 0.00 | 0.00 | 10.00 | 0.00 | 145.00 |
| TOTAL | | 155.00 | 0.00 | 0.00 | 10.00 | 0.00 | 145.00 |

THIS IS NOT A BILL
THE GEORGE WASHINGTON UNIVERSITY HEALTH PLAN, INC.
4550 Montgomery Avenue, Suite 800 • Bethesda, Maryland 20814 • (301) 941-2021

POS038 (1/98)

THE G__RGE WASHINGTON UNIVERSITY __SPITAL
DEPARTMENT OF MEDICAL IMAGING
DIAGNOSTIC REPORT

PATIENT:    EDDIE CHERIS

10/19/01 030

MED REC#:    02317100    54600705 MRI BRAIN W/WO CONTRAST

VT:      O
ROOM:    OP
D.O.S:   10/19/01
D.O.B:   02/08/59          DAVID SCHESSEL, M.D.
                           DEPT OF SURGERY
                           ACC 6B-416

CLINICAL HISTORY:  The patient is  a 42 year old  man with history of
ringing in the left ear.

MRI OF THE BRAIN WITH AND WITHOUT CONTRAST:

TECHNIQUE:  MR examination of the brain includes sagittal T1 and FLAIR
and T2-weighted images.  Axial, coronal and sagittal T1-weighted
images  were also obtained following the administration of intravenous
Gadolinium.  There are no prior studies available for comparison.

FINDINGS:   The brain architecture is normal.  There is no evidence of
midline shift, mass effect, or clot.  The ventricles are normal in
size, position and configuration.

There is no evidence of extra-axial fluid collections.  There are no
enhancing lesions identified.

There is a left maxillary sinus mucous retention cyst seen.

The cerebellar tonsils are slightly low lying but are within normal
limits.

IMPRESSION:

1.  Left maxillary mucous retention cyst.

2.  No acute intracranial  pathology or lesions  seen within the left
internal auditory canal.


Claude G. Raphael, M.D.

I attest to the fact that I have reviewed the above images and agree
with the above.


Lucien M. Levy, M.D.
J# 347242

**Dr. Patrick A. Coyne, M.D., P.C.**
**Ear, Nose, and Throat**

Kathy Grace
Audiologist

Name: _Eddie Cheris_   D.O.B. _____   Age: _____   Sex: _____   Date _____

Test Reliability: _good_   Audiologist: _Kathy Grace, M.A._

## AUDIOGRAM FREQUENCY (Hz)

| AUDIOGRAM (KEY) | | | | | | |
|---|---|---|---|---|---|---|
| | AIR | | BONE | | | |
| EAR | | Masked | | Masked | NR | |
| R | O-O | Δ-Δ | <··< | [-[ | / | |
| L | X-X | □-□ | >·> | ]-] | | |
| Un-specified | | | ∧ | | ↓ | S |

### SPEECH AUDIOMETRY

| | EAR | SRT dBHL | SAT dBHL | PB% dBHL | PB% dBHL |
|---|---|---|---|---|---|
| TAPE □ | RIGHT | S | | 96% | |
| | Masking | | | 48 | |
| | LEFT | S | | 100% | |
| MLV □ | Masking | | | 4C | |
| | AIDED | | | | |
| | AIDED | | | | |

Test Lists:
Hearing Aid Make & Model:
Settings:
Vol. Wheel:
Earmold/Ear:

① tinnitus, sensitive to loud sounds

## MASKING LEVEL in dB

### ACOUSTIC IMMITTANCE

| EXAMINER'S INITIALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PROBE RIGHT | RESTING PRESSURE | PVT | STATIC MEASUREMENT | | PROBE LEFT | RESTING PRESSURE | PVT | STATIC MEASUREMENT |
| | S | 1.6 | 1.8 | | | O | 1.9 | 0.6 |

| STIMULUS LEFT | CONTRALATERAL AR THRESHOLDS | | | | REFLEX DECAY | | STIMULUS RIGHT | CONTRALATERAL AR THRESHOLDS | | | | REFLEX DECAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 500 | 1000 | 2000 | 4000 | 500 | 1000 | | 500 | 1000 | 2000 | 4000 | 500 |
| | CNT | | | | | | | CNT | | | | |

| STIMULUS RIGHT | IPSILATERAL AR THRESHOLDS | HALF-LIFE | STIMULUS LEFT | IPSILATERAL AR THRESHOLDS | HALF-LIFE |
|---|---|---|---|---|---|

### TYMPANOGRAM

sensitivity

### COMMENTS

AD WNL
AS- mild HF SNHL
tymps WNL AU
CNT reflexes because pt. could
not tolerate loud noise.
Speech discrim excellent AU

■ Attachment 05 ■

PATRICK A. COYNE, M.D.
1145 19TH STREET, N.W.
SUIT 204
WASHINGTON, DC 20036
202-331-1011  202-331-1014

NAME

ADDRESS                           DATE

R

■ **Attachment 05** ■



■ **Topology of 5th Floor Passport Facility Workstation Relocation Points**

June 2000 my workstation was located at position 1. By September 2000; Tasha Thian requested I move my workstation to position 2. By January 2001. Mr. Cox, Mr. Thompson, Ms. Sampson and myself relocated are workstations to position 3.

LOUIS E. LEVITT, M.D.
MARC B. DANZIGER, M.D.
JASON W. NASCONE, M.D.
PRACTICE LIMITED TO ORTHOPAEDIC SURGERY & MEDICINE

1850 M Street N.W. - Suite 750 - Washington, D.C. 20036 - (202) 835-2222 - Facsimile (202) 659-8724

**NAME: Eddie Cheris**

**DATE:** January 30, 2002

**CHIEF COMPLAINT:** Left-sided hip and leg pain.

**HISTORY OF PRESENT ILLNESS:** Mr. Cheris reports a lifting injury several months ago while lifting some heavy wood. He noted pain in his lumbar region, extending down his leg. He used Ben-Gay and tiger balm but did not seek any significant treatment. He noticed significant improvement with moist heat. At this point, his back is not bothering him as much, but he is having intermittent discomfort that tends to get worse with activities.

**PHYSICAL EXAMINATION:** On examination today, he has full range of motion of his hips, knees, and ankles bilaterally. He has 5/5 motor strength in all groups. His sensation is intact to light touch throughout. He has brisk patellar reflexes and symmetric Achilles reflexes. He has no clonus and has downgoing toes. He has a markedly positive straight leg raising sign on the left.

**IMPRESSION:** My impression is that he has sciatic nerve root irritation.

**PLAN:** I think it would be reasonable to get him started on an oral anti-inflammatory. I gave him samples of Mobic, as well as a prescription, and instructed him on moist heat. He will follow-up in a two-to-three-week period, at which point we will reevaluate him and, if he is improving, hopefully get him started in a therapy program.

Jason W. Nascone, M.D.

JWN/jb



R<sub>X</sub> only

**Dosage:** Read accompanying
prescribing information.

Store at 25°C (77°F); excursions per-
mitted to 15°-30°C (59°-86°F). Keep in
a dry place.

Manufactured by Boehringer Ingelheim
Pharma KG, Ingelheim, Germany

Licensed from Boehringer Ingelheim
International GmbH

Marketed by Boehringer Ingelheim
Pharmaceuticals, Inc.
Ridgefield, CT 06877
and
Abbott Laboratories
North Chicago, IL 60064

**7.5 mg tablets**
Mobic® (meloxicam)    1 blister card of 2 tablets

Professional Sample



melo×icam    tablets 7.5 mg

R<sub>x</sub> only
1 blister card of 2 tablets

 

■ **Attachment 07** ■

**CareFirst BlueCross BlueSh**
**Federal Customer Service, Nᵍᵍᵍ**
550 12th Street, SW
Washington, DC 20065
Tel. 202-484-1650



You must appeal our decision within 90 days from the date of this letter. You should include any additional information to support your appeal, as well as a copy of this letter informing you of our review decision. If you have any further questions regarding the appeals process, contact us at 1-202-484-1650 or 1-800-848-9766.

Sincerely,

*Stacy Harmon*

Stacy Harmon
Customer Service Representative
Federal Employee Program

■ **Attachment 07** ■

CareFirst BlueCross BlueShield is an independent licensee of the Blue Cross and Blue Shield Association.
® Registered trademark of the Blue Cross and Blue Shield Association. ®′ Registered trademark of CareFirst, Inc.

CareFirst BlueCross BlueShield
Federal Customer Service, N500
550 12th Street, SW
Washington, DC 20065
Tel. 202-484-1650

# CareFirst
## BlueCross BlueShield

April 18, 2002

Eddie Cheris
925 North Jackson Street
Arlington, VA 22201

Patient:            Eddie
Date of Birth:      02/08/59
Member ID:          R25972740
Claim Number:       2050721514F
Date of Service:    01/30/02

Dear Mr. Cheris:

This letter is in response to your recent request for reconsideration regarding the processing of a claim for medical services provided to you on 01/30/02. These services were provided by Dr. Jason Nascone, who is a Participating provider. Your concerns to clarify the processing of this claim will be addressed in the following paragraphs.

As stated on page 6 of the 2002 Service Benefit Plan brochure, under Basic Option, you must use Preferred providers in order to receive benefits.

As stated on page 23 of the same brochure, under Basic Option, for outpatient medical services rendered by a Participating provider, you pay all charges.

In your letter you stated that benefits should be provided because you were not informed that Preferred providers must be utilized for benefits to be considered. The additional information you provided with your letter included the provider's billing statement and a copy of your receipt of payment and your identification card. The additional information is appreciated for an accurate review of the claim.

After a comprehensive review of the claims, it was determined that this claim was processed correctly as this provider is Participating; therefore, benefits cannot be provided under your Basic Option contract. Unfortunately, an exception cannot be made. Consequently, no additional benefits will be paid on the claim. Your total responsibility for the claims is $146.00.

You have the right to appeal our decision to the Office of Personnel Management. You must do this by writing to:

> The Office of Personnel Management
> Office of Insurance Programs
> Contracts Division I
> 1900 E Street, NW
> Washington, DC  20415-3610

■ Attachment 07 ■

CareFirst BlueCross BlueShield is an independent licensee of the Blue Cross and Blue Shield Association.
® Registered trademark of the Blue Cross and Blue Shield Association. ®' Registered trademark of CareFirst, Inc.

789

LOUIS E. LEVITT, M.D., P.C.
1850 M STREET NW.STE #750
WASHINGTON DC 20036

**FORWARDING SERVICE REQUESTED**

IF PAYING BY CREDIT CARD, PLEASE SEE REVERSE SIDE

| ☐ MASTERCARD | ☐ VISA |
|---|---|

| PAY THIS AMOUNT | $ | 146.00 | AMOUNT ENCLOSED | $ |
|---|---|---|---|---|

| MAIL PAYMENT TO: | ADDRESSEE: |
|---|---|
| **LOUIS E. LEVITT, M.D., P.C.**<br>**1850 M STREET NW.STE #750**<br>**WASHINGTON DC 20036** | **EDDIE S CHERIS**<br>**929 N. JACKSON AVE**<br>**ARLINGTON VA 22201-2232** |

☐ Please check box if above addressee is incorrect or insurance information has changed, and indicate change(s) on reverse side.

**STATEMENT OF ACCOUNT**    PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

| DATE | SERVICE | CHARGE | ADJUST | RECEIPTS | BALANCE | DOCTOR |
|---|---|---|---|---|---|---|
| 01/30/02 | INITIAL OFFICE VISIT | 146.00 | .00 | .00 | 146.00 | NASCONE |

NEXT APPOINTMENT :

■ **Attachment 07** ■

| MAKE CHECKS PAYABLE TO: | LOUIS E. LEVITT, M.D., P.C. | | |
|---|---|---|---|
| PROVIDER/ PRACTICE NAME **LOUIS E. LEVITT, M.D., P.C.** | | FOR BILLING INQUIRIES, CALL **(202) 969-1772** | |

| * AN ASTERISK APPEARS ON CHARGES FILED FOR INSURANCE | ACCOUNT NUMBER 44551 | | DATE OF LAST PAYMENT | INSURANCE PENDING .00 | | PAYMENT DUE DATE |
|---|---|---|---|---|---|---|
| **04/01/02** STATEMENT DATE | **146.00** CURRENT | **.00** OVER 30 DAYS | **.00** OVER 60 DAYS | **.00** OVER 90 DAYS | **.00** OVER 120 DAYS | **146.00** PLEASE PAY THIS AMOUNT |

# BACK

 Exercises

These exercises are designed to stretch and strengthen your back. Before beginning an exercise, read through all its instructions. While exercising, breathe normally and use smooth movements. If you feel any pain, stop the exercise. If pain persists, inform your health care provider.

## ☐ HAMSTRING STRETCH

**1** Lie on your back. Keeping your left knee straight or slightly bent, lift that leg off the floor as far as you comfortably can.

**2** Grasp the back of your left knee or calf. Or grasp a towel draped behind your knee or calf. Keeping your leg fairly straight, slowly pull it toward your chest. Hold for _____ seconds. Return to starting position.

**3** Repeat _____ times, then switch sides. Do _____ sets a day.

**CAUTION**
• Use a pillow to keep your neck from arching.
• Keep one leg flat on the floor.

## ☐ HIP ROTATOR STRETCH

**1** Lie on your back with your knees bent. Place your right foot flat on the floor. Rest your left ankle on your right knee.

**2** Use your left hand to gently push your left knee away from you. Feel the stretch in your right buttock. Hold for _____ seconds.

**3** Repeat _____ times, then switch sides. Do _____ sets a day.



**CAUTION**
• Use a pillow to keep your neck from arching.
• Keep your back flat on the floor.

## ☐ KNEE-TO-CHEST STRETCH

**1** Lie on your back. Bend your right leg, and place your right foot flat on the floor.

**2** Grasp the back of your right thigh. Slowly pull the knee toward your chest. Hold for _____ seconds. Return to starting position.



**3** Repeat _____ times, then switch sides. Do _____ sets a day.



**CAUTION**
• Keep your head on the floor.
• Keep your straight leg flat on the floor.

## ☐ QUADRICEPS STRETCH

**1** Stand an arm's length from a wall. Look straight ahead.

**2** Place your left hand against the wall. Grasp your right ankle with your right hand. Pull up gently.

**3** When you feel the stretch in your right thigh, hold for _____ seconds.

**4** Repeat _____ times, then switch sides. Do _____ sets a day.



**CAUTION**
• Don't arch your back.
• Don't twist your back to reach your leg.

©1996, 1998 The StayWell Company. All rights reserved.

■ Attachment 08 ■

9812



## PRONE PRESS-UP

**1** Lie on your stomach with your feet slightly apart. Rest your forehead on the floor. Relax your stomach and back muscles.

**2** Keeping your neck straight, push yourself up on your forearms only until you feel some tension in your lower back. Hold for _____ seconds. Then slowly lie back down.

**3** Repeat _____ times. Do _____ sets a day.

**CAUTION**
- Keep your stomach and hips on the floor.
- Don't arch your neck.

## PARTIAL CURL-UP

**1** Lie on your back with knees bent, feet flat on the floor, and hands crossed over your chest.

**2** Tighten your stomach muscles and slowly lift your head and shoulders until your shoulder blades start to come off the floor. Hold for _____ seconds. Then slowly lower yourself back down.

**3** Repeat _____ times. Do _____ sets a day.

**CAUTION**
- Don't pull up with your neck.
- Keep your arms relaxed.

## THE BRIDGE

**1** Lie on the floor with your back flat, knees bent and feet and palms flat on the floor.

**2** Tighten your stomach and buttock muscles. Slowly lift your buttocks off the floor until there's a straight line from your knees to your shoulder. Hold for _____ seconds.

**3** Repeat _____ times. Do _____ sets a day.



**CAUTION**
- Use a pillow to keep your neck from arching.
- Don't arch your back.

## WALL SLIDE

**1** Stand with your back and head against a wall. Look straight ahead. Keep your feet shoulder-width apart and 6 to 12 inches from the wall. Relax your shoulders and tighten your stomach muscles.

**2** Slowly sink straight down until you feel a stretch in the front of your thighs. Hold for _____ seconds. Then slowly slide back up.

**3** Repeat _____ times. Do _____ sets a day.

**CAUTION**
- Keep your head against the wall.
- Don't let your buttocks sink below your knees.

**StayWell**
**K R A M E S**

A Times Mirror Company

This information is not intended as a substitute for professional health care. Always follow your health care provider's instructions.
©1996, 1998 The StayWell Company, 1100 Grundy Lane, San Bruno, CA 94066-3030. (800) 333-3032. All rights reserved.

Printed on recycled paper

**■ Attachment 08 ■**

VISIT OUR WEBSITE AT
WWW.LADYFOOTLOCKER.COM

ANY DISCOUNT RECEIVED AS PART OF A
"BUY ONE - GET ONE" PROMOTION WILL
BE FORFEITED IF THE REGULAR PRICED
ITEM IS RETURNED.

```
           ST:06118 S:003 RG:1 TR:0033
SALE       02/27/04  6:28PM CV#0100339

55-50338-5
  02- 8.0     MDS 1 T        39.99

    SUBTOTAL                 39.99
    STATE 4.500%    39.99     1.80
MC   **************2786      41.79
    TOTAL              $     41.79

***********************************
 TOTAL CHARGE               41.79
MC   # **************2786 EXP: 01/07
  AUTH   027320
***********************************
```

**Athletic Shoe Purchase**



EMERGENCY MEDICINE ASSOCIA___, P.A.
1300 PICCARD DR SUITE 202
ROCKVILLE, MD 20850-4697

1114

| | CHECK CARD USING FOR PAYMENT |
|---|---|
| | ☐ MASTERCARD  ☐ DISCOVER  ☐ VISA  ☐ AMERICAN EXPRESS |

| CARD NUMBER | | SIGNATURE CODE |
|---|---|---|
| SIGNATURE | | EXP. DATE |

| For Inquiry Call: | (301)921-7920 |
|---|---|

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 3/20/04 | 374.00 | 2068425 |

Page:  1

| SHOW AMOUNT PAID HERE | $ |
|---|---|

═ ADDRESSEE: ═

═ REMIT TO: ═

EDDIE S CHERIS JR
925 N JACKSON ST
ARLINGTON, VA 22201-2232

EMERGENCY MEDICINE ASSOCIATES, P.A.
1300 PICCARD DR SUITE 202
ROCKVILLE, MD 20850-4697

Please check box if address is incorrect or insurance
information has changed, and indicate change(s) on reverse side.

**STATEMENT**   PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

800005A

| Date | Procedure | ICD | POS | Description | | Amount |
|---|---|---|---|---|---|---|
| | | | | Services for  EDDIE S CHERIS JR | | |
| | | | | Rendered at - VIRGINIA HOSP CTR - EXPRS | | |
| 03/03/04 | 99284 | 724.3 | 23 | EMERGENCY DEPT VISIT | EMA ARLX | 349.00 |
| 03/03/04 | 99052 | 724.3 | 23 | MEDICAL SERVICES AT NIGHT | EMA ARLX | 25.00 |

THIS STATEMENT REPRESENTS THE BILL FOR THE PHYSICIAN AND IS DUE IN FULL
ON RECEIPT.  This bill is separate from the hospital bill.  If you
believe you are receiving this bill in error please write or call as
soon as possible.  PLEASE PROVIDE INSURANCE INFORMATION IF APPLICABLE.

Este es un estado de cuenta por servicios medicos y ES DIFERENTE AL
ESTADO DE CUENTA POR SERVICIOS HOSPITALARIOS que usted probablemente
recibira por separado.  Usted esta en la obligacion de PAGAR ESTA
CUENTA DE INMEDIATO.  Si usted cree que esta cuenta no le pertenece por
favor escribanos o llamenos lo mas pronto posible.  Si usted pertenece
a una compania de seguros que cubre sevicios medicos llamenos pronto.
POR FAVOR TENGA SU NUMERO DE CUENTA DISPONIBLE AL LLAMAR.

For Long Distance calls please dial 1 800 397-0302.

Billing office hours are between 8:30 AM and 3:30 PM EST
PLEASE HAVE YOUR ACCOUNT NUMBER READY WHEN CALLING.

| Account No. | Billing Date | Responsible Party | Please Pay This Amount |
|---|---|---|---|
| 2068425 | 3/20/04 | EDDIE S CHERIS JR | 374.00 |

sterisked (*) items indicate that an insurance claim has been sent to your insurance company.

EMERGENCY MEDICINE ASSOCIATES,
1300 PICCARD DR SUITE 202
ROCKVILLE, MD 20850-4697

Telephone No.         (301)921-7920
Tax Identification No.   520962668

## PAYABLE UPON RECEIPT

| Current | 31-60 Days | 61-90 Days | 91-120 Days | Over 121 Days | Balance Due |
|---|---|---|---|---|---|
| 374.00 | | | | | 374.00 |

■ **Attachment 10** ■

1114*1720IPBLB000914

**VIRGINIA HOSPITAL CENTER - ARLINGTON**
1701 N. George Mason Drive
Arlington, Virginia 22205-3698

14868-J519

**VIRGINIA HOSPITAL**
C E N T E R
*Arlington*

TEMP-RETURN SERVICE REQUESTED

**PAGE: 1 of 1**

**STATEMENT DATE:** 03/10/04

**GUARANTOR NUMBER:** 5524171

**PAY THIS AMOUNT:** $773.50

ADDRESSEE:

EDDIE S CHERIS JR
925 N JACKSON ST
ARLINGTON, VA 22201-2232

OUR OFFICE HOURS ARE MONDAY
THROUGH FRIDAY 9:00 AM TO 4:30 PM.
FOR QUESTIONS, CALL (703) 558-6391

14868-J519*16Q1ED3U7000379

| DATE | PATIENT NO. | PATIENT NAME | DESCRIPTION | CHARGES/CREDITS |
|------|-------------|--------------|-------------|-----------------|
| 03/03/04 | 5492266 | CHERIS JR.    Eddie    S | | |
| 03/04/04 | | | HOSPITAL CHARGES | $773.50 |
| | | | BALANCE DUE | $773.50 |

THANK YOU FOR CHOOSING VIRGINIA HOSPITAL CENTER - ARLINGTON

---

TO INSURE PROPER CREDIT, DETACH AND RETURN THIS PORTION IN THE ENCLOSED ENVELOPE.

☐ Please check if above address is incorrect and indicate change on reverse side.

652176 (09/01)

| IF PAYING BY MASTERCARD, DISCOVER, VISA OR AMERICAN EXPRESS, FILL OUT BELOW. |
|---|
| CHECK CARD USING FOR PAYMENT |

☐ MASTERCARD   ☐ DISCOVER   ☐ VISA   ☐ AMERICAN EXPRESS

| CARD NUMBER | AMOUNT |
| SIGNATURE | EXP. DATE |
| CARDHOLDER NAME | |

**MAKE CHECK PAYABLE & REMIT TO:**

**STATEMENT DATE:** 03/10/04

**GUARANTOR NUMBER:** 5524171

**GUARANTOR NAME:** EDDIE S CHERIS JR

**VIRGINIA HOSPITAL CENTER - ARLINGTON**
P.O. BOX 1494 DRAWER CCC
MERRIFIELD, VA 22116-1494

| PAYMENT DUE BY | PAYMENT DUE NOW |
|----------------|-----------------|
| 03/30/04 | ▶▶▶▶▶▶▶  $773.50 |

■ ■ **Attachment 10** ■ ▌▌▌

VIRGINIA HOSPITAL CENTER - ARLINGTON
1701 N. George Mason Drive
Arlington, Virginia 22205-3698                    14868-K400



**TEMP-RETURN SERVICE REQUESTED**

BILLING QUESTIONS, PLEASE CALL:  (703) 558-6391

**PAGE: 1 of 1**                                    DATE: 10Mar2004

▬▬▬▬▬▬▬▬▬▬▬ ADDRESSEE: ▬▬▬▬▬▬▬▬▬▬▬          PATIENT NAME : Eddie CHERIS JR
                                           ACCOUNT NUMBER : 5492266
**MR EDDIE S CHERIS JR**                   SERVICE DATES : 3Mar2004 - 4Mar2004
925 N JACKSON ST
ARLINGTON, VA 22201-2232

                                           14868-K400*16Q1EHB2N000075

## INFORMATIONAL STATEMENT ONLY

Dear Mr. CHERIS JR,

Thank you for your recent visit to Virginia Hospital Center-
Arlington.  The following is a summary of charges incurred
during your visit:

| DESCRIPTION | AMOUNT |
|---|---|
| EMERG ROOM | 691.00 |
| PHARMACY | 51.25 |
| MED-SURG SUPPLIES | 31.25 |
| TOTAL | 773.50 |

If you have insurance which is in effect on the above referenced
service dates, please contact the business office.  If payment
has been made, please accept our thank you.  Any remaining
balance will be sent on a billing statement shortly.

Sincerely,

Business Office
Virginia Hospital Center - Arlington
(703) 558-6391

■ **Attachment 10** ■

VIRGINIA HOSPITAL CENTER - ARLINGTON
1701 N GEORGE MASON DRIVE
ARLINGTON, VA   22205
(703)558-6391

STATEMENT DATE  03/17/2004
PAGE   2 of  2

FEI #  540505989

PATIENT NAME     CHERIS JR, EDDIE S
ACCOUNT NUMBER   005492266
MEDICAL RECORD   06118871

START          END
DATE           DATE
03/03/2004   03/04/2004

GUARANTOR NAME AND ADDRESS

EDDIE S CHERIS JR
925 N JACKSON ST
ARLINGTON, VA   22201

FIN CLASS: S     ACCT TYPE: E

INSURANCE   POLICY
SELFPAY1    3

----- SUMMARY OF DETAIL CHARGES -----

| | | |
|---|---|---|
| PHARMACY | 0003 | 51.25 |
| MED-SURG SUPPLIES | 0003 | 31.25 |
| EMERGENCY ROOM CARE | 0004 | 691.00 |

■ Attachment 10 ■

INSURANCE BENEFITS ASSIGNED TO ARLINGTON HOSPITAL        BALANCE:      773.50

RGINIA HOSPITAL CENTER - ARLINGTON
01 N GEORGE MASON DRIVE
LINGTON, VA  22205
03)558-6391

STATEMENT DATE  03/17/2004

FEI #  540505989

TIENT NAME      CHERIS JR, EDDIE S
COUNT NUMBER    005492266
DICAL RECORD    06118871

|  | START DATE | END DATE |
|---|---|---|
|  | 03/03/2004 | 03/04/2004 |

GUARANTOR NAME AND ADDRESS

EDDIE S CHERIS JR
925 N JACKSON ST
ARLINGTON, VA  22201

FIN CLASS: S    ACCT TYPE: E

INSURANCE   POLICY
SELFPAYL    3

| RVICE TE | CHARGE DESCRIPTION | HCPCS/ CPT4 | CHARGE CODE | QNTY | TOTAL CHARGES |
|---|---|---|---|---|---|
| /03 | HYDROMORPHONE 2MG/ML SYR |  | 4709800 | 0001 | 9.25 |
| /03 | KETOROLAC 60MG/2ML VL |  | 4790820 | 0001 | 29.75 |
| /03 | DIAZEPAM 5MG/ML AMP INJ |  | 4918290 | 0001 | 12.25 |
| /03 | IV PLUS CATH 20X11/4 |  | 1844810 | 0001 | 14.25 |
| /03 | CLAVE CONNECTOR |  | 2030710 | 0001 | 6.75 |
| /03 | 8" EXT WITH CLAVE Y SITE |  | 2030740 | 0001 | 10.25 |
| /03 | ER-CAT-IV | 99284 | 5050040 | 0001 | 424.25 |
| /03 | INJECTION SUBQ/IM | 90782 | 5092250 | 0001 | 29.75 |
| /03 | INJECTION INTRAVENOUS | 90784 | 5092260 | 0002 | 237.00 |

■ Attachment 10 ■

SURANCE BENEFITS ASSIGNED TO ARLINGTON HOSPITAL       BALANCE:      773.50

## VIRGINIA HOSPITAL CENTER--ARLINGTON
## EMERGENCY DEPARTMENT
## Arlington, VA 22205
## 703-558-6167

**Date:** Wednesday, March 03, 2004
**Patient:** EDDIE CHERIS
**Doctor:** Vikram Malkani MD.

---

**The following instruction(s) should be read carefully:**

**SCIATICA:**

Sciatica is caused by pressure in the lower back on the sciatic nerve - the long nerve that goes down the leg from the lower back. The most common cause is a disc between the vertebrae that degenerates and bulges against the nerve. The most common symptom is low back pain, with the pain also going down the leg. Other symptoms may include tingling or numbness in the leg and weakness. Some people have leg symptoms alone - without any back pain.

The initial treatment for sciatica is usually the same as for less serious causes of low back pain such as a sprain of ligaments or strained muscles. Follow-up with your doctor for a sciatic problem is very important, and even more so if any weakness develops. Most cases of sciatica can be successfully managed without surgery.

When lying, any comfortable position is all right. Use a pillow under your knees when you lie on your back. Sleep on a firm mattress. Stay off your feet as much as possible for the next 2-3 days or until you are better.

Avoid any bending or lifting until your symptoms are completely better. When you are recovered be sure to lift properly by bending your knees (not your back) and using your leg muscles to help.

Anti-inflammatory and analgesic drugs are often prescribed. Skeletal muscle relaxants may be helpful also.

Ice massage breaks the cycle of pain and spasm in your back by slowing down the nerve impulses. Freeze water in a papercup. Peel the top inch or two of the cup away. Lie on stomach with pillow under it and have someone gently massage a 6 x 8 area over the painful area. Massage in a circular motion for 5-7 minutes, no longer.

Follow-up with your doctor for a sciatic problem is very important, and even more so if any weakness develops. Your follow-up doctor will determine the need for further testing, physical therapy, and if you need referral for possible disc surgery.

**NOTIFY YOUR DOCTOR** or return to the Emergency Department in case of the following:
    - Progressive symptoms of sciatica (pain, weakness or numbness in your legs).
    - Back pain is worsening or is not improved within 4-5 days.
    - Abdominal pain or change in the location of pain.
    - Difficulty with urination or bowel movements.

■ **Attachment 10** ■

**EDDIE CHERIS**          **Arlington Hospital**          **Page 2**

The following prescription(s) have been given:

> **Name:** Motrin : Motrin 800mg
> **Disp:** #21
> **Sig:** 1 po tid with food
> **Refills:** 0    Voluntary Formulary Permitted

> **Name:** Flexeril : Flexeril 10 mg
> **Disp:** #30
> **Sig:** 1 PO tid
> **Refills:** 0    Voluntary Formulary Permitted

> **Name:** Vicodin : Vicodin
> **Disp:** 10 (ten).
> **Sig:** 1 or 2 by mouth every 4-6 hours as needed for pain.
> **Refills:** 0    Voluntary Formulary Permitted

The following instruction(s) concern medicine(s) and should be read carefully. This information is a summary of the common uses and adverse effects of your medication. It is intended to serve as a guide and may not contain all the information you may need. If you experience other effects not listed above, have questions about your medical condition, or have questions about your medications, contact your doctor or pharmacist.

**Motrin**

**Common Uses:** This medication relieves pain, inflammation, swelling and stiffness. It is also used to reduce fever and to relieve headaches, muscle aches, menstrual pain, backache, and pain after surgery or dental work.

**How to Use This Medication:** Follow the instructions on your prescription label carefully. This medication comes as tablets and oral liquid. The oral liquid needs to be shaken well before each use. Take this medication with food or milk.

**Possible Side Effects:** Indigestion, nausea, vomiting, heartburn, bloating, abdominal pain, stomach pain, gas, constipation or diarrhea, and loss of appetite may occur. If these effects persist or are severe, contact your doctor or pharmacist. If skin rash, hives, or blurred vision occurs, contact your doctor or pharmacist. Dizziness, headache, drowsiness, nervousness, and ringing in the ears may occur. If these effects persist or are severe, contact your doctor or pharmacist. If a black or bloody stool, yellowing of skin and eyes, or swelling of hands and feet occurs, stop this medication and call your doctor immediately.

**Cautions:** Tell your doctor if you are a woman who is pregnant or breast-feeding before taking this medication. Tell your doctor if you have ever had gastritis or bleeding from the stomach or rectum, ulcers, diverticulitis, kidney disease, high blood pressure, or heart disease. Tell your doctor if you have allergies, especially allergies to aspirin or other arthritis or pain medications. To avoid overdose, read the labels on non-prescription pain relievers, cough and cold products, fever reducers, headache relievers, and arthritis

■ **Attachment 10** ■

EDDIE CHERIS               Arlington Hospital          Page 3

products, and avoid taking products with ibuprofen, naproxen, and ketoprofen. Do not take aspirin when using this medication unless directed by your doctor. This medication may cause drowsiness. Do not drive a car or operate dangerous machinery until you know how it affects you. Do not drink alcohol while taking this medication.

**Missed Doses:** If you take this medication on a regular schedule, take the missed dose as soon as you remember it. But, if it is almost time for the next dose, skip the missed dose and continue your usual dosing schedule. Do not double dose. If you have any questions, contact your doctor or pharmacist.

### Flexeril

**Common Uses:** This medication is a muscle relaxant. It is used to relieve pain and stiffness caused by muscle strains and sprains.

**How to Use This Medication:** Follow the instructions on your prescription label carefully. Do not take this drug for more than 3 weeks without consulting your doctor.

**Possible Side Effects:** Possible side effects from this medication are drowsiness, dizziness, weakness, indigestion, nausea, constipation, headache, bad taste in mouth, blurred vision and confusion. If these effects persist or are severe, contact your doctor. If dry mouth occurs, suck on sugarless hard candies or chew sugarless gum.

**Cautions:** Tell your doctor if you have glaucoma, an overactive thyroid gland, heart disease, difficulty urinating or if you are pregnant or breast-feeding. Tell your doctor and pharmacist about all medication you are taking. Do not take this medication with alcohol or medication called MAO inhibitors (ie. Nardil, Parnate).

**Missed Doses:** If you miss a dose, take it as soon as you remember. Do not take two doses at the same time. If you miss two or more doses or you are not sure what to do, contact your doctor or pharmacist for advice.

### Vicodin

**Common Uses:** This medication is used to relieve moderate to moderately severe pain.

**How to Use This Medication:** This medication comes as tablets, capsules, and oral liquid. Follow the instructions on your prescription label carefully. This medication can be taken with or without food.

**Possible Side Effects:** Lightheadedness, dizziness, drowsiness, nausea, or vomiting may occur. If these effects occur try lying down for a while. If these effects persist or are severe, contact your doctor or pharmacist. If lethargy, impaired mental and physical performance, mood changes, or constipation occur and are severe, contact your doctor or pharmacist. If you experience difficulty breathing, stop taking this drug and contact your doctor immediately or go to the hospital.

**Cautions:** Tell your doctor if you are a woman who is pregnant or breast-feeding before taking this medication. Tell your doctor if you have any allergies. This drug can be habit-forming. Do not take it more often or for a longer time then your doctor tells you to. Also, do not take more than the amount

EDDIE CHERIS          Arlington Hospital          Page 4

prescribed at each dose. This drug may cause drowsiness. Do not drive a car or operate dangerous machinery until you know how it affects you. This medication contains acetaminophen. Before taking cough and cold, pain, or allergy drugs, read their labels carefully to be sure that they do not contain acetaminophen. An overdose of acetaminophen can be harmful. Do not drink alcohol while taking this medication.

**Missed Doses:** If you miss a dose, take it as soon as you remember. Do not take two doses at the same time. If you miss two or more doses or you are not sure what to do, contact your doctor or pharmacist for advice.

**The following note(s) should be read carefully:**

Call Howard Zahalsky M.D. (703-525-4103) at Suite 306  1715 N. George Mason Dr.,  Arlington today or as soon as possible.  Let the office know that you were seen at VIRGINIA  HOSPITAL  CENTER--ARLINGTON (703-558-6167) and that you were told to call the office to arrange a  follow-up visit.

I understand that the treatment I have received was given on an emergency basis only. I understand that further treatment may be necessary. I have been given a copy of the above instructions. I understand these instructions and I will arrange for follow-up care as outlined above. If my condition worsens, I will call my doctor or return to the hospital. Emergency Department phone number: **703-558-6167.**

Signed: _____ (_____)
                                        Relation to Patient

# CVS PHARMACY
3133 LEE HWY, ARLINGTON, VA
PHARMACY: 522-0260  STORE: 522-2558

REG#02 TRAN#6341 CSHR#000095 STR#1407

| | |
|---|---|
| 1 RX ITEM 0012790300 | 18.99N |
| 1 RX ITEM 0012790400 | 9.99N |
| 1 RX ITEM 0012790500 | 9.99N |
| 1 BEN-GAY ULTRA 4Z | 8.99N |

| | |
|---|---|
| 4 ITEMS | |
| TOTAL | 47.96 |
| CASH | 60.00 |
| CHANGE | 12.04 |

5141

GET YOUR CVS EXTRACARE CARD

THANK YOU. SHOP ANYTIME AT CVS.COM!
MARCH 4, 2004          6:31 AM

RETURNS WITH RECEIPT THRU 05/03/2004

## Medication Purchase



**LOUIS E. LEVITT, M.D.**
**MARC B. DANZIGER, M.D.**
**MARK J. SCHEER, M.D.**
OFFICE OF ORTHOPAEDIC MEDICINE & SURGERY
1850 M Street, N.W., Suite 750 • Washington, D.C. 20036 • (202) 835-2222

BND No. AL 1614153
BND No. BD 3785295
BND No. BS 6389147

Name _Eddie Cheers_       Date _3/9/04_

Address _____

Ultracet 37.5-g
i - ii po q6° prn.
pain #30

Label as to Contents

REP. 0 - 1 - 2 - 3 - 4 - 5 PRN _____ M.D.

---

**LOUIS E. LEVITT, M.D.**
**MARC B. DANZIGER, M.D.**
**MARK J. SCHEER, M.D.**
OFFICE OF ORTHOPAEDIC MEDICINE & SURGERY
1850 M Street, N.W., Suite 750 • Washington, D.C. 20036 • (202) 835-2222

BND No. AL 1614153
BND No. BD 3785295
BND No. BS 6389147

Name _Eddie Cheers_       Date _3/9/04_

Address _____

Ibuprofen 800-g
i po TID
#30

Label as to Contents

REP. 0 - 1 - 2 - 3 - 4 - 5 PRN _____ M.D.

■ **Attachment 11** ■



LOUIS E. LEVITT, M.D.
MARC B. DANZIGER, M.D.
MARK J. SCHEER, M.D.
OFFICE OF ORTHOPAEDIC MEDICINE & SURGERY

1850 M Street, N.W., Suite 750 • Washington, D.C. 20036 • (202) 835-2222

BND No. AL 1614153
BND No. BD 3785295
BND No. BS 6389147

Name *Eddie Cheris*                Date 3/9/04

Address

*Flexeril 10-8*

*ii PO QHS #30*

Label as to Contents

REP: 0 - ①- 2 - 3 - 4 - 5 PRN _____ M.D.



*Prescriptions Since 1874*

UNION STATION
19TH STREET
℞
DUPONT CIRCLE

**TSCHIFFELY PHARMACY**
1330 Connecticut Avenue, N.W. 20036 (202) 331-7176
50 Massachusetts Avenue, N.E. 20002 (202) 466-8440
1145 19th Street, N.W. 20036 (202) 408-5178
Visit us at www.rxdc.com

Receipt-Tax & Insurance
EDDIE CHERIS            03/09/04

RX#660-615      PLAN#      0
    ULTRACET 37.5/325MG TAB #30
PRICE:  $40.28 PAID:      $40.28
Dr. DANZIGER 1850 M STREET NW #7
WASHINGTON      DC      20036
        00045-0650-60

TSCHIFFELY PHARMACY/19th St.
1145 19th Street N.W.  Phone 466-8440  Wash., D.C. 20036

Tschiffely Pharmacy
1145 19th St. NW
Washington, DC 20036
(202) 466-8440

C O P Y
03/09/2004  12:08
S a l e :

Transaction #        27
Card Type:         VISA
Acc:      ************9021
Entry:            Swiped
Sale:            40.28
Reference No.:
        406
Auth.Code:        009871
Response:APPROVAL 009871
Sequence Number:   0030

■ **Attachment 11** ■

LOUIS E. LEVITT, M.D.
MARC B. DANZIGER, M.D., P.C.
MARK J. SCHEER, M.D.
1850 M Street N.W.
Suite 750
Washington, D.C. 20036
(202) 835-2222

3/9/04

To whom it may concern:

This is to certify that:

_Cheris, Eddie_

has been under my professional care, and was:

☐ Totally incapacitated

☐ Partially incapacitated

from_____ to_____

He/She may return to full/light duty on

3/9/04

Limitations/remarks: No lifting greater
than 5 lbs for the next
week.

Signed _____ MD

---

LOUIS E LEVITT MD
1850 M ST NW #750
WASHINGTON  DC 20036

03/09/04     09:07:11
MER#: 8299906789790
STR#: 4616   TER#: 0001
S-A-L-E-S  D-R-A-F-T

REF#:   1042    BCH: 043
CD TYPE: VI
TR TYPE: PR

TOTAL:        $192.00

ACCT: 4@
EXP:  0107    AP: 009680
EDDIE SPERO CHERIS

CARDMEMBER ACKNOWLEDGES
RECEIPT OF GOODS AND/OR
SERVICES IN THE AMOUNT
OF THE TOTAL SHOWN
HEREON AND AGREES TO
PERFORM THE OBLIGATIONS
SET FORTH BY THE
CARDMEMBER'S AGREEMENT
WITH THE ISSUER

THANK YOU FOR USING VISA

X _____

TOP COPY-MERCHANT
BOTTOM COPY-CUSTOMER

---



*Prescriptions Since 1874*

UNION STATION · 19TH STREET · DUPONT CIRCLE

**TSCHIFFELY PHARMACY**
1330 Connecticut Avenue, N.W. 20036 (202) 331-7176
50 Massachusetts Avenue, N.E. 20002 (202) 466-8440
1145 19th Street, N.W. 20036 (202) 408-5178
Visit us at www.rxdc.com

Receipt-Tax & Insurance
EDDIE CHERIS          03/18/04

RX#660-615     PLAN#     0
  ULTRACET 37.5/325MG TAB #30
PRICE:  $40.28 PAID:   $40.28
Dr. DANZIGER 1850 M STREET NW #7
WASHINGTON      DC    20036
     00045-0650-60

TSCHIFFELY PHARMACY, 19th St.
1145 19th Street N.W.   Phone 466-8440 Wash., D.C. 20036

---

TSCHIFFELY PHARMACY
1145 19TH ST,NW
WASH,DC20036 202-466-8440

RX      RX 660615
    1 EA @    40.28    40.28 NTX

1215604 TILL1   SubTot.    40.28
KM  KM           Tax        0.00
03/18/04

18:42 30.          Total     40.28
                   CASH     45.00
                   CASH     ca.

                   Change    4.72

---

■ **Attachment 11** ■

DOCTOR #:DANZIGER, MB   COPY: 's office

APPT TIME   APPT DATE   ADDR: 929 N. JACKSON AVE   ARLINGTON VA 22201   DICTATED L D
9:20   03/09/84

Enctr # 96931   BLUE CROSS BLUE SHIELD   R25972740   *ptd 192nd VOW*   WI

LOUIS E. LEVITT, M.D., P.C.
MARC B. DANZIGER, M.D.
PRACTICE LIMITED TO ORTHOPAEDIC SURGERY
1850 M STREET NW, STE N750
WASHINGTON, DC 20036
TELEPHONE (202)835-2222
DC-DC #3979   FED. TAX ID#52-1453370
DUNS #13-236-7438   MEDICARE LE 533077

## ATTENDING PHYSICIAN'S STATEMENT

| CPT | OFFICE SERVICES TOS 600 | FEE |
|---|---|---|
| 9920 | IOV Level 1 2 3 4 5 | |
| 9921 | OV Level 1 2 3 4 5 | 19 |
| 9924 | Consultation 1 2 3 4 5 | 19 |
| 99456 | IME | |
| 99456-1 | RE-EVALUATION WC | |
| 99199 | Record Review (.........)min... | |
| 99456-1 | PPD Rating | |

| CPT | OFFICE PROCEDURES TOS 600 | FEE |
|---|---|---|
| 20610 | ARTHOCENTESIS, MAJOR JOINT, BUR | |
| 20605 | ARTHOCENTESIS, INTERMID JOINT, B | |

Office Surgery

| CPT | APPLIANCE | FEE |
|---|---|---|
| | Ace | |
| | Sling | |
| | Castboot | |
| | Post Op Shoe | |
| | Crutches, Alum | |
| | Wrist Splint | |
| | Cervical Collar | |
| | Knee Immobilizer | |
| | Knee Brace Stalilizer | |
| | Air Cast | |
| | Elastic Anklet | |
| | Elastic Wristlet | |
| | Elastic Knee Support | |

| | | |
|---|---|---|
| | Cane | |
| | Back Brace | |
| | Theraband | |
| | Custom Orthotic | |
| | Finger Splint | |
| | Ankle Brace, Zippered | |
| | Brace Special Orthopedic | |
| | Educational Literature | |
| | Rocket Soc | |
| | Low Profile Walker I | |
| | Low Profile Walker II | |
| | GameKeepers Thumb Splint | |

| CPT | X-RAYS TOS 500 | FEE |
|---|---|---|
| 72010 | Spine-Complete (Ap & Lateral) | |
| 72040 | Spine-Cervical (Ap & Lateral) | |
| 72050 | Spine-Cervical Complete | |
| 72070 | Spine-Thoracic (Ap &Lateral) | |
| 72100 | Spine-Lum (Ap&Lateral) (Spot) | |
| 72110 | Spine-Lum Complete (5 Views) | |
| 72170 | Pelvis (AP Only) | |
| 73000 | Clavicle | R L |
| 73030 | Shoulder | R L |
| 73060 | Humerus | R L |
| 73070 | Elbow | R L |
| 73090 | Forearm | R L |
| 73100 | Wrist | R L |
| 73110 | Wrist (3 Views) | R L |
| 73130 | Hand | R L |
| 73140 | Finger | R L |
| 73500 | Hip-Unilateral | R L |
| 73510 | Hip (AP & Lateral) | R L |
| 73520 | Hip-Pelvis X 2 | R L |
| 73550 | Femur-Include One Joint | R L |
| 73560 | Knee (AP & Lateral) | R L |
| 73564 | Knee (Multiple) | R L |
| 73590 | Leg-Including One Joint | R L |
| 73610 | Ankle - 3 | R L |
| 73630 | Foot | R L |
| 73650 | Calcaneus | R L |
| 73660 | Toe | R L |
| 76499 | Duplicate X-Ray | R L |

| | CASTS TOS 200 | |
|---|---|---|
| 29405 | Short Leg | R L |
| 29345 | Long Leg | R L |
| 29365 | Cylinder | R L |
| 29435 | PTB | R L |
| 29055 | Thumb Spica Cast | R L |
| 29075 | Short Arm | R L |
| 29065 | Long Arm | R L |
| 29125 | Splint | R L |

Referral # of Visits
Surgery Date

## PATIENT DISABILITY STATEMENT

DATE FIRST SEEN   DATE LAST SEEN
1-30-02   1-30-02

NEW CONDITION

PREVIOUS DIAGNOSIS: 724.2

Date Accident Occurred   2/2/98
or Symptoms Appeared:   Mo Day Year

Disability   LIABILITY   INJURY
Related To:   COMPENSATION   OTHER

Referral:

| SURGERY and FRACTURE | CURRENT DIAGNOSIS   DXP TOS FEE | DOCTOR'S SIGNATURE |
|---|---|---|

NOTES

RETURN _____ DAYS _____ WEEKS 2 MONTHS _____ OFFICE USE 1 2 3 TOTAL 192-

**■ Attachment 11 ■**

# Additional Contacts Pertaining to this Report

### Director of Consular Affairs
Frank E. Moss    202.647.5366    CA/PPT
U.S. Department of State, 2201 C. Street N.W
Room 6811, Washington D.C. 20520

### 3rd Level Supervisor
(Note: Ms. McCoy recently replaced Tim Martin)
Timothy P. Martin    202.955.0257    CA/PPT/IML/R
U.S. Department of State, 1111 - 19th Street N.W.
Suite 500, (SA-17), Washington DC 20520
(Note: Mr. Martin replaced Tashia Thian)

### 2nd Level Supervisor
William H. Crawford    202.955.0246    CA/PPT/IML/R/RP
U.S. Department of State, 1111 19th Street N.W.
Suite 500, (SA-17), Washington DC 20520

### 1st Level Supervisor
Corey A. Bent    202.955.0233    CA/PPT/IML/R/RP/QA
U.S. Department of State, 1111 - 19th Street N.W.
Room 520, (SA-17), Washington DC 20520
(Note: Mr. Bent replaced Steve Cox)

### Human Resources Representative
Kimberly Q. Milligan    202.663.2540    CA/EX/HRD
U.S. Department of State, 2401 E. Street N.W.
Room H1010, (SA-1), Washington D.C. 20520
(Note: Ms. Milligan replaced Ms. Hatchett)

### Human Resources Representative
Nicole Hicks    202.663.2534    CA/EX/HRD
U.S. Dept of State, 2401 E. Street N.W.
Room H1010, (SA-1), Washington D.C. 20520

■ **Attachment 12** ■

Copy for:  Secretary of State

11 January 2002 / Friday


Clark Kent Ervin
U.S. Department of State
Office of Inspector General
Post Office Box 9778
Arlington, Virginia  22219


Detailed on the attachments are some of the activities that have transpired at the Passport Office over the past few years.


In particular, one of these activities occurring at the Passport Office got very much out-of-hand – where it is just common sense to contact your office concerning this matter.  In brief...


> My supervisor required me to set at my workstation and endure pain to the point that I was almost crying.  When I properly asked the supervisor for an item (in this case, ear protection), in order to stop the pain from occurring and to effectively get my job done well – I must "beg" for this item.


Thank you for your time and assistance.

Eddie


■ **Attachment 13** ■

Arthur H. Mott
(DS/ICI/PR)
Diplomatic Security
Tele: (202) 663-0725
U.S. Department of State
2121 Virginia Avenue,
SA-03, 4th Floor,
Washington, D.C. 20520
(202) 663-0725
(202) 955-0248

## MEMORANDUM

Date: 27 February 2002 / Wednesday

To: Arthur H. Mott, DS/ICI/PR

From: Eddie S. Cheris, CA/PPT/IML/R/RP/QA

Subject: Office of Medical Services (Situation Report)

On Wednesday, 27 February 2002, (09:45 am), I received a call from Dr. Kenneth Dekleva of the Office of Medical Services (202) 663-1919.

We briefly discussed several topics over the telephone. Dr. Dekleva said that he called to kindly offer his services. I politely provided Dr. Dekleva several brief explanations of my wish not to participate in this service.

Previously, I forwarded to the Office of Medical Services documentation (which you have a copy of). And, soon afterwards had spoken with a Dr. Athena M. Moundalexis on the telephone (202) 633-1918. And, with both contacts stated that I am not interested in participating in their service(s) due to several prime reasons.

In light that my supervisors contacted medical services requesting I participated in this type of activity. And, the Office of Medical Services has contacted me repeatedly. I am now reporting this to you as borderline harassment.

It is just reasonable that if my supervisors are requiring me to participate in such (time-consuming) activities; that a very sold justification should be provided, in addition to providing me with additional money(ies) for services rendered.

Thank you, again, for your time and assistance.

■ Attachment 13 ■

---

United States **Department of State**

*Office of Medical Services*
*Department of State and the Foreign Service*

*Washington, D.C. 20520*

## MEMORANDUM

Date: February 14, 2002

To: Mr. Eddie Cheris

From: Athena Mourdalexis, M.D.
M/DGHR/MED/DP
Phone 202-663-1918
Fax 202-663-1613

CC: Mr. William Crawford
CA/PPT/IML/R/RP
Phone 5-0246
Fax 5-0256

RE: January 2, 2002 memo about workplace concerns from Eddie Cheris

I have received a copy of the above memo sent to Ambassador Ryan that addresses concerns you have about your workplace and medical concerns within the workplace. In order to address these issues and help treat any treatable illness, I would like you to meet with my colleague, Dr. Dekleva on Tuesday, Feb. 26 at 1000 am, in Room L-223 in the Office of Medical Services, SA-1 (Columbia Plaza). In order to conduct a thorough, fair, and careful evaluation, the process may take a good part of the day.

Please call 202-663-1903 to confirm this appointment and discuss with Dr. Dekleva any questions you may have. We look forward to responding to the concerns you have raised. If you feel you want to be seen before Feb 26, please call Dr. Dekleva to arrange an earlier appointment.

**Cheris, Eddie S**

| | |
|---|---|
| **From:** | Cheris, Eddie S |
| **Sent:** | Monday, February 04, 2002 7:52 AM |
| **To:** | Crawford, William |
| **Subject:** | Private Matter / / / Confidential |

Hello Mr. Crawford

This morning (Monday Feb 4th) I came to work and went to my work station as usual. Trying to comfortably set in my chair without incurring a lot of pain.

Mrs. Spratt once again begins making her rediculous comments something about me complaining or grouning, making everyone sick, and I should go home.

Common sense just dictates not to response to her.

Instead of calling security -- I thought it would be best to forward this email to you.

*A similar thing occurred on the previous Friday morning, where Mrs. Spratt complained about the smells, mentioning that this place smelled like a senior citizens' home.*

I realized the ben gay substance smells a little, but I absolutely *need it to be mobile. And I did ask Steve Cox if I should go home,* Steve Cox told me no and that I had limited leave to use.

In addition, I don't think Mrs. Spratt has a right to complain since she is almost constantly immitting *air-borne substances from her* workstation station. Steve Cox was informed about one of these (odors) where Mrs. Spratt was spraying something (maybe air freshener). The smell was so bad that I had to take a break and go out-side. On other occasions Mrs. Spratt has been cooking or boiling something (wicked smelling) at her station that the smell was over-bearing where I started coughing.

With one additional comment. Ever since Mrs. Spratt brought in that green plant which sets on her desk, there has been little fly or nats flying around.

Thank you

Eddie Cheris

||||||||||||||||||||||||||||||||||||
Note: I was not wearing any
Ben-Gay Paste on February 4th.

## Situation Report

During the weeks of May 27th through June 6th, several of the personnel located in Room 520, complained about getting sick (heavy sinus congestion, headaches, and so on). And several personnel called in on sick leave during this time period.

Over the past date, I noticed several people in the office coughing and sneezing (more than usual).

On Wednesday, June 5th around 10:15 am, while setting at my workstation, I began having severe sinus problems – like thousands of tiny bugs eating ate my nasal passage(s) capsules. At 4:15 pm, I left work with this above mentioned condition and around 5:00 pm took more Tylenol to hopefully relieve the condition. By 8:10 pm, I was throwing-up/sick. And continued to have the sinus irritation and headache which kept me awake until 3:30 am the next day. Exhausted, I went to work, and mentioned the above to Mary Sampson (who was in charge). I soon discovered that at least one other co-worker also called in sick (this same day) and that two other co-workers previously called in sick.

Note: This health condition was not the flu and as far as I can determined was some-type of chemical present in the air that was irritating my sinus and giving me a headache almost instantly. After walking through the office area several times, it was also apparent that a particular odor lingered in the office – but unsure where it came from.

On Thursday, June 6th, all personnel present in Room 520, where requested to visit the Medical facility in Building SA-1 for examination and questioning. This included myself, Mary Sampson, Ms. Spratt, Sharon, and a gentleman named Robert.

By 12-Noon, Thursday, June 6th we were placed on leave for Thursday afternoon and all day Friday. And were told to report back to work on Monday, June 10th.

Following instructions, I reported back to work on Monday, June 10th. After speaking with several of my co-workers, I was informed not to work in Room 520 and that a cleaning crew would be cleaning this facility supposedly for dust – something dealing with the air-conditioning vents.

By Monday afternoon, I and my co-workers returned to Room 520 and to our particular workstations and began working with no further sinus irritation. It is unknown what measures (management) took to discover and/or fix this problem. And it was also apparent that no cleaning crew entered Room 520 and/or did anything.

■ Attachment 13 ■

**Cheris, Eddie S**

| | |
|---|---|
| **From:** | OIG Hotline |
| **Sent:** | Friday, February 15, 2002 3:34 PM |
| **To:** | Cheris, Eddie S(CA/PPT/IML/R(RP/DA) |
| **Subject:** | Hotline Complaint |

Dear Mr. Cheris,

This is to acknowledge your letters and the issues you brought to the attention of the Office of Inspector General's Hotline.

We conducted a review of your concerns and determined that the appropriate office to address this matter is the Bureau of Consular Affairs/Executive Office (CA/EX). We have forwarded your correspondence to that office for action and have asked that it contact you directly for more information, if necessary. Please refer future correspondence to CA/EX.

Thank you for bringing this matter to our attention. Should you have any questions, please contact the office mentioned above for further assistance.

Sincerely,
OIG Hotline

---

01 April 2002 / Monday

George W. Bush
The President of the United States
The White House
1600 Pennsylvania Avenue, N.W.,
Washington, D.C. 20500

Dear Mr. President:

The enclosures are provided to detail serious issues at the Passport Office here in Washington, D.C. and the repeated abuse I received from my supervisor.

The enclosures were brought to the attention of several individuals within the U.S. Department of State and in particular to my higher level superior(s). I waited to see if they would correct this situation—which they have not.

It is my intention to respectfully ask if this case can be examined by the U.S. Attorney General and/or the Federal Bureau of Investigations.

Thank you very much for your time and assistance.

Eddie S. Cheris

U.S. Department of State
Bureau of Consular Affairs
Passport Office, Suite 520,
1111-19th Street, N.W.,
Washington, D.C. 20522-0001

Copy to: Secretary of State (Colin L. Powell)





■ Attachment 13 ■

**Memorandum for the Record**

19 June 2002 / Wednesday

Since the beginning of March 2002, there has been a (daily) repeated presence of gNat's (little flies) in Room 520. Each of the personnel in Room 520 have also taken the initiative to killed those gnats that were possible to catch.

Overhearing others complain about these nats – the assumption is that the gnats come from the plants that are in the Office – but I have also heard from other personnel that these gnats cover the range of the entire 5th floor.

On Monday, 17 June, I tried spraying (Off-spray/bug repellant) on my cloths in order to see if it would keep away this gnats, while I was working.

On the afternoon of 19 June, while typing at my workstation a gnat flew directly up my nose. It was not retrieyable.

---

25 Oct 2002/Friday

Dear Mr. Crawford

For approximately the past two weeks, Betty and Bruce have loudly been complaining (particularly in the afternoons); that there was some-type of bad odor coming from the hallway or one of the trash containers.

Every afternoon this week both Betty and Bruce have mentioned "loudly" that they have smelled an odor of something like pine scent within room 520.

At 2:45pm - today, I am working at my computer and was suddenly interrupted by a very powerful presence of this pine odor, which appeared and lasted for a while. Since it was close to break-time, I stepped outside for breath of fresh air – because I really needed too.

I asked Bruce, if he had any idea where this strong odor was coming from; and he pointed to Ms. Spratts' workstation.

Thought you might want to look into this.

Thanks Ed

---

*Situation Report, 22 October 2002/Tuesday*

On Friday, 18 October 2002, I provided Mr. Crawford a report concerning the pine scent smell in Room 520; that several people were complaining about.

On Monday, 21 October 2002, Ms. Spratt was not in the Office.

Today, at 08:55 this pine scent re-appeared and was strong. Mr. Crawford entered Room 520 at 09:05 and I wrote down on a piece of paper; "May I step out side to get a breath of fresh air – that the pine spell is really bad. And I handed Mr. Crawford this paper. Mr. Crawford told me that he would let me go out and get a breath of fresh air; but it would be considered one of my break-times. And, he thought that I just wanted to go and have a cigarette.

Mr. Crawford asked Ms. Spratt about the smell and Ms. Spratt said it was hand-lotion.

Several comments mildly went back and forth concerning the severity of this smell. And Mr. Crawford asked Ms. Spratt if she would be more sensitive on how and where she applied this hand-lotion.

■ Attachment 13 ■

09 December 2002

Mr. Crawford

On Friday/Dec 6 at 12 O'clock, I went to Jonathans Restaurant for lunch and eat a sandwich. Though, I ate the entire sandwich, because I was hungry, it did not taste good (maybe spoiled).

I arrived back to the Office at 12:35 and began my work. From 12:35 to about 1:00, Bruce Thompson, Mimi Spratt and someone else where talking really loud about several topics. I tried to ignore them and just do my job – by wearing that ear protection, I have at my desk. Bruce Thompson left the Office area around 1:00. From 1:00 to 2:15 it was very apparent Mimi Spratt was in the Office. Repeatedly she yelled across the room. Even with the ear protection on, I could hear her, well. Which was particularly annoying since I was seriously trying to do my job. Also, from 12:35 to 2:30, Bruce, Sharon, & Robert had their radios tuned to the same station. From my desk, I could here this annoying, "so-called" music very well (which is something I would not want to here anyway) – by putting on the ear protection – I blocked this particular noise out.

By 2:30, putting up with this noise and honestly not feeling good after eating that sandwich; I decided to go home on sick leave. I also did not feel good over the weekend.

Thanks

Ed Cheris

■ Attachment 13 ■

---

## Cheris, Eddie S

**From:**      Cheris, Eddie S
**Sent:**      Monday, December 09, 2002 9:56 AM
**To:**        Crawford, William
**Subject:**   Private Msg / / /

Hi Mr. Crawford

For the past 20 minutes, Bruce, Mimi Spratt, Betty all have been "heavily" complaining (yelling) about some-type of smell in Room 520. Really noisy.

This morning, when I arrived in the Office; I also smell something that resembles that fleu like smell.

Thanks  Ed

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Note: At the point of forwarding the above email to Mr. Crawford, Mimi Spratt sprays her workstation with something having a very strong pine scent – which in turn, Betty, Robert, Bruce, and Mary all complained (yelled) about this very irritating pine scent smell. Both me and Betty developed headaches. Fortunately, this was 7 minutes before break-time (10:00) and me, Bruce, Mary, and Robert all disappeared from the Office.

Briefly, re-examining the original smell detected earlier this morning. The smell originates between Roberts' workstation and Mimi Spratts' workstation and honestly resembles the fleu like vomit.

What ever the smells are; I am at my workstation trying to do some work; and there is a yelling going-on; which makes it difficult to concentrate.

09 DEC 2002 / Monday Sit. Rep.

---

Mr. Crawford discovered that the original smell was Mimi Spratts' rauting plant

1

Date:            20 December 2002/Friday

Page:            01 of 05

From:            Eddie Cheris

Thru:            Mr. Crawford

To:              DOS Security

Purpose:         Situation Report for Intended Questioning by State Department - Security

On Friday morning, 13 December 2002, Mr. Crawford requested to speak with me in his office. Our conversation concerned a woman named Robin, whom had worked in another section of the Passport Office.

Mr. Crawford informed me that management decided to relocate Robin to my office area (Rm 520), and that I should not talk with her. Basically avoid any contact with this individual. I was more than happy to work with Mr. Crawfords' request and followed his instructions to the letter. Mr. Crawford informed me that Security may want to question me about an incident which occurred sometime ago, with Robin and is described below.

After over hearing several personnel in the office speak about Robin and having a brief meeting with Mr. Crawford. I got the idea that this woman ran into serious trouble with State Dept. Security officers. In fact, two security officers repeatedly visited Rm 520 to see Robin over the past week. What type of trouble Robin encountered was not particularly clear. Later, I over heard, again, that Robin was in the hospital.

About four or five years ago, I was walking from one section of the Passport Office to another and had to open a door (outwardly) to enter the next section. As I slowly opened the door, I just happen to notice something on the floor next to the opposite side of the door. I was not sure what it was (maybe a little puppy – since it looked hairy). Since my hand was on the door handle, I prevented the door from knocking into whatever it was. I waited a few seconds and repeated (slowly) opening the door.

As I opened the door "slightly", discovered that this woman, Robin was crouched down on the floor with her head placed close to the base of the door and near the metal storage racks. Seeing me there, Robin immediately re-adjusted her position and began loudly, shouting "you hit me, you are trying to kill me." Robin got totally out of control and I did not do anything to her. My first thought was maybe she was sick, collapsed/fell down in that position. I did ask her what she was doing on the floor. Robin yelled that she was looking for a quarter. As I tried to walk away, two (individuals in a laughing manner and whom were working with the skids and boxes, said out loud, that Robin was trying to get out of doing work and get workman's compensation. Honestly, I don't remember who these two individuals were (maybe James and Benny).

■ **Attachment 13** ■

Page: 03 of 05 / Situation Report

"If I may, let me prove my innocence, not only in the above case, but also dealing with several other incidents at the Passport Office.

In November 1999, at my initial firing date (interview) both the woman in Personnel Department and Tasha Thian required that they wanted me to come into the workplace, do my job very well and stick to it self, and basically say nothing. This was a "mandatory requirement" from of these individuals were very particular about this issue. I then understood, there was to be no arguments around of my job. No personal involvement (sexually or otherwise) with anyone. Keep the job choice, stabilizing with anyone, should be kept at a minimum and further if any problems arose, I was nothing it to their attention, immediately. And, basically, I was just in order to play my job, and that was it – nothing more and nothing less. I was at the job-site to make a profession. only. Both of these individuals were very particular about this issue. Upon accepting the job, I agreed to this.

In that, I was given this initial "Order", and have tried my best to fulfill it.

Unfortunately, within the first year and a ½ several (out-of-control) incidents occurred within this facility. As one of my supervisor's was Steve Cox, according to an idiot course called OSP. I knew there was something going on around me. I have repeatedly tried to tell Steve Cox about the mandatory requirement these individuals gave me. I then simply told the supervisor directly that I am in it for the money, nothing more and that I have no time to play about it. As time went on, I actually eventually...

[remainder illegible]

---

Page: 02 of 05 / Situation Report

Note here. This is the only encounter. I have over had with this woman. Honestly, I have no idea who she is, and/or what she does at the workplace. But, I have repeatedly over heard her in the hallways and in the elevators (and at Jonathan's Restaurant) yelling very loudly.

I don't remember if I reported this above incident to Steve Cox, but I do remember reporting the incident to Tasha Thian. Unfortunately, like a number of other incidents, which have occurred at the workplace - I reported it to the supervisor(s), and nothing was done about it. Now, approximately five years later, the incident re-emerges, again.

If I may make another comment here. Over the past seven years, there have been a number of incidents at the Passport Office among a number of its' personnel. Robin is not the only individual who has displayed this verbally, loud - explosive behavior in reaction to something that basically was nothing. I am not sure if some of these individuals are conditioned to react in this manner – due to their lifestyle(s), or maybe they have so much anger/tension built up that anything triggers them to vent their expressions; or they might be on drugs, or just maybe there is something in the (office) air that they are reacting to; or it could be that they are hustling others for money - intimidation; or most likely they act this way to cover up their screw ups. I have tried to analyze this behavior. How some these individuals live day-to-day on an emotional roller-coaster is beyond me. In any case, I don't function like this and don't want to and honestly, can't afford to do so, especially with a very heavy study load. Over the past seven years, I have observed and in some cases encountered this loud noisy emotional display (approbative that I might lead to and in some cases has led to violent physical behavior), I aggressively (defensively) avoided certain individuals all together. Robin is one of these individuals, I have purposely avoided due to the above detail encounter.

If I may re-affirm my statement mentioned above. There is a logical reason, I do not know anything about some of my co-workers, do to the fact that I have (defensively) restricted contact with them and continue to do so. There is also the other issue that has "repeatedly" surfaced at the Passport Office no matter who has been involved in what particular incident. Who is supposed to manage, whom: I am a GS-6, File Clerk - my job is to do clerical-type duties. I am not rated as a supervisor. I do not want to be a supervisor. And, much more vitally important, I am not receiving a supervisor's pay cheque. Legally, I am not responsible to manage, judge in the personal needs of, and/or baby-sit my fellow co-worker(s).

Who is properly performing their required duties and who is not; is the point that this should be very strictly examined here and not only presently but over the past seven years.

Page: 04 of 05 / Situation Report

Repeatedly, I have informed several individuals that my employer owes me some money. For initially, I was instructed to perform my job in a particular manner (by two separate individuals in authority), and have repeatedly been forced into the position of *doing the supervisors' job* – do to the fact, that the supervisor(s) could not or would not properly do their particular job.

If I may, let me re-affirm my statement mentioned above more precisely. *The initial mandated order given to me;* restricted me from managing, maintaining the personal needs of, and/or baby-setting my fellow co-worker(s). As best as possible, I have only been following the orders. Concerning my fellow co-workers, for example Robin mentioned above (what ever their personal needs, may be), is not my responsibility and never has been my responsibility. It is the supervisors' primary duty to perform this function.

In any case, if I may let me provide you an ethical and logical point of view here. There have been a number of incidents among a number of personnel at the Passport Office. I have been involved in only a few of these incidents; for example the above incident concerning, Robin. Surrounding *one or more of these incidents has developed the accusation that I intended to cause harm to someone else.* And, is bothering me about their poverty condition(s). I did not go bothering them and eventually came a defensive position towards this aggression.

Analyze any and all of the incidents that have occurred. Examine the character profiles of any and all of the individuals involved. I believe you will find a pattern here.

From my perspective, there is no doubt, that I am definitely much more motivated and driven, much more cultured, educated and experienced, financially more stable, and in many cases even dress better than a number of individuals I work with. This is a plain and simple fact. Baseline logic would justifiably dictate, what would I have to gain personally, even speaking with a number of my co-workers – Nothing! It would be utterly stupid on my part to do so. I have no essential need to bother these other individuals; and there is nothing to gain from them.

More to the point, and I could express it in a much more flaming and colorful way. Respect to my reader, I will express it in a softer way. *"Honestly, I do not want contact with several of my co-workers; because I do not want to be contaminated with their poverty lifestyle(s)."* I could have expressed this adjacent statement in a much more flaming, colorful and critically direct way. Out of respect to my reader, I did not do this. Basically, I have to look-out for my own best interest(s), because no one else will.

Page: 05 of 05 / Situation Report

This topic of poverty was and still is the basic issue of my supervisor sending me to an idiot course called, OSP. If my supervisor wishes to get *contaminated into someone else's poverty,* that his own personal, business. But, there was no need to drag me or others into this poverty reprogramming junk – which honestly was a sincere waste of my time.

Returning to the first part of my report concerning Robin. The conclusion by myself and two other individuals was that Robin intended to set me up as the fall-guy so that she could collect workman's compensation benefits – because she wanted to get out of doing any work. The scam did not work, as she immediately accused of doing something I had no thought of even considering. Now, this particular issue re-emerges approximately five years, latter. Before you jump all over my case, please re-examine, who is properly performing their required duties and who is not.

■ Attachment 13 ■

28 March 2003 / Friday

U.S. Department of State
CA/EX/HRD (202) 663-2529
Adrienne B. Hatchett
Personnel Department
2401 E. Street, N.W.,
Room H1010B, SA-1,
Washington, D.C. 20520

Dear Ms. Hatchett

Over a month ago, I forwarded a letter to you briefly explaining that for some time, the workflow in my office has decreased "greatly" to almost nothing. This lack of work has now extended into its' fifth month.

I have continued spending my time typing-up large quantities of research notes for my dissertation – in light that there is nothing else to do.

And, unfortunately, personnel conflicts keep arising in the office -- in addition to the on-going issue of loud noise -- yelling and arguing between personnel (particularly by a woman named, Betty). I intentionally wear ear protection to block-out all of the out-of-control noise that frequently occurs.

Many times, I have informed both Steve Cox and William Crawford of these on-going personnel issues in the office -- which I have successfully avoided for some time. Recent documentation attached as reference.

In respect to the above -- time after time "a number" of situations have occurred within the workplace that is the direct responsibility of the supervisor(s) to properly handle; and not mine or some other personnel, "Time after time the supervisor(s), have failed to perform their jobs.

Since very little work is being provided and for a lengthy period of time, I believe it is just common sense to respectfully, request a re-assignment (a transfer) to another office where people act, perform and work "normally."

The primary reason for forwarding my letter is to make an appointment to discuss with you a re-assignment.

I would also like to discuss with you the removal of the OSP course from my permanent records. Documentation attached. Steve Cox sent me to the 18-day course; which was a waste of my time, besides embarrassing. Tasha Thian said it would stay on my record for three years and them be removed.

There is also another issue I need to discuss with you. Several times during last year I contacted Ms. Hicks concerning the cancellation of my government health insurance and thrift savings plan. She told me I had to wait until Open Season to cancel the government health insurance. Before Christmas 2002, I forwarded to Ms. Hicks a letter with forms requesting that my government health insurance and my thrift saving plan be cancelled. I needed to use this extra money for other purposes. Ms. Hicks gave me a hard time about this. By the end of January 2003, I noticed that on my pay statement that my government health insurance was cancelled. But the thrift savings plan was not.

Thank You

Ed Cheris    (202) 955-0248

Personal & Confidential

U.S. Department of State
CA/EX/HRD

(202) 663-2529
Adrienne B. Hatchett
Personnel Department
2401 E. Street, N.W.,
Room H1010B, SA-1,
Washington, D.C. 20520

Page 2

■ Attachment 13 ■

# - NOTICE -

## TO ALL GOVERNMENT & CONTRACT EMPLOYEES RECORDS SERVICES DIVISION

In recent weeks we have had several thefts on the floor. Circumstances indicate that the theft must have been committed by one or more employees.

It is recommended you keep your money, wallets, or purses close at hand. Do not leave them unattended. Be on the alert for persons stopping by unattended workstations or offices. Notify supervisors of suspicious behavior.

It is most regrettable that someone among us would engage in this criminal activity. If caught, we will pursue prosecution.

March 12, 2003

■ Attachment 13 ■

---

**Cheris, Eddie S**

To:        Washington, Vanessa D
Subject:   FW: Private Message /// /Alert / / /

FYI

Copy sent to William Crawford

-----Original Message-----
From:     Cheris, Eddie S
Sent:     Monday, March 10, 2003 11:12 AM
To:       Crawford, William
Subject:  Private Message /// /Alert / / /

Hi Mr. Crawford

Over the past 1/2 hour, Betty has been arguing with Sharon and Robin and getting load verbally. Thought you might went to check-in on this before there is some type of conflict in the office.

Thanks Ed

Steve/Corey

**This is for your information.**

**This morning I received the email reminder to go-get the new Smart Card ID Badge.
I printed the email message to take along with me.**

**As I picked up the printed email message from the printer; that older woman, named Betty began calling me by name and I got the idea that she wanted to ask me some kind of question – I am not sure on what.**

**I completely avoided her and walked away reading the printed email message.**

**Honestly, I do not want contact with this woman, for she acts strange at times; and has previously caused me trouble and I don't even know her.**

**Thanks Ed  09 apr 03**

---

Corey Bent/Steve Cox/William Crawford

10 Apr 03

(FYI)

At 10:03 I went on break and got a cup of coffee at Jonathan's Restaurant across the street. At 10:15, I returned to the fifth Floor. I got off the elevator and proceeded to room 520. As I walked towards room 520 -- I noticed that Timi Spratt and Betty were at the door entrance of Room 520 and they were in discussion with the Janitor who was talking about (2 of something (?)) – I got the idea that he was physically pointing-out Betty's breasts. As I proceeded closer to room 520, Timi Sprat went into room 520 and Betty slowly proceeded down the hallway. As soon as Timi Sprat entered room 520 the door closed directly behind her making a clicking noise but not really loud. Betty immediately became 'startled' by this door clicking sound (like she was ready to climb up the wall.) As I approached and opened the door of room 520; Betty stood where she was positioned and just stared at me. Of course, I tried to ignore her and proceeded to enter room 520.

I have no idea what this woman wants from me and honestly I don't want anything to do with her. But, Betty has on a number of occasions; demonstrated this shock and stare "pattern". I am not sure if this pattern of behavior is her normal operating mode, or possibly she is on drugs, or possibly there; is another influence making her behave this way. I am not sure.

But, I am getting more than a little edgy, that if she proceeds with this pattern of behavior it may eventually lead to physical conflict.

I will do my best to avoid her. Thanks Ed

Situation Report / 14 April 2003 / Ed Cheris

To: Corey Bent / Steve Cox / William Crawford

At approximately 10:43 am, I was in the processing of alphabetically sorting-out about 500 documents that Corey Bent had previously requested me to sort and file.

I placed these documents out on my desk surface(s) to separate in alphabetical piles to be organized.

Half way in sorting these documents, I stopped for a few seconds, picked up my cup of coffee and began having a drink while facing towards the front door of room 520. While taking a sips of coffee - I heard Mimi Spratt say something. At first I didn't know if she was on the phone again or talking to me. I glanced towards her work area and noticed immediately that Mimi Spratt was starring at me. Once, we made eye-to-eye contact she began complaining in a low-voice that I was starring at her.

Immediately, my first thoughts were, "man, I don't have time for this idiot junk".

I briefly informed Steve Cox of this situation and returned to sorting documents.

Approximately 20 minutes later, I over heard Mimi Spratt saying to Bruce and Betty that I was starring at her. She was definitely loud enough that I could hear what she was saying.

I briefly informed Steve Cox of this and again, and returned to sorting documents.

Situation Report (07 May 2003/Wednesday) Ed Cheris

Today at 10:10, I looked at the wall clock and noticed I had missed break-time by 10 minutes. I told Corey of this and mentioned that I was taking my break 10 minutes late.

Leaving Corey's office I proceeded to walk out of Room 520. As I passed the older woman, Betty I pointed lightly. Wondering if my computer was secure, I turned around to go back to my desk to double-check that it was locked-up. Here Betty I was starring in the act saying something about me covering my mouth and something else, which I can't recall. I thought she was trying to pick a fight with me, "again". Immediately, I informed Corey of this incident.

As I proceeded back again to leave Room 520 for my break and without coughing; Betty again, began starring at me and making a lengthy comment about getting germs.

I am not doing anything to this woman. I could care less even to talk with this woman. And she has repeatedly come bothering me about her personal problem(s).

If I may expand a little the above story a little more. All week, Mimi (timi) Spratt has been continuing to tell me or ... I think she has the flu. Mimi (timi) Spratt is positive to close to Betty 4 pm – 4 pm. No once have I heard Betty say to Mimi (timi) Spratt anything about coughing or germs.

■ Attachment 13 ■

Hi Corey

● This note is just between you and me.

   ● Reminder that Monday and Tuesday, I am attending the Intermediate
   ● Access Course at FSI.

● For two reason, I have also decided to return the Kastle Key (enclosed)
and not come-in early each morning to the office to study.

The FSI FasTrack courses; I signed-up for – "I think"; I can print them out at
the Library of Congress on Saturday afternoons. Will check if this is
feasible this Saturday. My little HP printer is available to do any extra-
curricular printing. But, I need the tech guys to install the drivers when they
have extra time. I could do this extra printing during lunch times and buy
my own ink cartridges and paper.

Thursday, I came in early 6:20 am to study the FasTrac courses. All through
the morning hours Betty, Bruce, Mini Spratt and several other people got
loud (talking a lot). I even (quietly) told Crystal about it. Seriously,
distracting when I was trying to get the work done.

Anyways, since you, me and Crystal have demonstrated over the past 4-5-6
weeks the eagerness to do the work and very well. It is only logical to form
some form of working relationship with Crystal especially when she has
relocated across the isle from me.

So over the past 2-3 days, I have frequently spoken to Crystal about some of
my adventures. Nothing bad or derogatory; just polite conversation. In
light, that you me and Crystal are approximately from the same area – more
than likely we have a good idea on how each other thinks and operates –
which would logically make us a good workable and flexible team.

Friday while doing the work, I continued socializing with Crystal and we
were responding back and forth well – no problems at all. When I asked her
for extra work; she immediately gave another box.

Around 14:17, while highlighting the ROB's, Mimi Spratt shouts out, "Shut
Up" you talk all the time.

■ **Attachment 13** ■

some way that she will do something outline of line, such as possibly through something at me or maybe worse.

I have gone way out of my way to avoid contact with this woman – because in the past that has harassed me and accused me of doing things 'to her' – and sincerely could care less to even say good morning to her. Plus, its' not my job to baby-set her.

In any case, you should be informed about the above situation. If you think it is beneficial, maybe talk with Crystal concerning what occurred.

I have decided to refrain the Castle Key, because coming in early to study, may honestly leave me open to future attacks/accusations from Mimi Spratt that could lead to serious consequences. I don't trust this woman and don't want contact with her. Basically a good reminder to keep my guard up!

I sincerely see one of our ways to build a solid working relationship with you and Crystal and I am out to shut up. But in turn, I am required to hear the other guy calling and loud talking without complaint. Something wrong with this picture.

I didn't want to take the initiative to get the map board complete as efficiently as possible. I asked Robert, if he would furnished me a list of the pins so that I could install all of the correct pins – immediately. He claimed is the only thing he sent me. Maybe Wednesday, we can continued this project.

Thanks

Ed

---

I immediately asked Crystal, should I call Security?

Crystal, I think, surprised at Mimi Spratt's comment, looked towards Mimi Spratt and then looked at me and responded to me in a non-verbal expression. No.

I waited for about, 5 –10 minutes more to see if Mimi Spratt would mouth off again – nothing more occurred. I did noticed (at a distance) that Mimi Spratt at that time was playing around on the Internet – instead of doing the ROB's. About 30 minutes later, Mimi Spratt, after this occurrence - started working on Piers. It isn't hard to notice what she was working on. The view of her screen is wide open and anyone walking by and can easily see what's on the screen at any given time

While I waited out for the 5 – 10 minute duration – Bruce re-enters rm 520 from the side-door expressing something real loud. To the point that I looked at Crystal and then mentioned, I wondered how many decimals that was?

In any case, I quietly told Crystal that I was going to discontinue talking with her for a while to see what happens. In a non-verbal expression even Crystal questioned Mimi Spratt's remark. Suggesting in a way – what's wrong with her.

By 14:45, Crystal, I guess? – decided to visit Betty. They spoke for a while. I could hear them well from across the room. Bruce and the temp-lady were engaged in their own conversation. While this was going on, I typed-up this note. Mimi Spratt just sat by herself and didn't not speak to anyone.

By 15:10, Mary, Betty, and the temp-lady were all joking about each other and where loud enough that I could hear what they were say and Mimi Spratt didn't say a thing and left – I guess for the day.

Mimi Spratt has already been told in the past (I believe, more than once) to consult her supervisor(s) instead on confronting me with her particular problem(s). I have also been instructed to do the same.

I discontinued talking to Crystal, because I am and have been in the past more than apprehensive that if Mimi Spratt is inadvertently pressured in

## MEMORANDUM FOR THE RECORD
26 July 2002 / Friday (Page 01 of 05)


Throughout the early part of July my leg/back problem appeared to be improving a lot. I began walking a lot more normally than I had been with very little pain.

On Tuesday, 23rd and Wednesday 24th of July; my back and right leg where hurting me severely. I also had tight pain across my lower stomach/hip areas. And, in fact, I went home on sick leave due to this problem on Wednesday, July 24th. Enduring this stomach pain all through the night, I decided to get some advice.

Very early Thursday morning 25th July, I called into work on sick leave. By 8:30 am, I took the subway to Foggy Bottom and walked down to SA-1/Building. Unsure what time the medical center opened and not wanting to interrupt any of the medical personnel morning staff meetings; I decided to wait until 9:30 or 10:00 to visit.

Since the Main State Department building was half a block down the street, I decided to gradually walk to this building and visit the credit union. I waited for an hour and then gradually walked to SA-1 where I went to the State Departments' medical facility and met with Judith A. Zarbo  Tele:  (202) 663-3974.

Within the span of half an hour, I briefly explained the history of my back/leg problem, which appeared to be getting better. Except for the severe re-occurrence over the past two days including pain in the lower stomach/hip area.

My intent was to ask Dr./Ms. Zarbo if she was able to refill my previous prescription of Meloxican issued by another doctor. She was not able to do this; but did provide me with several tablets of Motrin. And, then recommended, I make arrangements to see an orthopedic doctor at the Georgetown Medical Center, in Arlington, Virginia.

## MEMORANDUM FOR THE RECORD
26 July 2002 / Friday (Page 02 of 05)

I thanked Dr./Ms. Zarbo and immediately left SA-1/Facility. My intent was to return to the Main State Department building and take the shuttle bus back to the workplace on 19th Street. But, I was very apprehensive on doing this. Earlier, when I was at the Main State Department building, I found a visitors badge lying on the floor. The logical thing was to return the badge to where it initially came from. So on my way out of the Main State Department Building; I (quietly and confidentially) handed the visitors badge to a security officer and informed him that I found it lying on the floor in the coffee shop on the B Level of the building. Immediately this security officer made a big deal out of this entire situation. First by requesting me to the side and then requesting to see my badge and take down my name and badge number. I felt embarrassed as hell and told the officer I was kindly returning the lost badge and did not want any trouble. As requested, I presented my badge to the officer who was taking a long time just to jot-down any information. And, I tried to tell the officer, I felt embarrassed and did not want anyone to know I returned the lost badge. While in discussion with this officer, pain in my leg began acting-up and I began rubbing my leg. As I glanced down at my leg – I then became aware that I was (inadvertently) standing at the exit end of the X-ray machine. And then, respectfully informed the officer that I was afraid of standing next to this machine – because of possibly exposure to radioactivity. The officer returned my badge and gave me leave to go. On the way out, I stopped at the Information Desk and informed the two woman, whom where at the desk of this embarrassing situation. Both woman informed me that I did the proper thing in returning the lost visitors badge. And, I left the building swearing that if I ever (in the future) find another lost badge – I am not even going to bother with it.

In any case, after leaving the medical facility, I gradually and slowly walked back to the workplace on 19th Street. Three blocks into this walk; the pain was so bad, that I had to find the nearest bench and sat down for about 20 minutes – almost crying.

## MEMORANDUM FOR THE RECORD
26 July 2002 / Friday (Page 03 of 05)

Continuing my walk, I came to Tower Records store and decided to just take a rest from straight walking. I stayed there for about another 20 minutes letting the pain soften up. Leaving the store, I then walked up to 22nd Street and L Street. My intention was to just get the subway train and go home or on sick leave for the rest of the day.

Heading for the subway station, I passed a barbershop. I not only needed to sit down because of the pain, but also need a haircut too, and so I went in.

Sitting in the barbershop for about half an hour my leg began feeling a lot better. No pain. Instead of going home, I walked to the workplace.

By this time it was approximately 11:45 am. My lunch hour is typically between 12:00 to 12:45. Thus, I was just logical for me to go get lunch and then enter the workplace at 12:15. Which I did.

Returning to work at 12:15 or completed a leave slip and then delivered it to [illegible] Mr. Crawford (primarily) and [illegible] both of us speak with Mr. Martin. For [illegible] Mr. Martin's office; Mr. Crawford (primarily) and [illegible] where I was [illegible] that day, the history of my back/leg problem including medical solutions and that he wanted me to phone him [illegible] person. Instead of leaving messages (concerning sick leave) on his voice mail and that I should submit my leave slip ahead of time before taking any leave.

During this conversation between [illegible] and Mr. Crawford, Mr. Martin primarily sat his desk with a sarcastic [illegible] look on his face. And on three different occurrences, Mr. Martin spoke-up saying that he thought I was basically faking an injury, and I was playing a game. (Indirectly calling me a liar.)

Attachment 13

■ Attachment 13 ■

## MEMORANDUM FOR THE RECORD
26 July 2002 / Friday (Page 05 of 05)

With an additional note concerning mismanagement at the Passport Agency and as noted on the attachment. Recently, the Secretary of State requested Ambassador Ryan to resign due to a mismanagement incident in Qatar. Ambassador Ryan is the boss directly above my supervisors. I have formerly met Ambassador Ryan and seriously thought this woman was one sharp and very dynamic individual. From the time, this resignation announcement was released, I can't avoid wondering if not just one but possibly two of my supervisors where somehow involved (either directly/indirectly) with this situation in Qatar. If I may explain a little further. My supervisors' primary job is to account for, maintain, and review all of the passports logs issued at each of the American Embassies and posts. He receives these reports on a daily basis. Over the past several years, I have overheard that the supervisor has had difficulty in getting *most* if not all of the Embassies and posts to forward the passport data logs to our office in a proper format, on time, and with correct data and so on. I seriously wondered/suspected, if Ambassador Ryan is taking the blame for someone or several individuals in lower level management (at the Passport Agency here in Washington); whom either screwed-up or did not do their job(s) properly and let the mismanagement occur in Qatar.

## MEMORANDUM FOR THE RECORD
26 July 2002 / Friday (Page 04 of 05)

At this point, I understood that I was being harassed based on several points: One, I have already been to an orthopedic doctor who issued me medication *for the back/leg problem.* Two, I can provide a number of witnesses(individuals) who can verify observing me incuring leg pain. And, thirdly – in a previous meeting with Mr. Martin and Mr. Crawford – Mr. Martin had already told me of his opinion. There is no need for this man to tell me repeatedly of his opinion, over and over again. I seriously had to wonder if, Mr. Martin is either stupid, depressed or is intentionally trying to provoke a fight with me. In any case, I did not ask for this man's opinion nor do I want to hear it. Particularly, after the last our encounter *off on the agency's shrink.* And then to Mr. Frank Moss.

Additional note, It has already been expressively confirm by both personnel here in the Office and by (Adrienne Hatchet) of the Personnel Department that previously this Office was badly mismanaged under Tasha Thian.

As I suspected late last year and earlier this year, *once* I had spoken with top level security officers concerning issues in the Office. And, also informing them and Mr. Crawford and Mr. Martin of my intent on hiring *an attorney* to file a lawsuit against my supervisor concerning abuse and negligence – some form of retaliation would occur.

In brief, these meetings with Mr. Crawford, Mr. Martin, Mr. Moss and several other individuals (on my part was to hopefully settle any issues out of court).

Unfortunately trying to negotiate a peaceful settlement with any of these individuals has just lead to more abuse, *entrapment, punishment, and further* intimidation tactics.

I have no choice except to follow through with a lawsuit.

**United States Department of State**

*Washington, D.C. 20520*

Mr. Eddie S. Cheris
Office of Information Management and Liaison
1111 19th Street, NW Room 520
Washington, DC

Dear Mr. Cheris:

This letter is to inform you that the U.S. Department of State proposes to suspend you from your position as a File Assistant, GS-0305-06, step 8, with the Bureau of Consular Affairs, Office of Information Management and Liaison, Records Services Division, for a period of 5 calendar days. This action is being taken in accordance with Part 752 of the Code of Federal Regulations to promote the efficiency of the service.

## Reason: Failure to Comply with Supervisor's Instructions

**Background:**

On September 18, 2001, you approached two co-workers, Mr. Thomas Atkins and Ms. Terry Spot. The comments and behavior that you displayed left them both feeling intimidated and uncomfortable. You spoke of wanting to physically harm your immediate supervisor Mr. Stephen Cox, as you blame him for a medical condition affecting your ears. Your third line supervisor, Timothy Martin arranged for you to meet with Dr. Flora Bryant, from the Employee Consultation Service, with the hope that you would discuss your concerns with her, instead of with fellow co-workers. Mr. Martin concluded that in light of the September 11th tragedies, your co-workers might have been more sensitized that usual about your unsettling behavior. You were counseled on September 21, 2001 in lieu of a reprimand and given explicit instructions to be mindful of the comments made in the workplace that could upset your co-workers.

**Specification:**

On February 21, 2002, you ignored the instructions of your third line supervisor, Mr. Martin and approached two co-workers. You warned Ms. Veda Matthews by stating, "You would want to watch out for yourself, because something is getting ready to happen soon." You also told Ms. Mary Sampson that an investigation was about to start and that she should be careful when she has sitting around her desk.

You have again upset your co-workers by making statements of impending doom. By "warning" your co-workers of impending happenings you continue to create a sense of anxiety in the workplace. By making the above contacts with your co-workers, you have clearly failed to follow the instructions given to you in September 2001. This behavior causes unnecessary apprehension in the office and has an adverse effect on morale and workplace efficiency and will not be tolerated.

You have the right to seek employee assistance if you are experiencing personnel or medical difficulties. It is strongly recommended that you make an appointment to see Dr. Kenneth DeHava, M/DGHR/MED, who may be reached on 202-663-1903 and/or Anne Weiss, M/DGHR/ME, on 202-663-1816. If you do not make and keep your appointment(s) and there is a repeat of your disruptive behavior, more severe disciplinary action will be proposed.

The materials relied upon to support this proposal are enclosed. If there is anything in this notice that you do not understand or wish explained, you may contact Nicole Hicks, Human Resources Specialist at (202) 663-2534. You have the right to answer orally and/or in writing and to submit affidavits or other written statements in support of your answer within fifteen (15) calendar days from the date in which you receive this notice.

Your written response should be mailed to the deciding official, Mr. Frank Moss, Bureau of Consular Affairs (CA/EX), Executive Director, Room 1004C, SA-1, 2401 E Street NW, Washington, D.C. 20522. If you wish to make an oral response, please contact Ms. Stephanie Holzman, at (202) 663-2500, who will arrange an appointment for you to meet with Mr. Moss. Prior to making his decision, Mr. Moss will carefully review the entire file, giving full consideration to any response you might submit.

You may be represented by the National Federation of Federal Employees (NFFE), Local 1998, an attorney, or other representative whose designation would not create a conflict of interest or conflict of position as prohibited by Federal Regulations. A written decision on this proposal will be issued to you as soon as possible once your response is received or after completion of the fifteen (15) day response period.

Sincerely,

Adrienne B. Hatchett
Human Resources Officer
Bureau of Consular Affairs

Enclosures:

1. March 4, 2002 – Request for disciplinary action from Tim Martin
2. January 02, 2002 – Statement from Eddie Cheris (page 7-8)
3. September 22, 2001 – Memorandum from Tim Martin
4. September 18, 2001 – Statement of Incident from Thomas Atkins
5. September 18, 2001 – Statement of Incident from Ms. Terry Spot
6. February 22, 2002 – Memorandum of Incident from Ms. Veda Matthews
7. February 22, 2000 – Statement of Incident from Ms. Mary Sampson

■ **Attachment 13** ■

## MEMORANDUM FOR THE RECORD

Date:     08 April 2002 / Monday

Page:     01 of 02

From:     Eddie Cheris

Subject:     Meeting with Mr. Frank Moss.

On Wednesday, 03 April 2002 (3:00pm), I met with Mr. Frank Moss to discuss the matter of suspension from duty and the history of issues at the Passport Office. As it was briefly explained to me that Mr. Frank Moss is the Director of Personnel.

Frank E. Moss, U.S. Department of State, CA/EX, 2401 E. Street, N.W., Room H10004C, SA-1, Washington, D.C. 20520
Tel: (202) 663-2500

Within this initial meeting was present the personnel specialist, Nicole Hicks.

Nicole Hicks, U.S. Department of State, CA/EX/HRD, 2401 E. Street, N.W., Room H1010, SA-1, Washington, D.C. 20520
Tel: (202) 663-2534

This meeting (aggressively) went on for approximately an hour whereupon Mr. Moss insisted/requested I meet with either Dr. Moundalexis or Dr. Dekleva, before he made his decision concerning the suspension from duty.

At this point I personally understood that Mr. Moss had an understanding of the issues at the Passport Office; though it was apparent that he did not thoroughly read the material I previously forwarded to him. Unfortunately, Nicole Hicks just wanted to argue about any issue. And, it was respectful of Mr. Moss to refer me particularly to Dr. Moundalexis. The gentleman gave me a choice to meet with either Dr. Moundalexis or Dr. Dekleva and he personally got on the phone and made the appointment immediately.

---

Page:     02 of 02          Date:     08 April 2002 / Monday

Athena Moundalexis, M.D. U.S. Department of State, Medical Services, 2401 E. Street, N.W., Room L209D, SA-1, Washington, D.C. 20520
Tel: (202) 663-1918

I viewed this request as very inappropriate and suspected it to be either a forceful diversion and/or possibly a vehicle for entrapment purposes (and should have been referred to legal services and not to medical services. This which it will probably be used as one.) The primary logic here, is that I case deals with individual(s) violating the law. There would not be a case; if individuals, such as myself where not being harmed/abused in someway or manner (either past and/or present).

It is one thing to discuss moral, ethical, and behavioral conduct by and among personnel. But when damage is already inflicted upon another this is/becomes a legal matter.

At approximately, 4:00 pm, I met with Doctor Moundalexis. This interviewing session went on until 7:00pm. Doctor Moundalexis thoroughly went out-of-her way to do her job and well. And, in fact, I felt a little guilty of perhaps inadvertently placing her in the middle of things and perhaps taking advantage of her services. We discussed a wide-range of subject matter (both professionally and personally).

And, unfortunately, none of the three individuals mentioned above had any clear understanding that I should be paid extra money(ies) to participate in this type of activity.

I left both of these meetings; with the opinion/understanding that nothing (again), is going to be done about the serious issues at the Passport Office and this case should and hopefully will be referred to the U.S. Attorney General and/or the Federal Bureau of Investigations.

■ Attachment 13 ■

United States Department of State

*Washington, D.C.  20520*

APR 2 2 2002

Mr. Eddie Cheris
Office of Information Management and Liaison
1111 19th Street NW Room 520
Washington, DC

Dear Mr. Cheris:

On April 1, 2002 you received a letter from Adrienne B. Hatchel, the Human Resources
Officer for the Bureau of Consular Affairs, proposing to suspend you from your position
of File Assistant, GS-305-06 with the Bureau of Consular Affairs, Office of Information
Management and Liaison, Records Services Division in accordance with the Title 5 of the
Code of Federal Regulations, part 752. This notice provided you with an opportunity to
respond to the reasons contained therein. You provided an oral and written response to
this suspension on April 3, 2002.

I have reviewed and carefully considered all materials of record relating to your
misconduct. I believe that this suspension is justified by your failing to follow the explicit
instructions of your third line supervisor Mr. Timothy Martin. Based on the evidence
presented in Ms. Hatchel's letter and your responses, I have decided to mitigate your
suspension to a period of two days without pay. This suspension will be effective on May
2 and 3, 2002. You will be expected to return to work on Monday, May 6, 2002.

Should there be any repetition of this behavior such as you claiming to have "inside
information" regarding possible terrorist attacks, investigations or other matters that
alarm your supervisors and/or co-workers, you will be subject to more severe disciplinary
action. I am hopeful that this suspension will convince you of the need to change certain
aspects of your behavior at work and to respect the instructions of your supervisors.

During your oral response several additional issues were discussed and I would like to
strongly suggest that you consider the following:

- You have met with Dr. Athena Mouradas of the Office of Medical Services and
  she has provided you with the names of Greek-Armenian doctors who you could
  contact for continuing therapy. I urge you to do so. I know that you do not agree, but
  I believe based on your behavior both at work and in our meeting on April 3 that you
  may benefit from medical counseling or treatment.

- I urge you not to drop your health insurance. You need medical assistance for your
  various problems including your back pain and such assistance will be more possible
  if you have medical insurance.

Since you occupy a position in the bargaining unit for which the National Federation of
Federal Employees (NFFE), Local 1998, holds exclusive recognition, you may grieve this
decision under the provisions of Article 20 within 10 days from the effective date of this
suspension.

If you have any questions about this decision, please feel free to contact me at 202-663-
2500.

Sincerely,

Frank E. Moss
Executive Director
Bureau of Consular Affairs

## <u>Situation Report of Monday, 17 September 2001 . . .</u>
Updated: 24/SEP/2001 (Page 01 0f 05)

On Monday, September 17, (07:15 am) I arrived to work as usually and went directly to my desk and began working on a particular project. For this project I needed to print two pages. I should mentioned here I did not saying anything to anyone.

I started up my computer and began working on my project printing out two pages. As I walked from the printer back to my desk I could here my co-worker (Mimi Sprat) saying something. Honestly, I thought she was on the telephone as usual. As I approached my desk (Mimi Sprat) stood up, looked at me and in a low voice began complaining about me using the printer. I could barely make out what she was saying; but I could tell by the expression on her face (she was angry about something). And, since I did not do anything or say anything to her it was better to keep my distance.

I was not sure how or if I should even response to her and I was particularly busy attending to my project. So I immediately, shrugged my shoulders and mumbled to myself that I was not here to babysit anyone.

Once I completed my project, I went out to have a cigarette. On my way out the office – I stopped at another co-workers desk (Tom…the mailroom guy) – the 3rd and only other individual in the office and quietly mentioned to him. That Mimi Sprat was complaining about me printing and that Tom…the mailroom guy) may be aware that she was possibly in a bad mood or something ("again"). Common sense dictates that all of us are to maintain some security awareness within this facility. Logic justifies letting the other guy know what occurred so he and/or someone else does not encounter any trouble. I went and had a cigarette. While I was downstairs in front of the building (Tom…the mailroom guy) happened to come down and be talking to the security officer at the front desk and he stepped out side. I put forward or postulated the question to him of what do you think should do; I tell Mr. Crawford about Mimi Sprat's comments or maybe let security know about it. Tom did not say anything in return. Approximately, an hour afterwards, I was called up to Mr. Tim Martin's office and questioned about this incident.

## Situation Report of Monday, 17 September 2001 ...
Updated: 24/SEP/2001 (Page 04 0f 05)

management's responsibility, not mine. Of course, being somewhat educated I understood that the behavior counselor asked specific questions to analyze my reasoning and responses to them. But, towards the end of our conversation the behavior counselor was either testing me critically or tried to establish/stipulate false accusation/character dis-credibility. Whatever the case, I did inform both (several times) that I need to participate in a stress management class to learn how to manage this ear problem (Tinnitus) – which I got from the job. At times this ear problem can get really painful here. I must put-up with all of the junk mentioned above and my ear is ringing like a bell. Especially in the evenings when I get home, the ring gets so bad I honestly need to drink to soften/mask the pain.

By Friday morning (21 September), I was called into Mr. Tim, Martin's office and after a brief and decent conversation with him and Mr. William Crawford. I was given the "explicit critical warning" to keep my mouth shut and do not talk to anyone. If one more incident/encounter/argument takes place between me and anyone else – then I will be forced to leave. Mr. Martin did inform me that if I encounter any specific personnel problems, I am to bring it to his attention. At the end of our conversation, I politely said thank you very much. Though the "explicit critical warning" is completely out-of-line since I did not do anything wrong; being ordered not to talk with anyone was great! Now, I don't have to baby-sit the other guy any longer and use my time wisely studying my computer books. Seriously I was getting really tired of that social class stricture cross-contamination which is definitely much more negative than positive here at the Passport Office. More easily explained, when you are an "A/B" student (like myself), who can perform very well, hanging around a bunch of 5th graders, is a damn burden and let me be honest here that's useful too!

## Situation Report for Monday, 17 September 2001 ...
Updated: 24/SEP/2001 (Page 05 0f 05)

Waiting for Mr. Crawford who said initially that he was going to assist me with the workers compensation package and their discovering that he was stalling. And then analyzing the events that transpired over the past week and then the idea to present me with an "explicit critical warning" – might become its is backdown and I was being blackmailed.

Reviewing past events: my supervisor on May 24th picked a fight with me when I feared that I might just have to protect myself because the guy looked like he was going to get violent. I informed Mr. Crawford; but no one did anything about it. Why isn't my supervisor getting chewed-out or reprimanded for misconduct?

Mr Crawford and Mr Martin were both informed before this September 17th incident, that I probably intend to filing the workers' compensation claim for damage done to my ear- but intend to file a lawsuit

■ Attachment 13 ■

**Situation Report of Monday, 17 September 2001 ...**
Updated: 24/SEP/2001 (Page 02 0f 05)

If I may let me expand on the history of the problem mentioned above.

During December and January, Mimi Sprat and I conversed several times concerning the topic internet business web pages/ e-commerce busy opportunities. If fact, I provided Mimi Sprat with a copy of some of the research I had already done on this topic. And which she seemed to be very enthusiastic about.

During these infrequent conversations concerning web pages; Mimi Sprat would infuse our conversation with strange questions about and comments about personnel of the 5th floor and her dissatisfaction pertaining to her previously job where here co-workers were hateful or were jealous of her. When Mimi Sprat began getting off the subject of business web pages I found myself trying break from our conversations.

I stopped associating with Mimi Sprat back in February of this year, because she emailed me several (still and video) photos that definitely where questionable (more on the side of pornography, and brutality). I immediately got scared that the OIG might discover this junk and start questioning me of why this kind of stuff was doing on my computer – since it is suppose to be illegal conduct on government machines. I told my supervisor (Steve Cox) about this and asked him to tell Mimi Sprat not to email me again. Steve Cox told me he did not need to see the photos and I should delete them – which I did.

For months, Mimi Sprat has made and number of comments to me; like this that occurred on the morning of September 17th – which covered a number of topics; such as me sneezing and coughing to the beeping sound on my computer keyboard and so on. I have learned to ignore her. And, I have mentioned to Tom... the mailroom guy) at least twice before September 17th about Mimi Sprat's comments.

**Situation Report of Monday, 17 September 2001 ...**
Updated: 24/SEP/2001 (Page 03 0f 05)

From February, I strictly kept my distance from Mimi Sprat and tried to ignore her repeated comments on about everything. Over the months while at my desk, I have over-heard Mimi Sprat telling others in person and on the telephone about her frustrating family problems. Especially with her son – who seems to be constantly bumming money – which makes her angry. Before this September 17th incident, I have encountered Mimi Sprat comments early in the mornings and basically ignored her. And twice, before the September 17th incident I have mentioned these occurrences to (Tom... the mailroom guy). Why was I called up to Mr. Tim Martin's Office on September 17th, and not before is highly questionable.

Due to this incident with Mimi Sprat on September 17th, each day after this for the entire work week I was bothered by the management staff – in turn wasting a lot of my time. In fact, some behavior counselor/psychiatrist was called-in. As I understood it both the management personnel and the behavior counselor spoke to a number of personnel on the 5th floor.

I had a lengthy conversation with both Mr. Martin and the behavior counselor. I explained what transpired on the morning of September 17th and further detailed some of the past experiences and history that have occurred on the 5th floor of the Passport Office. In brief, I spoke about the social class (structure) conflicts that have occurred over time – which is a big problem within this facility. And, informed them that some 2-3 years ago, I began avoiding contact with a number of individuals on the 5th floor because I understood this social class (structure) conflicts that existed and continue to exist. And, my intent was to avoid any danger/ trouble and not waste my time with someone else's personal problems. There has existed on the 5th floor a history of other people bothering other people about their personal problems – I have encountered this at times. And, after six years of being at the Passport Office and observing this particular environment; my preferred work ethic/attitude is to strictly do my job which is my responsibility and greatly limit my contact with a number of individuals. Usually, this limiting contact helps greatly in saving me time for a heavy study load of schoolwork. In brief, baby-setting the other guy is

■ Attachment 13 ■

## MEMORANDUM FOR THE RECORD

Date:        08 April 2002 / Monday

Page:        01 of 02

From:        Eddie Cheris

Subject:     Meeting with Mr. Frank Moss

On Wednesday, 03 April 2002 (3:00pm), I met with Mr. Frank Moss to discuss the matter of suspension from duty and the history of issues at the Passport Office. As it was briefly explained to me that Mr. Frank Moss is the Director of Personnel.

Frank E. Moss, U.S. Department of State, CA/EX, 2401 E. Street, N.W., Room H1000AC, SA-1, Washington, D.C. 20520
Tel: (202) 663-2500

Within this initial meeting was present the personnel specialist, Nicole Hicks.

Nicole Hicks, U.S. Department of State, CA/EX/HRD,
2401 E. Street, N.W., Room H1010, SA-1, Washington, D.C. 20520
Tel: (202) 663-2534

This meeting (aggressively) went on for approximately an hour whereupon Mr. Moss insisted/requested I meet with either Dr. Moundalexis or Dr. Dekleva before he made his decision concerning the suspension from duty.

At this point I personally understood that Mr. Moss had an *understanding of the issues at the Passport Office*; though it was apparent that he did not thoroughly read the material I previously forwarded to him. Unfortunately, Nicole Hicks just wanted to argue about any issue. And, it was respectful of Mr. Moss to refer me particularly to Dr. Moundalexis. The gentleman gave me a choice to meet with either Dr. Moundalexis or Dr. Dekleva and he personally got on the phone and made the appointment immediately.

---

Date:        08 April 2002 / Monday

Page:        02 of 02

Athena Moundalexis, M.D. U.S. Department of State, Medical Services,
2401 E. Street, N.W., Room L209D, SA-1, Washington, D.C. 20520
Tel: (202) 663-1918

I viewed this request as very inappropriate and suspected it to be either a forceful diversion and/or possibly a vehicle for entrapment purposes (and which it will probably be used as one.) The primary logic here, is that I should have been referred to legal services and not to medical services. This case deals with individual(s) violating the law. There would not be a case; if individuals, such as myself where not being harmed/abused in someway or manner (either past and/or present).

It is one thing to discuss moral, ethical, and behavioral conduct by and among personnel. But when damage is already inflected upon another this is/becomes a legal matter.

At approximately, 4:00 pm, I met with Doctor Moundalexis. This interviewing session went on until 7:00pm. Doctor Moundalexis thoroughly went out-of-her way to do her job and well. And, in fact, I felt a little guilty of perhaps inadvertently placing her in the middle of things and perhaps taking advantage of her services. We discussed a wide-range of subject matter (both professionally and personally).

And, unfortunately, none of the three individuals mentioned above had any clear understanding that I should be paid extra money(ies) to participate in this type of activity.

I left both of these meetings; with the opinion/understanding that nothing (again), is going to be done about the serious issues at the Passport Office and this case should and hopefully will be referred to the U.S. Attorney General and/or the Federal Bureau of Investigations.

■ Attachment 13 ■

## Memorandum

Date:        19 February 2002 / Tuesday

To:          Kenneth Dekleva, M.D.
             Office of Medical Services
                                                        (202) 663-1919

From:        Eddie S. Cheris
             CA/PPT/IML/R/RP/QA
                                                        (202) 955-0248

CC:          Athena Moundalexis, M.D.
             M/DGHR/MED/DP
                                                        (202) 663-1918

Subject:     February 14, 2002 memo concerning requested visit to Office
             of Medical Services on Tuesday, February 26, 2002

Enclosure 1:  February 14, 2002 memo concerning requested visit to Office
              of Medical Services on Tuesday, February 26, 2002
Enclosure 2:  Medical Records pertaining to Ringing in Left Ear
Enclosure 3:  Medical Records pertaining to Left Hip and Leg Pain
Enclosure 4:  OIG Hotline Complaint / February 15, 2002


Dear Dr. Dekleva:

On Friday, February 14th, I received the attached memorandum from my second level
supervisor, Mr. William Crawford -- requesting me to visit the Office of Medical
Services. Upon receipt of this memorandum, I briefly spoke with you and your colleague
Dr. Moundalexis on the telephone.

As noted on the attached memorandum, you received a copy of my memorandum
previously forwarded to Ambassador Ryan, dated January 2, 2002.

I am not sure if you were briefed on the parameter(s) of my purpose in forwarding this
memorandum to Ambassador Ryan. In brief, contacting Ambassador Ryan, whom is the
Director of CA was a sincere attempt to peacefully settle this case out-of-court.

Forwarding my January 2, 2002 memorandum was to brief my superiors of the major
problem(s) within the workplace -- basically the abuse received from my supervisor and
that my supervisor ridiculously wasted "a lot" of my valuable time on what I can simply
define as poverty issues. And, I want monetarily compensated. For me, this is fair and
reasonable.

■ **Attachment 13** ■

Memorandum    (Page 2)    19 February 2002 / Tuesday

In respect to the attached memorandum dated, February 14, 2002. It is not clear if this requested visit to the Office of Medical Services is mandatory or voluntary. If this visit to the Office of Medical Services is a direct order of my superiors, I will attend the scheduled appointment. Unfortunately it will be a waste of time for both of us.

I am obligated to inform you that I can not discuss this case further with you without legal representation – there are several reasons for this decision. For one this case should properly be discussed with Ambassador Ryan, and/or Director Ervin.

Enclosures 2 and 3, contain a copy of my recent medical records concerning my left back/leg injury which was initially acquired on the job and my left ear difficulty. And, briefly details my endeavor to fix both of these physical injuries. And which are fixable. These enclosures are respectfully provided for your information, in light that the memorandum at Enclosure 1 makes an inquiry of medical concerns.

I do not know you personally, and I am not trying to be rude here in my letter, only honest.

A number of incidents have occurred at the workplace that have for reaching legal ramifications. I have repeatedly tried to work things out with my 2nd and 3rd level supervisors; whom either can not or will not do anything about these things. In brief, I have learned to distrust my superiors, and for solid reasons. Since I am being requested to your office (for a psych exam), after complaining about my supervisor and this repeated screw-ups, it is plainly obvious (to me), that I am being punished instead of rewarded.

After reviewing the parameters of this case (as briefly documented in my January 2, 2002 memo); the statistical probability would indicate that you and your service(s) are or will be used either (directly or indirectly) as an entrapment vehicle. The end result is that I have nothing to discuss with you.

To double-check that my decision stated directly above; was sincere, fair and correct. I consulted with four separate individuals (friends), whom are employed at four separate government agency's concerning the memorandum, at Enclosure 1. Two individuals basically told me that I do not (legally) have to provide you with any information at all and I should not. The third individual suggested meeting with you would be a golden opportunity. The fourth individual postulated that this scheduled appointment with you "may/not" be what it initially appears to be, up front. And, seriously could be (a very slim chance) an interview for a position elsewhere within the Agency.; Total sum: 50 / 50 odds? – definitely not a good point spread.

Please let me know, what should be done concerning our appointment scheduled for February 26th.

Memorandum    (Page 3)    19 February 2002 / Tuesday

In conclusion, and if I may make a personal comment and/or request here in my memorandum. My intent here is not to be cruel or step on anyone's toes metaphorically; but to be sincerely honest.

I was given the memorandum contained at Enclosure 1 for the specific request of visiting the Office of Medical Services. After consulting your office, I soon became aware that the doctor I am to visit is a Greek-American doctor. I am also Greek-American and proud of it. If I am not comfortable then I should be referred to this doctor instead of you. Whom would I logically prefer in formulating line-of-trust with? Once I became aware of this fact; I felt slightly insulted. And I firmly make my decision that if I am not going to get recommendations and/or advice (medically) from my fellow Greek-American; then I am not even going to consider what you may have to offer. The end result again, is that I have nothing to discuss with you.

Thank you for your time and assistance.

■ Attachment 13 ■

# MEMORANDUM

Date:          February 25, 2002 / Monday

To:            Mr. Art Mott  (SA-3)

From:          Eddie Cheris

Subject:       Additional Source Materials

On Friday, February 22, 2002, I was requested to an (investigative) meeting with you and two other gentleman.

Having time (over the weekend) to review the information exchanged in our meeting; I thought it be proper to provide the enclosed documentation.

As I have previously mentioned there have been a number of occurrences within the workplace among a number of its' personnel. During our meeting we discussed several of these major occurrences; which were previously documented. And, it would take several more hours to provide you a full-coverage other occurrences.

In light that this meeting and/or investigation is focused on a particular topic. It is reasonable to provide you with one additional description of an occurrence - which was not previously covered and may be essential.

My residence is located between the Virginia Square Metro Station and the Clarendon Metro Station. Since 1994, I have taken the train to work from both stations -- basically alternating (stations) about every two to three days. A small map of the Metro System is enclosed as reference. Around October/November 2001, another occurrence unfold within the workplace. I did not mentioned this occurrence in my previous correspondence - due to the fact that it did not have anything to due directly with my supervisor.

During the timeframe (approximately) October/November 2001, I would ride the train to work as usual and had noticed that one young black woman whom worked somewhere in the Passport Office was riding the same train. I do not know this womans' name and at the time I had no idea what section she worked at or anything else about her. The only knowledge I had was that twice I had seen her on the fifth floor of the Passport Office at the elevators.

To begin my description let me say that I never arrive at the subway station(s) the same time every day. I need to be at work at 7:30 am. I get the train at any time between 5:30

■ **Attachment 13** ■

## MEMORANDUM

(Page 02 of 03) February 25, 2002

am to at least by 7:15 am. And, several times I have been late and get the train by 7:30 am or 7:45 am. (These variables are vital in supporting this incident)

For approximately four weeks, this young woman mentioned above would get onto the metro train at the CourtHouse Metro Station. On the exact train(car) I was on at the exact time I was on the train, and set in the exact seating area where I was at.. As the first week went by I had noticed her on the train, but did not think anything was out-of-place. Twice I said hello to her by waving my hand, but she did not response. As usual I am almost always reading my books while on the train. As weeks, two and three past every day she would be in the exact car I was in, no matter what time I got the train (for the exception of maybe Friday's). And, what I became very aware of is that this woman would be watching me. If I took my attention from my book and looked at her, she then would look at the floor. Once I departed the train at the Farragut West Metro Station, I needed to walk two blocks to the Passport Office, and frequently would stop-off at one of the coffee shops on the way. No matter if I went directly to the Office from the subway station or if I stop-off on the way to get coffee; this woman would be following behind me. If I looked at her while walking, she would just look down at the ground.

Twice, I intentionally stop-off at the Stouny's restaurant for coffee, (after getting-off the train) and waited for about 20 minutes just to make a test. During these two "tests" I intentionally waited and then walk to the Passport. And whom I would I see behind me, but this young woman. Since I did not know this young woman, I could only guess at what her intentions were. Several idea's came to mind, such as, maybe she was scared to ride the train and needed to be around someone to be safe and comfortable with. Or maybe she was looking for a boyfriend. Or maybe I was under surveillance. Or, just maybe she thought I was one of the supervisors and was trying to make a good impression. Who knows?

As this activity went into the fourth week, I became very uncomfortable with it. One day as I walked-out-of-the Farragut West Metro Station, I politely told her, "Please do not follow me around" and then I walked away from her.

Now this was said in the subway station and not at the workplace. I did not abuse or harm this woman, but politely said please do not follow me around.

I went and got my coffee and then walked to the Office and sat at me workstation around 7:45 am. Around 8:00 am, Dorothy Johnson comes running into my work area screaming at and cursing me, trying to provoke a (physical) fight. I had no doubt that this woman was in combative mode and I was forced to stand-up to her. Once I physically stood up-right and verbally repelled her verbal aggression; Dorothy Johnson back-off with repeated verbal abuse. Everyone whom was present in the office (she) was well aware of what was happening. I am not sure if Dorothy Johnson back-off because I called her bluff —

## MEMORANDUM

(Page 03 of 03) February 25, 2002

excepted the challenge or maybe (which I think is the case) is Dorothy Johnson became surprising aware that I was not afraid of her or her intimidation and was able and willing to defend my position.

a- While in verbal combat with Dorothy Johnson, I acquired the information that this young woman mentioned above was under Johnson's supervision.

Once this early morning roll-call was over, I then reported it to the second level supervisor, Tasha Thian. With additional points, such as: Dorothy Johnson is not my supervisor and since I did not do anything wrong, I should not have to take this abuse. What is Dorothy Johnson sending in my work area. Since I had to make polite contact with this young woman in the subway station and for good reason, this matter has nothing to do with the job.

In brief, security should have been properly called on this occurrence. But I got the idea that Tasha Thian was afraid of Dorothy Johnson and wanted to blame me for the incident.

I am reporting the above for more than one reason.

1. This type of activity is the primary topic of your investigation.

2. I have encountered twice the aggressive verbal abuse from Dorothy Johnson - which had no firm basis to be presented.

3. During June of July 2001, I overheard Dorothy Johnson and another employee (not sure of the other employees name), arguing very abusively back and forth.

4. Over time, I have heard negative comments concerning Dorothy Johnson from other personnel.

a- About a month ago, a coworker named Sharon, whom was under Dorothy Johnsons' supervision, received an order (to the point that she had the intent to resign (out-of-anger). After speaking with Sharon, I suggested that she should speak with the second and third level supervisors for the possibility of being relocated elsewhere on the fifth floor. Sharon was then placed under Steve Cox's supervision.

Thank you for your time and assistance.

■ Attachment 13 ■

## **Situation Report (Page 01 of 03)**

To:    Mr. Crawford

From: Eddie Cheris

On 26 November 2002/Tuesday, at approximately 3:35 pm, I left my desk and went to the restroom. Returning from the restroom a few minutes later; I headed back to my desk. Opening the door to Room 520, I discovered that a woman named Betty was blocking the doorway/pathway while talking with a co-worker named Mary Sampson. There was not enough room to get around Betty to get to my desk. Instead of interrupting their conversation, I waited a few seconds in order for Betty to see me and politely re-adjust her position – so that I could get by. Betty inadvertently bumped me with her elbow and at first said excuse me. I personally did not think this was a big deal and there was nothing vital to say to her; and so as soon as Betty re-adjusted her position, I moved around her and continued walking to my desk. Betty became hysterical and verbally abusive, saying "loud" comments as; that was very rude, (bla Bla bla)... This went on for approximately 3 to 5 minutes.

Since, I did not do anything wrong to Betty (either directly or indirectly). And, patiently waited for her to move out of the way -- putting up with her verbal abuse was just plain stupid. In light that Betty continued with her verbal abuse -- I told her that I did not want to hear about her poverty condition - (more on this follow.)

At approximately, 4:00 pm, I went to the restroom again, to obtain paper towels to wipe-down my workstation. Here, I met up with and informed Mr. Crawford of the above situation.

On my return to the Office (Rm 520), I informed Mary Sampson that I had spoken with Mr. Crawford about the above situation. Mary Sampson was temporarily in charge of the office while Steve Cox was on leave.

While I was speaking with Mary Sampson, Betty enters through Room 520 and again, and immediately becomes verbally abusive saying comments as: are you still speaking about that incident and that she was going to get a lawyer.

- - - - - - - - - - - - -

**Notes:** Today, was the first time I ever spoke to Betty. I honestly have no idea who she is or what she is doing in the office – what kind of work. And, I have nothing to do with her directly. There has been a number of times that I have entered through the door at Rm 520; and upon my entrance, Betty has given me a hard stare, but does not say anything. Also, I have seen her one time outside the office at a convenience store (Farragut North Metro Station) – while she was buying lottery tickets -- she and the gentleman behind the counter were having a little scuffle/argument about something. This occurred some months ago.

Since the time Betty came into the Office (Rm 520); some months ago, I have had to repeatedly wear my ear protection, again. I need to wear this equipment, basically to keep my concentration on doing my work. I am supposed to do my job and do it well. Repeatedly Betty has yelled across the room in an excitable manner usually to Bruce Thompson. And, this activity has continued throughout each work day

■ **Attachment 13** ■

## Situation Report (Page 03 of 03)

Onward things in the Office were somewhat unclear. The PRISM database system was taken off-line ?again? (9/12/00 -- work interrupts. Around 2?m, Ms. Spratt returns to Betty's workstation and both continue talking about doctors and Ms. Spratt' son and some other issues.

- - - - - - - - - - - -

I mentioned the "Additional Note" directly above for a good reason and as one of many solid examples:

On Friday morning, I mentioned the workplace got down to doing the job and my thoughts "were" *[remainder of section heavily faded and illegible]*

In conclusion *[text largely illegible]* ... Network .. Betty or Ms. Spratt, besides several other employees ... the individual bothering another individual *[illegible]* ... personal problem(s) has been a repeated occurrence ... I am for the only individual who has complained about this situation. Since the occurrence keeps on happening one after another (which have been damaging, hurting, embarrassing) my employer gives me some money.

■ Attachment 13 ■

---

## Situation Report (Page 02 of 03)

and on a daily basis. This loud noise was reported to the supervisor Steve Cox and to Mary Sampson two months, previously. Some of the content that Betty graciously expresses has definitely been out-of-line.

Over the past several months, I have overheard Betty making comments about me (and other personnel) to employees in the Office. For example, she refers to me as Columbo and the way I dress or smell. Several times, I have eaten my lunch at my desk and each time Betty has loudly commented about the smell of my food. At least twice, there has been the comment expressed by Betty that guy setting at the back desk all mysterious like and doesn't say anything.... And, there have been other comments. I have never been introduced to this woman) and I have never spoken to this woman until today -- and she has repeatedly been verbally abusive.

In conclusion this situation mentioned above is not much different from other situations that have occurred within the workplace among a number of personnel. Basically, one individual bothering another individual about the personal problem(s) -- which basically refer to as a poverty issue.

Logically, person (A) would not be bothering persons (B), (C), or (D); if person (A) did need or want something from persons (B), (C), or (D). The other side of the issue here is what duties and responsibilities does persons (B), (C), or (D) have to person (A).

With the situation mentioned above many Bettys' expressive comments, baby setting or providing her with some type of attention is the supervisor' job, not mine.

- - - - - - - - - - - -

### Additional Note:

On Friday morning, 29 November, the day after the Thanksgiving; I entered the Office (Room 520) at 07:20 and immediately began my work. The only two people present in the office were Ms. Spratt and Betty -- who were both engaged in a conversation something about a 17 pound Turkey(?) and something, I believe about traveling(?). I did not pay much attention to them.

By 08:00, Ms. Spratt was at Bettys' workstation and both where making comments about other personnel in the Office. I tried to ignore them and just do my job; but they were loud enough, that I could over hear some of their conversation. Ms. Spratt, complained "again" about her son taking advantage of her. It is not particularly clear what her son is doing to her, I can only guess. Whatever the case may be, each time she speaks about her son; Ms. Spratt evokes an angered disposition, which is typically vented verbally.

As their, conversation evolved, there was something said about someone not liking woman(gay) and afraid to talk to woman. And, something about someone else being afraid about something -- which again was not clear. At 08:30, Bruce Thompson arrived into this Office. From about 08:45

Over the past six years, the computer system(s) have gone down many, many times. Both for short and long periods of time. These down times have ranged from 5 minutes to days at a time.

Initially, during these down times, there was no other work for me to do, even when I repeatedly asked the supervisor(s) for other work - which typically was none. I have asked the supervisors for this added work so many times, that I got tired of asking.

So I began studying my school books when such occurrences developed. The frequency of these computer down times have occurred more and more over the past two years. So I began typing up my school notes to have something to do. Logically, it is better that I do something "beneficial" than set around goofing off or at best, look busy.

In any case, sometime in late November or early December (a lot) of the work that I, Bruce Thompson, Mary Sampson, Timi Spratt, and a gentleman named Robert was doing - drastically changed.

As I understand it another department took over most (not all) of our work dealing with inspection of passport applications on the electronic databases. But there could be other management issues here, that I am not completely aware of.

Seriously, all of December and most of January I had very, very little work to do. By the second week of January, I informed my second level supervisor (Mr. Crawford) of this. Mr. Crawford did provide me additional work to inspect, but it is irregular because 3 or 4 other individuals are doing the same work and it runs out – quickly. In fact, one individual became irritable about me asking for this additional work – so I slowly backed off. Supposedly, there is another shipment of this alternative work arriving next week.

Throughout December and January - when the work ran out -- I spent my time typing-up large quantities of research notes for my university dissertation (great stuff!.) Ms. Spratt frequently was asleep at her workstation. Gentleman Robert played card games on his computer and would also fall asleep in his chair. Bruce Thompson was in frequent conversation with two other personnel: Betty & Robin. And, Mary Sampson kept to herself and was quiet as usual. It is now the first week of February and hardly any work.

Getting paid for doing nothing is great! - My dissertation is looking real good and I "sincerely" appreciate the time to work on it. For the other guys in the office, I hope they are benefiting from whatever they have been doing. But, honestly, I am a little apprehensive that some legal ramifications may develop due to the lack of work not being completed and which is not being provided.

I thought it wise to <u>confidentially</u> inform you of the above work situation. (FYI)

"Thank you"

Eddie Cheris

03 February 2003 / Tuesday

Note:  At the point of forwarding this brief letter to you, my supervisor finally gave me some solid work to complete.

To:  Ms. Hatchett (Personnel)

■ Attachment 13 ■

## MEMORANDUM FOR THE RECORD

Date:  17 January 2003 / Friday

From:  Eddie Cheris

Since late November and early December 2002, the amount of paperwork that was typically processed, by (me, Timi Spratt, Mary Sampson and Bruce Thompson), substantially decreased to almost nothing. There were at least 10 separate days, where I did not have a scrap of work to complete.

The reason as I understood it; for this paperwork slowdown, was that another department was processing most of this paperwork that our section previously had been doing and will continue to do so.

For the past month and a half, I have basically sat at my workstation and typed-up a number of research pages towards my university dissertation.  Trying to look busy in some way.

During this time period, I had notice that Timi Spratt was frequently sleeping at her workstation.  Bruce Thompson frequently engaged in conversation with two woman:  Betty and Robin.  Several times Bruce would get upset concerning Robins' verbal behavior.  Mary Sampson was quiet (and stuck to herself) as usual.  The other gentleman in the Office - Robert, frequently played card games on his computer.  During this time, and as usual I was forced to wear my ear protection, to block out any distracting noises, especially from Betty; who has been loud enough, that I could hear her very well from way across the room.  I am very happy that I have my ear protection, because some of the subject matter that Betty continues to emotionally express is inappropriate and none of my business away.  Even now, at the time that I am composing this memorandum; Betty and Bruce are in conversation, and even with the ear protection on, Betty is really loud.

This morning, Mr. Crawford requested I begin data entering the Reports of Birth records – which supposedly run into the millions to be processed. Very straightforward, simple data entry work.

Logically, I could have been processing these Reports of Birth records back in early December.  But, there was nothing I could do, (work-wise) without one of the supervisors' approval.  I had to do something besides stare at the wall in front of me.  So, I worked on my dissertation.  The above is just one more example of the ongoing mismanagement within my office.

I need to document the above incident, just-in-case the Inspector General comes bombarding me with a bunch of questions and/or accusations concerning fraud, waste, and abuse at the job-site.

One additional note:  at least for the past five years within this office the computer system(s) have crashed repeatedly (for long and short periods of time – leaving gaps in the workflow.  I have learned by experience to keep some of my study notes in my desk drawer – so when these gaps occur, I have something essential to do, rather than complain.

Around 12:30, Mary Sampson gave me a batch to process on Prism. Wow, finally some work! It took me at least an hour and a half to process this OAZ batch work. For approximately the entire time, Betty was verbally loud to the point I had to wear my ear protection to concentrate on doing my work. Surprisingly, I never heard anything from Robin or Sharon.

Throughout today, Steve and Cory had rearranged Steve's office and had to use a dally. Later someone, placed this dally in my work area. Around 2:20 pm after finishing the batch work, I asked Steve Cox, if he would like me to return the "dally" that was in my work area to the place where he originally got it from. I was ready to wheel the dally out the door. But Steve insisted he take care of it.

By this time I was ready to hold open the front door of Room 520 for Steve to wheel the dally out. While Steve slowly wheeled the dally from the back of room 520 to the front door he had to pass Betty, whom was positioned in the pathway and was required to move temporarily. While Steve wheeled out the dally towards Betty, she made the "strange" comment that this particular dally looked like the one to secure Hannibal Lector.

I thought this was one sick remark, and honestly wondered not only how, but why she frequently comes-up with these strange remarks. Since she was directly speaking to Steve and not to me, I did not say a thing. Steve wheeled the dally out the door while I held the door open and that was it.

After this Betty, Bruce and briefly Robin maintained a lengthy discussion. I could her Betty loudly even with my ear protection on. Betty verbally expressed comments about: incess, sex, homosexuality, witchcraft, smells and basically putting individuals down.

Logically, the Hannibal Lector remark, typically could be set aside as something stupid. But last week, either Thursday or Friday; I overheard Betty saying to Bruce; (in a resentful way) that there was something wrong with Steve Cox (upstairs).

She said this out of anger. Why she said this, I am not sure. But I am a little weary that some form of conflict will eventually occur between Betty and Steve.

By 4 pm, Steve Cox and Corey had already left the office, and honestly the noise in the office (between Bruce, Nel and particularly Betty) is so loud that it seems like there is a party going-on or they are fighting.

MEMORANDUM / Tuesday, 25 March 2003
To: Mr. Crawford / From: Ed Cheris

■ **Attachment 13** ■

**Cheris, Eddie S**

| | |
|---|---|
| **From:** | Hatchett, Adrienne B |
| **Sent:** | Thursday, May 22, 2003 5:59 PM |
| **To:** | Cheris, Eddie S |
| **Subject:** | RE: Request for appointment |

*Hello Eddie, could you come over on Friday at 1:30?*

*Adrienne B. Hatchett*
*Human Resources Officer*
*Bureau of Consular Affairs*
*202-663-2529*

‑‑‑‑Original Message‑‑‑‑
**From:**    Cheris, Eddie S
**Sent:**    Thursday, May 22, 2003 8:16 AM
**To:**    Hatchett, Adrienne B
**Subject:**    Request for appointment

Hello Ms. Hatchett

I realize you have a very busy schedule.

I would like to meet with you to discuss a possible re-assignment and the continued mismanagement (situation) occurring in my office.

Thank you

Eddie Cheris
Tel:  202.955.0248

■ **Attachment 13** ■

1

United States Department of State

*Washington, D.C. 20520*

OCT - 7 2008

MEMORANDUM

To:     CA/PPT/IML/R/RP/QA – Eddie Cheris

From:   CA/PPT/IML/RS – Timothy P. Martin

Subject: Weapons in the workplace.

The purpose of this memo is to advise you that it is unacceptable for you to introduce weapons, or devices that may be used as weapons, of any sort to the workplace, or to carry them on your person while in the workplace. If you should have occasion to feel that your physical well-being is threatened by a co-worker, you are to advise your supervisor (or, in his absence, the next level supervisor, or myself) immediately of the supposed threat. In no event is it acceptable for you to carry a weapon, brandish a weapon, or allude to the possession of a weapon in the workplace.

■ Attachment 13 ■

---

Corey

FYI (01 Oct 03)

This morning at 10:02 am, Sharron approached my work area holding-up an ROB. Which took me by surprise – the approach was swift. As she approached my work area, her voice got louder and she was yelling at me. As she rose up and stood near me, setting in my chair I gradually lean away from her – because she was loud and I wasn't sure what she was going to do next. I just looked at her and listen to what she was saying.

Within less than 30 seconds after being approached, Sharron began commenting (loudly) on why I was leaning away from her, and commented that I didn't want to hear what she was saying. I told her, then I told her to get out-of my work area. Instead of leaving, Sharron just stood where she was and continued arguing with me. About this same time several people entered through the front doorway of Rm 520. At this point Sharron told me that she was going to talk to Mr. Crawford and walked away. I replied go ahead.

As Sharron walked away and headed towards the front of the room, she made the expressive comment that she wanted to engage me in physical confrontation. About 5 minutes later Mr. Crawford came over to my work area, sat down and immediately briefed me on these particular ROB's -- that must be pulled from the boxes instead of being data entered. Mr. Crawford instructed me to let the situation go because maybe Sharron was having tension with Betty & Robyn.

I have already been told previously about these particular ROB's – even by Sharron months earlier. Why I was being told again is questionable? Extra Note: I have already been doing on a daily basis what Mr. Crawford just briefed me on concerning these particular ROBs. Well, again instead of spending my time properly doing my work I am forced to type-up a situation report.

Honestly, in the past I not only liked Sharron as a friend and respected her for being former Army and have even helped her out with two former situations. And until today, truthfully I use to feel "sorry" for her, not only because she had one or more violent encounters with that "weirdo" Dorothy Johnson; but she is now forced to manage both Betty and Robyn -- whom everyone knows have emotional (+ other) problems.

Today the trust between me and Sharron has permanently been broken. Sharron has in the past demonstrated her violent (verbal) behavior with others (and perhaps rightfully so); but has now brought this aggressive behavior to me; forcing me to go on the defensive. I feel bad to inform my supervisors about these on-going 'poverty situations' occurring in the office. Sharron's behavior may and probably will lead to physically violence towards me and/or others. If it happens to come down to the nitty-gritty, I have no alternative, but to defend myself or be injured.

I frequently find myself in an angered disposition; because I have been maintaining for some time; scholastics studies equal to or greater than a master's degree performance level and I am continuously being forced into baby-setting my fellow co-worker(s). Honestly, I can't afford to waste my time engaged 'in the other guys' activities. In addition to the above; over the past two weeks, Mimi Spratt has some bothering me twice about her 'personal problems'. This particular State Department employees can't seem to get the primary message: That I am not here to service her. And, legally it is not my job to manager her. In fact, Mini Spratt has harassed me so many times, that any future occurrences, I will not be informing my supervisor(s); but will be phoning State Department Security and filing charges sexual harassment. I have already stated in the past and repeatedly, that I did not want anything to do with Mini Spratt and have aggressively avoided contact with this woman.

Claim for Compensation

# U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs



| SECTION 1 | EMPLOYEE PORTION | |
|---|---|---|

a. Name of Employee  Last *CHERIS*  First *EDDIE*  Middle *S*    OMB No. 1215-0103   Expires: 08/31/2005

b. Mailing Address (Including City State, ZIP Code) *925 N. JACKSON STREET ARLINGTON VA 22201*    c. OWCP File Number

d. Date of Injury   Month Day Year  *97-04*

E-Mail Address (Optional) *CHERISES @ STATE.GOV*

e. Social Security Number  *175522023*

f. Telephone No./FAX No.  *(202) 955-0248*
(   )      -

**SECTION 2**  Compensation is claimed for:

Inclusive Date Range  From   To   Intermittent?

a. ☐ Leave without pay        ☐ Yes ☐ No   Go to Section 3
b. ☐ Leave buy back ✓         ☐ Yes ☐ No   Go to Section 3, and Complete Form CA-7b
c. ☐ Other wage loss; specify type, such as downgrade, loss of night differential, etc.   Type:____   ☐ Yes ☐ No   Go to Section 3
   If intermittent, complete Form CA-7a,
d. ☐ Schedule Award (Go to Section 4)   Time Analysis Sheet

**SECTION 3**  Have you worked outside your federal job during the period(s) claimed in Section 2? (Include salaried, self-employed, commission, volunteer, etc.)

☐ Yes   Name and Address of Business: *N/A*

☐ No    | Name   | Address   | City | State | ZIP Code |
Go to
Section 4   | Dates Worked:   | Type of Work: | | | |

**SECTION 4**  Is this the first CA-7 claim for compensation you have filed for this injury?

☒ Yes   *Complete Sections 5 through 7 and a Form SF-1199A, "Direct Deposit Sign-up"*
☐ No    Has there been any change in your dependents, or has your direct deposit information changed, or has there been a claim filed with U.S. Civil Service Retirement, another federal retirement or disability law, or with the Department of Veterans Affairs since your last CA-7 claim?

☐ Yes - Complete Sections 5 through 7 or a new SF-1199A to reflect change(s)   ☐ No - Complete Section 7

**SECTION 5**  List your dependents (including spouse):

Living with you?
Name *NONE*   Social Security #   Date of Birth   Relationship   Yes  No

| | | / / | | ☐ ☐ | For dependents not |
| | | / / | | ☐ ☐ | living with you, complete |
| | | / / | | ☐ ☐ | items a and b below. |

a. Are you making support payments for a dependent shown above?   ☐ Yes ☒ No  If Yes, support payments are made to:

Name   Address   City   State   ZIP Code
b. Were support payments ordered by a court?   ☐ Yes ☒ No   If Yes, attach copy of court order.

**SECTION 6**  a. Was/Will there be a claim made against a 3rd party?   ☐ Yes ☐ No  *N/A*
b. Have you ever applied for or received disability benefits from the Department of Veterans Affairs?

☐ Yes  Claim Number   Full Address of VA Office Where Claim Filed   Nature of Disability and Monthly Payment
☐ No

c. Have you applied for or received payment under any Federal Retirement or Disability law?

☐ Yes  Claim Number   Date Annuity Began   Amount of Monthly Payment   Retirement System (CSRS, FERS, SSA, Other)
☐ No

**SECTION 7**  I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States. I certify that the information provided above is true and accurate to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both. In addition, a felony conviction will result in termination of all current and future FECA benefits.

Employee's Signature _____   Date (Mo., day, year) _____

Form CA-7
Rev. Nov. 1999

**Employing Agency Portion**
**For first CA-7 claim sent, complete sections 8 through 15.**
**For subsequent claims, complete sections 12 through 15 only.**

| SECTION 8 | Show Pay Rate as of | Additional Pay | Additional Pay | Additional Pay |
|---|---|---|---|---|
| Date of Injury: | Base Pay | Type _____ | Type _____ | Type_____ |

Date: _____ / _____ / _____   $_____ per _____   $_____ per _____   $_____ per _____   $_____ per _____

Grade:_____ Step:_____

Date Employee Stopped Work:

|  |  | Type _____ | Type _____ | Type_____ |

Date: _____ / _____ / _____   $_____ per _____   $_____ per _____   $_____ per _____   $_____ per _____

Grade:_____ Step:_____

Additional pay types include, but are not limited to: Night Differential (ND), Sunday Premium (SP), Holiday Premium (HP), Subsistence
a. Does employee work a fixed 40-hour per week schedule?

**SECTION 9**
(SUB), Quarter (QTR), etc. *(List each separately)*      Yes ☐   No ☐
   1. If Yes, circle scheduled days:      S      M      T      W      TH      F      S
   2. If No, show scheduled hours for the two week pay period in which work stopped. Circle the day that work stopped.

| FOR EXAMPLE ONLY | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|
| WEEK 1 From 5/14 to 5/20 |  | 8 | 4 | 6 | 6 |  |  |
| WEEK 2 From 5/21 to 5/27 |  | 8 |  | 6 | 6 |  | 4 |

| WEEK 1 From _____ to _____ | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|
| WEEK 2 From _____ to _____ |  |  |  |  |  |  |  |

b. Did employee work in position for 11 months prior to injury?      ☐ Yes   ☐ No

If No, would position have afforded employment for 11 months but for the injury?      ☐ Yes   ☐ No

**SECTION 10**   On date pay stopped, was employee enrolled in:

a. Health Benefits under the FEHBP?   ☐ No ☐ Yes Code ☐☐
c. Optional Use Insurance? ☐ No ☐ Yes Class_____ *(D-Z only)*

b. Basic Life Insurance? ☐ No ☐ Yes
d. A Retirement System? ☐ No ☐ Yes Plan_____ *(Specify CSRS, FERS, Other)*

**SECTION 11**   Continuation of Pay (COP) Received *(Show inclusive dates)*:

From _____ / _____ / _____   To _____ / _____ / _____
Intermittent?   ☐ Yes — Complete Time Analysis Sheet, Form CA-7a
                      ☐ No

**SECTION 12**   Show pay status and inclusive dates for period(s) claimed:

| | | Intermittent? | |
|---|---|---|---|
| Sick Leave From _____/_____/_____ To_____/_____/_____ | ☐ Yes ☐ No | If intermittent, complete Form CA-7a, Time Analysis Sheet. |
| Annual Leave From _____/_____/_____ To_____/_____/_____ | ☐ Yes ☐ No | |
| Leave without Pay From _____/_____/_____ To_____/_____/_____ | ☐ Yes ☐ No | If leave buy back, also submit completed Form CA-7b. |
| Work From _____/_____/_____ To_____/_____/_____ | ☐ Yes ☐ No | |

**SECTION 13**   Did employee return to work?   ☐ Yes   ☐ No
               If Yes, date _____/_____/_____

If returned, did employee return to the pre-date-of-injury job, with the same number of hours and the same duties?

☐ Yes   ☐ No      If No, explain: _____

_____

_____

**SECTION 14**   Remarks:


**SECTION 15**   An employing agency official who knowingly certifies to any false statement, misrepresentation, or concealment of fact, with respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on this form is true to the best of my knowledge, with any exceptions noted in Section 14, Remarks, above.

Signature_____ Title_____ Date_____/_____/_____
               *(Agency Official)*

Name of Agency_____

If OWCP needs specific pay information, the person who should be contacted is:

Name_____ Title_____

Telephone No. (____)_____   Fax No. (____)_____   E-Mail Address_____

# INSTRUCTIONS FOR COMPLETING FORM CA-7

If the employee does not qualify for continuation of pay (for 45 days), the form should be completed and filed with the OWCP as soon as pay stops. The form should also be submitted when the employee reaches maximum improvement and claims a schedule award. If the employee is receiving continuation of pay and will continue to be disabled after 45 days, the form should be filed with OWCP 5 working days prior to the end of the 45-day period.

The CA-7 also should be used to claim continuing compensation, when a previous CA-7 claim has been made.

Collection of this information is required to obtain a benefit and is authorized by 20 C.F.R.10.106.

**EMPLOYEE**    (or person acting on the employee's behalf) — Complete sections 1 through 7 as directed and submit the form to the employee's supervisor.

**SUPERVISOR** (or appropriate official in the employing agency) — Complete sections 8 through 15 as directed and promptly forward the form OWCP.

**EXPLANATIONS** — Some of the items on the form which may require further clarification are explained below:

| Section Number | Explanation |
|---|---|
| 2d. Schedule Award | Schedule awards are paid for permanent impairment to a member or function of the body. |
| 5. List your dependents | Your wife or husband is a dependent if he or she is living with you. A child is a dependent if he, or she either lives with you or receives support payments from you, and he or she is: 1) is under 18; or 2) is between 18 and 23 and is a full-time student; or 3) is incapable of self-support due to physical or mental disability. |
| 6a. Was/will there be a claim made against 3rd party? | A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the injury. For instance, the driver of a vehicle causing an accident in which an employee is injured, the owner of a building where unsafe conditions cause an employee to fall, and a manufacturer who gave improper instructions for the use of a chemical to which an employee is exposed, could all be considered third parties to the injury. |
| 8. Additional Pay | "Additional Pay" includes night differential, Sunday premium, holiday premium, and any other type (such as hazardous duty or "dirty work" pay) regularly received by the employee, but does not include pay for overtime. If the amount of such pay varies from pay period to pay period (as in the case of holiday premium or a rotating shift), then the total amount of such pay earned during the year immediately prior to the date of injury or the date the employee stopped work (whichever is greater) should be reported. |
| 11. Continuation of pay (COP) received | If the injury was not a traumatic injury reported on Form CA-1, this item does not apply. |
| 14. Remarks | This space is used to provide relevant information which is not present elsewhere on the form. |

---

### Pubic Burden Statement

Public reporting burden for this collection of information is estimated to average 13 minutes per response including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this estimate or any other aspect of this information collection, including suggestions for reducing this burden, please send them to the Department of Labor, Office of Workers' Compensation Programs, Room S-3229, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

**DO NOT SEND THE COMPLETED FORM TO THIS OFFICE**

Complete all items in your section of the form. If additional space is required to explain or clarify a point, attach a supplemental statement to the form. In addition to the information requested on the form, both the employee and the supervisor are required to submit additional evidence as described below. If this evidence is not submitted along with the form, the responsible party should explain the reason for the delay and state when the additional evidence will be submitted.

## Employee ( or person acting on the employee's behalf)

Complete items 1 through 18 and submit the form to the employee's supervisor along with the statement and medical reports described below. Be sure to obtain the Receipt of Notice of Disease or Illness completed by the supervisor at the time the form is submitted.

### 1) Employee's statement

In a separate narrative statement attached to the form, the employee must submit the following information:

a) A detailed history of the disease or illness from the date it started.

b) Complete details of the conditions of employment which are believed to be responsible for the disease or illness.

c) A description of specific exposures to substances or stressful conditions causing the disease or illness, including locations where exposure or stress occurred, as well as the number of hours per day and days per week of such exposure or stress.

d) Identification of the part of the body affected. (If disability is due to a heart condition, give complete details of all activities for one week prior to the attack with particular attention to the final 24 hours of such period.)

e) A statement as to whether the employee ever suffered a similar condition. If so, provide full details of onset, history, and medical care received, along with names and addresses of physicians rendering treatment.

### 2) Medical report

a) Dates of examination or treatment.

b) History given to the physician by the employee.

c) Detailed description of the physician's findings.

d) Results of x-rays, laboratory tests, etc.

e) Diagnosis.

f) Clinical course of treatment.

g) Physician's opinion as to whether the disease or illness was caused or aggravated by the employment, along with an explanation of the basis for this opinion. (Medical reports that do not explain the basis for the physician's opinion are given very little weight in adjudicating the claim.)

### 3) Wage loss

If you have lost wages or used leave for this illness, Form CA-7 should also be submitted.

## Supervisor (Or appropriate official in the employing agency)

At the time the form is received, complete the Receipt of Notice of Disease or Illness and give it to the employee. In addition to completing items 19 through 34, the supervisor is responsible for filling in the proper codes in shaded boxes a, b, and c on the front of the form. If medical expense or lost time is incurred or expected, the completed form must be sent to OWCP within ten working days after it is received. In a separate, narrative statement attached to the form, the supervisor must:

a) Describe in detail the work performed by the employee. Identify fumes, chemicals, or other irritants or situations that the employee was exposed to which allegedly caused the condition. State the nature, extent, and duration of the exposure, including hours per days and days per week requested above.

b) Attach copies of all medical reports (including x-ray reports and laboratory data) on file for the employee.

c) Attach a record of the employee's absence from work caused by any similar disease or illness. Have the employee state the reason for each absence.

d) Attach statements from each co-worker who has first-hand knowledge about the employee's condition and its cause. (The co-workers should state how such knowledge was obtained.)

e) Review and comment on the accuracy of the employee's statement requested above.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

## Item Explanations Some of the items on the form which may require further clarification are explained below:

### 14. Nature of the disease or illness

Give a complete description of the disease or illness. Specify the left or right side if applicable (e.g., rash on left leg; carpal tunnel syndrome, right wrist).

### 19. Agency name and address of reporting office

The name and address of the office to which correspondence from OWCP should be sent (If applicable, the address of the personnel or compensation office).

### 20. Employee's duty station, street address and zip code

The street address and zip code of the establishment where the employee actually works.

### 23. Name and address of physician first providing medical care

The name and address of the physician who first provided medical care for this injury. If initial care was given by a nurse or other health professional (not a physician) in the employing agency's health unit or clinic, indicate this on a separate sheet of paper.

### 24. First date medical care received

The date of the first visit to the physician listed in item 23.

### 32. Was the injury caused by third party?

A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the disease. For instance, manufacturer of a chemical to which an employee was exposed might be considered a third party if improper instructions were given by the manufacturer for use of the chemical.

## Employing Agency - Required Codes

### Box a (Occupation Code), Box b (Type Code), Box c (Source Code), OSHA Site Code.

The Occupational Safety and Health Administration (OSHA) requires all employing agencies to complete these items when reporting an injury. The proper codes may be found in OSHA Booklet 2014, Record Keeping and Reporting Guidelines.

### OWCP Agency Code

This is a four digit (or four digit plus two letter) code used by OWCP to identify the employing agency. The proper code may be obtained from your personnel or compensation office, or by contacting OWCP.

C-2
(Rev. 3/98)

This receipt should be retained by the employee as a record that notice was filed.

| | | | |
|---|---|---|---|
| Signature of Official Superior | Title | | Date (Mo., Day, Yr.) |
| *Corey L. Rent* | | | 4/5/04 |

At (Location)
1111 19 th St NW Suite 520
Washington DC 20533

I was first notified about this condition on (Mo., Day, Yr.)
3/11/2004  By Phone Call

(Name of Injured employee)
Eddie S. Cheris

This acknowledges receipt of notice of disease or illness sustained by:

**Receipt of Notice of Occupational Disease or Illness**

---

**Privacy Act**

In accordance with the Privacy Act of 1974 (Public Law No. 93-579, 5 U.S.C. 552a), you are hereby notified that:

(1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the office receives and maintains personal information on claimants and their immediate families.

(2) The information will be used to determine eligibility for and the amount of benefits payable under the Act.

(3) The information may be used by other agencies or persons in matters relating directly or indirectly to the matter of the claim, so long as such agencies or persons have received the consent of the individual claimant, or complied with the provisions of 20 CFR 10.

(4) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits (disclosure of a social security number is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled).

---

**Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)**

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following general benefits for employment-related occupational disease or illness:

(1) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians of the employee's choice.

(2) Payment of compensation for total or partial wage loss.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

The first three days in a non-pay status are waiting days, and no compensation is paid for these days unless the period of disability exceeds 14 calendar days, or the employee has suffered a permanent disability. Compensation for total disability is generally paid at the rate of 2/3 of an employee's salary if there are no dependents, or 3/4 of salary if there are one or more dependents.

If an employee is in doubt about compensation benefits, the OWCP District Office servicing the employing agency should be contacted. (Obtain the address from your employing agency.)

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

| U.S. DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION Office of Workers' Compensation Programs | REPORT OF TERMINATION OF DISABILITY AND/OR PAYMENT |
|---|---|

### PART — A GENERAL

| 1. Name of Injured Employee (Last, first, middle) | 2. Social Security Number | 3. OWCP File Number (If known) |
|---|---|---|
| CHERIS EDDIE S. | 175 52 2025 | |

| 4. Department or Agency | 5. Bureau or Office |
|---|---|
| STATE DEPT | CONSULAR AFFAIRS |

| 6. Name and Address of Reporting Office (Include Zip Code) |
|---|
| 1111 19TH STR NW WASH DC 20520 |

| 7. Date and Hour of Injury (Mo., day, year) | 8. Date and Hour Stopped Work (Mo., day, year) | 9. Date and Hour Pay Stopped (Mo., day, year) | 10. Date and Hour Returned to Work (Mo., day, year) |
|---|---|---|---|
| 1977-200 ☐ AM ☐ PM | ☐ AM ☐ PM | ☐ AM ☐ PM | ☐ AM ☐ PM |

| 11. Employee's Work Week On Return To Duty, If Other Than Monday Through Friday | 12. Present Pay Rate If Different From That Received At Time Employee Stopped Work | | | |
|---|---|---|---|---|
| S M T W T F S | a. Base Pay | b. Subsistence | c. Quarters | d. Other (Specify) |

| 13. Inclusive Dates Employee Received Pay For Any Part Of The Period Of Absence Because of: | | |
|---|---|---|
| a. Annual Leave | b. Sick Leave | c. Other (Specify) |
| From: Through: | From: Through: | From: Through: |

14. Has Employee's Work Assignment Been Changed Because of Disability Resulting From This Injury?  ☐ Yes  ☐ No  If Yes, Describe The Type of Work Employee Is Performing.

| 15. If Interrupted, Show Dates Deductions For Health Benefits and/or Optional Insurance Were Resumed (Mo., day, year)  Health Benefit    Optional Insurance | 16. If Health Benefits Option Has Changed Since Disability Began, Show New Code Number and Date of Change (Mo., day, year)  Number:      Date: |
|---|---|

17. Remarks:

### PART — B CONTINUATION OF PAY

| 18. Inclusive Dates That The Employee's Regular Pay Continued During The Period Of Disability. Do not include period of sick or annual leave (Mo., day, year)  From:      Through: | 19. Show The Gross Dollar Amount Of Regular Pay Which The Employee Received During The Period Of Disability. Do not include pay received for sick or annual leave. |
|---|---|

| 20. If Pay Rate Changed During The Period Employee Was Receiving Continuation Of Pay, Show The Date of Change (Mo., day, year) | 21. If Pay Rate Changed During The Period Employee Was Receiving Continuation of Pay, Give New Rate | | | |
|---|---|---|---|---|
| | a. Base Pay | b. Subsistence | c. Quarters | d. Other (Specify) |

| 22. Signature of Supervisor | 23. Title and Office Phone Number | 24. Date (Mo., day, year) |
|---|---|---|
| | | |

Form CA-3
Rev. Dec. 1974

## INSTRUCTIONS FOR COMPLETING FORM CA-3
### WHEN EMPLOYEE RETURNS TO WORK

#### PART – A

**REQUIRED WRITTEN REPORT**

- When disability ceases and/or employee returns to work, the official superior shall immediately report that fact to the OWCP on Form CA-3 unless this information has been previously submitted on Form CA-1 or CA-2 or otherwise. This form should be submitted for each injury resulting in time lost from work whether or not claim for compensation is made.

**TELEPHONE TELEGRAPH REPORT**

- If the employee is receiving disability compensation periodically each four weeks, the official superior should immediately telephone or telegraph the OWCP advising the date employee returned to work. This will avoid an overpayment of compensation. Follow-up should then be made with Form CA-3.

**PAY RATE INFORMATION**

- Employee's base pay in items 12a or 21a should not include value of subsistence, quarters or other pay. These should be shown separately in their own columns.

#### PART – B

**CONTINUATION OF PAY**

- In most traumatic injury cases, the employee will have qualified for and received continuation of pay under 5 USC 8118 (FECA). When this occurs, items 9, 13, and 15 in Part A will usually be left blank. When there is a continuation of pay, Part B must always be completed, unless the information has been submitted on Form CA-7, Claim for Compensation on Account of Traumatic Injury.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, DC 20402

Catalog Number L3-FORM-CA-3

NO INSURANCE
FOR 2004

PLEASE
DO NOT
STAPLE
IN THIS
AREA

APPROVED OMB-0938-0008

CARRIER

# HEALTH INSURANCE CLAIM FORM

PICA

PICA

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE
MM | DD | YY     SEX
M ☐   F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☐  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY                    STATE

8. PATIENT STATUS
Single ☐  Married ☐  Other ☐

CITY                    STATE

ZIP CODE        TELEPHONE (Include Area Code)

Employed ☐  Full-Time Student ☐  Part-Time Student ☐

ZIP CODE        TELEPHONE (INCLUDE AREA CODE)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES ☐  NO ☐

a. INSURED'S DATE OF BIRTH
MM | DD | YY     SEX
M ☐   F ☐

b. OTHER INSURED'S DATE OF BIRTH
MM | DD | YY     SEX
M ☐   F ☐

b. AUTO ACCIDENT?     PLACE (State)
YES ☐  NO ☐

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES ☐  NO ☐

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES ☐  NO ☐   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____  DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

14. DATE OF CURRENT:
MM | DD | YY
ILLNESS (First symptom) OR
INJURY (Accident) OR
PREGNANCY (LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS.
GIVE FIRST DATE   MM | DD | YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   MM | DD | YY   TO   MM | DD | YY

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   MM | DD | YY   TO   MM | DD | YY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?        $ CHARGES
YES ☐  NO ☐

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. ⌐___
2. ⌐___

3. ⌐___
4. ⌐___

22. MEDICAID RESUBMISSION
CODE        ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A DATE(S) OF SERVICE | | | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | | | | CPT/HCPCS | MODIFIER | | | | | | | |
| 1 | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | |

25. FEDERAL TAX I.D. NUMBER        SSN   EIN
☐ ☐

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT?
(For govt. claims, see back)
YES ☐  NO ☐

28. TOTAL CHARGE
$

29. AMOUNT PAID
$

30. BALANCE DUE
$

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____  DATE _____

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #

PIN#        GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)    PLEASE PRINT OR TYPE

FORM HCFA-1500 (12-90), FORM RRB-1500,
FORM OWCP-1500

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

Item 8.    Leave blank.

Item 9.    Complete "9a-9d" if 11d is "yes". If any potential third party payors other than FECA or Black Lung. This includes other federal programs ( Medicaid, Medicare, CHAMPUS, etc.) and any private policy. Include policy number and policy holder's name.

Item 10.   For FECA: check the appropriate boxes under 10a - 10c. For Black Lung: not required.

Item 11.   For FECA: enter the patient's claim number. OMISSION WILL RESULT IN DELAYED BILL PROCESSING. For Black Lung: leave blank.

Item 11a.  Leave blank.

Item 11b.  For FECA: enter the name of the federal employing agency. For Black Lung: leave blank.

Item 11c.  Leave blank.

Item 11d.  Check the appropriate box. If "Yes" is checked, list any potential third party payors under Item No. 9.

Item 12.   The signature of the patient or authorized representative authorizes release of the medical information necessary to process the claim, and requests payment. Signature is required; mark (X) must be co-signed by a witness and relationship to patient indicated.

Item 13.   Signature indicates authorization for payment of benefits directly to the provider. Acceptance of this assignment is considered to be a contractual arrangement. The "authorizing person" may be the beneficiary (patient) eligible under the program billed, person with power of attorney, or a statement that the beneficiary's signature is on file with the billing provider.

Item 14.   For FECA: enter date of injury or first symptom. For Black Lung: not required.

Item 15.   For FECA: enter first date of similar illness, injury or symptoms. For Black Lung: not required

Item 16.   For FECA: enter dates (MMDDYY) patient is unable to work in current occupation. For Black Lung: leave blank.

Item 17.   and 17a. If this is a referral, enter full name and tax I.D. of referring physician.

Item 18.   If services were provided during an inpatient hospital stay, enter the inpatient service days covered.

Item 19.   Use for additional information (see Item 24).

Item 20.   Must be completed if laboratory service charges are included on the bill. Check "YES" if the services were performed outside the physician's office, and enter the amount charged. Enter the name and address of the person/facility providing the service in Item No. 32 with an †. If an independent laboratory is billing, indicate where the sample was taken in 24b.

Item 21.   Enter the diagnosis(es) of the condition(s) being treated using current ICD codes. Enter codes in priority order (primary, secondary condition). Coding structure must follow the International Classification, Clinical Modification, 9th revision or the latest revision published. A brief narrative may also be entered but not substituted for the ICD code.

Item 22.   Leave blank.

Item 23.   If a prior authorization number has been assigned provide that number; otherwise leave blank.

Item 24.   In Column A, enter month, day, and year (MMDDYY) for each service/consultation provided.If the "from" and "to" date represent a series of identical services, enter the number of services provided in column "G".

Column B: enter the correct HCFA/OWCP standard "place of service" code (see HCFA manual).

Column C: not required.

Column D: enter the applicable five digit AMA CPT (current edition) code and applicable modifier(s), the HCPCS, or the OWCP generic procedure code; enter a brief narrative in columns "J and K".

Column E: enter the diagnostic reference number (1,2,3 or 4, in Item No. 21) to relate the date of service and the procedure(s) performed to the appropriate ICD code, or enter the appropriate ICD code.

Column F: enter the total charge(s) for each listed service(s). Describe any unusual circumstances in column "J and K" or attach report to avoid processing delays.

Column G: enter the number of services/units provided for period listed in column "A".

Column H: Leave blank

Column I: Enter "YES" if an emergency service.

Column "J" and "K": use for nomenclature or notes.

Item 25.   Enter the federal tax I.D. or social security number to which the payment will be assigned. THIS ITEM MUST BE COMPLETED FOR PAYMENT TO BE PROCESSED.

Item 26.   Review notes on FECA, FBLBA and Signature.

Item 27.   Enter the total charges from column 24F.

Item 28.   If any payment has been made, enter that amount here.

Item 29.   Enter the amount due (Item 27 less Item 26).

Item 30.   Enter the balance now due.

Item 31.   Signature is required. Print name if not listed in Items 32 or 33. For Black Lung Mechanical reproduction is acceptable.

Item 32.   Complete as appropriate: (1) if address is different than that in Item No. 33, (2) if Item No. 20 applies, (3) if other circumstances apply.

Item 33.   Enter (1) the name and address to which payment is to be made, and (2) your PIN and Group number (if member). FOR BLACK LUNG in the space following "GRP #", enter your BLACK LUNG SIX-DIGIT FBLBA assigned provider number. FAILURE TO ENTER THIS NUMBER WILL DELAY PAYMENT OR CAUSE REJECTION OF THE BILL FOR INCOMPLETE/ INACCURATE INFORMATION.

### Public Burden Statement

We estimate that it will take an average of ca. ten to fifteen minutes to complete the information required on this form. This includes reviewing of instructions, abstracting information from the patient's records and entering the data onto the form. This time is based on familiarity with standardized coding structures and previous use of this common form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of IRM Policy, Department of Labor, Room N-1301, 200 Constitution Avenue, NW, Washington, DC 20210 and to the Office of Management and Budget, Paperwork Reduction Project (1215-0055), Washington, DC 20503.

DO NOT SEND THE COMPLETED FORM TO EITHER OF THESE OFFICES

☆ U.S. GPO: 1994-301-192/13024

Instructions for Completing OWCP 1500 Health Insurance Claim Form For
Medical Services Provided Under the FEDERAL EMPLOYEE'S COMPENSATION ACT (FECA) and
the Federal BLACK LUNG BENEFITS ACT (FBLBA)

**GENERAL INFORMATION: FEDERAL EMPLOYEES COMPENSATION CLAIMANTS**

Claims filed under the Federal Employees' Compensation Act (FECA) (5 USC 8101 et seq.) are for employment-related illness or injury. All services, appliances, and supplies prescribed or recommended by a qualified physician, which the Secretary of Labor considers likely to give relief, reduce the degree or period of disability, or aid in lessening the amount of the monthly compensation, may be furnished. "Physician" includes all Doctors of Medicine (M.D.s), podiatrists, dentists, clinical psychologists, optometrists, chiropractors, and osteopathic practitioners within the scope of their practice as defined by State law. The term "physician" includes chiropractors only to the extent that their reimbursable services are limited to treatment consisting of manual manipulation of the spine to correct subluxation as demonstrated by X-ray to exist.

**FEES**

The U.S. Department of Labor's Office of Workers' Compensation Programs (OWCP) is responsible for payment of all reasonable charges stemming from covered medical services to claimants eligible under FECA. OWCP employs a relative value scale fee schedule and other means to determine reasonableness. Schedule limitations are applied through an automated billing system that is based on the identification of procedures as defined in the AMA Current Procedural Terminology (CPT); correct CPT code and modifier(s) is required. Incorrect coding will result in inappropriate payment. For specific information about schedule limits call the Department of Labor's Federal Employees' Compensation (FEC) office which services your area.

**REPORTS**

A medical report which indicates the dates of treatment, diagnosis(es), findings, and type of treatment offered is required for services provided by a physician (as defined under the Act). The initial report should explain relationship of the injury or illness to the employment. Test results and x-ray findings should accompany billings.

**GENERAL INFORMATION: FEDERAL BLACK LUNG BENEFITS ACT (FBLBA) CLAIMANTS**

The Federal Black Lung Benefits Act (30 USC 901 et seq.) covers medical services to eligible beneficiaries for diagnostic and therapeutic services for black lung disease as defined under the Act. For specific information about reimbursable services, call the Dept. of Labor's Black Lung office that services your facility or call the National Office in Washington, D.C.

**NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF INFORMATION**

OWCP is authorized (FECA, 5 USC 8101 et seq; FEBLBA 30 USC 901 et seq.) to collect information needed to administrate the FECA and the FBLBA. The information collected is used to identify the eligibility of the claimant for benefits, and determine coverage of services provided. There are no penalties for failure to supply information; however, failure to furnish information regarding the medical service(s) billed on the amount charged will prevent payment of the claim. Failure to supply other information, such as claim number or use of ICPT CPT codes, will delay payment or may result in rejection of the claim because of incomplete information.

**SIGNATURE**

Your signature in item 31 indicates your agreement to accept the Government's charge determination on covered services as payment in full and indicates your agreement not to seek reimbursement from the patient of any amounts not paid by OWCP for covered services as a result of the application of its fee schedule or related tests for reasonableness (appeals are allowed).

Your signature in item 31 also indicates that the services shown on this form were medically indicated and necessary for the health of the patient and were personally rendered or were rendered incident to your direct order. Your signature indicates that you understand that any false claims, statements or documents, or concealment of a material fact may be prosecuted under applicable Federal or State laws.

**FORM SUBMITTAL**

FECA: Send all forms for FECA to the appropriate Federal Employees' Compensation District Office, or to the patient's employing federal agency for forwarding to the correct address.

FBLBA: All forms for services provided under the FBLBA should be returned to the Federal Black Lung Program, P.O. Box 740, Lanham, MD 20706, unless otherwise instructed.

**INSTRUCTIONS FOR COMPLETING THE FORM**

A brief description of each data element and its applicability to requirements under FECA and FBLBA (Black Lung) are listed below. For additional information contact the U.S. Department of Labor.

   1.   Check the name of the program being billed.

  1a.   Enter patient's social security number.

item 2.   Enter the patient's last name, first name, middle initial.

   3.   Enter the patient's date of birth (MMDDYY).

   4.   For FECA: leave blank.

      For Black Lung: complete only if patient is deceased and this medical cost was paid by a survivor. Enter the name of the survivor to whom medical payment is due.

   5.   Enter the patient's address (street address, city, state, ZIP Code; telephone number is optional.

item 6.   Leave blank.

   7.   For FECA: leave blank.

      For Black Lung: complete if Item No. 4 was completed. Enter the address of survivor to whom payment is due.

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured," i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services are not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101; 41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 38 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record," published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

Notice of Occupational Disease
and Claim for Compensation

**U.S. Department of Labor**

Employment Standards Administration
Office of Workers' Compensation Programs




**Employee:** Please complete all boxes 1 - 18 below. Do not complete shaded areas.
**Employing Agency** (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

### Employee Data

| | |
|---|---|
| 1. Name of employee (Last, First, Middle) CHERIS EDDIE S | 2. Social Security Number 175522023 |

| 3. Date of birth Mo. 2 Day 8 Yr. 59 | 4. Sex M | 5. Home telephone ( ) N/A | 6. Grade as of date of last exposure Level 6 Step 9 |
|---|---|---|---|

| 7. Employee's home mailing address (Include city, state, and zip code) 929 N. JACKSON STREET ARLINGTON VA 22201         Zip Code | 8. Dependents NONE ☐ Wife, Husband ☐ Children under 18 years ☐ Other |
|---|---|

### Claim Information

| 9. Employee's occupation FILE CLERK    INFORMATION ASSISTANT | a. Occupation code |
|---|---|

| 10. Location (address) where you worked when disease or illness occurred (include city, state, and zip code) 9111-19TH STR, NW WASH, DC 20520 | 11. Date you first became aware of disease or illness 1997 Mo. Day Yr. |
|---|---|

| 12. Date you first realized the disease or illness was caused or aggravated by your employment  Mo. Day 1997 Yr. 1998 | 13. Explain the relationship to your employment, and why you came to this realization |
|---|---|

| 14. Nature of disease or illness SIATICA | OWCP Use - NOI Code b. Type code c. Source code |
|---|---|

15. If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.

SEE ATTACHMENT

16. If the statement requested in item 1 of the attached instructions is not submitted with this form, explain reason for delay.

17. If the medical reports requested in item 2 of attached instructions are not submitted with this form, explain reason for delay.

SEE ATTACHMENT

### Employee Signature

18. I certify, under penalty of law, that the disease or illness described above was the result of my employment with the United States Government, and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and other benefits provided by the Federal Employees' Compensation Act.

Signature of employee or person acting on his/her behalf _____   Date 30 MAR 04

Have your supervisor complete the receipt attached to this form and return it to you for your records.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled, is subject to felony criminal prosecution and may, under appropriate provisions, be punished by a fine or imprisonment, or both.

Complete all items on your section of the form. If additional space is required to explain or clarify any point, use a supplemental statement to the form. In addition to the information requested on the form, both the employee and the supervisor are required to submit additional evidence as described below. If this evidence is not submitted along with the form, the responsible party should explain the reason for the delay and state when the additional evidence will be submitted.

### Employee (or person acting on the employee's behalf)

Complete items 1 through 18 and submit the form to the employee's supervisor along with the statement and medical reports described below. Be sure to obtain the Receipt of Notice of Disease or Illness completed by the supervisor at the time the form is submitted.

#### 1) Employee's statement

In a separate narrative statement attached to the form, the employee must submit the following information:

a) A detailed history of the disease or illness from the date it started.

b) Complete details of the conditions of employment which are believed to be responsible for the disease or illness.

c) A description of specific exposures to substances or stressful conditions causing the disease or illness, including locations where exposure or stress occurred, as well as the number of hours per day and days per week of such exposure or stress.

d) Identification of the part of the body affected. (If disability is due to a heart condition, give complete details of all activities for one week prior to the attack with particular attention to the final 24 hours of such period.)

e) A statement as to whether the employee ever suffered a similar condition. If so, provide full details of onset, history, and medical care received, along with names and addresses of physicians rendering treatment.

#### 2) Medical report

a) Dates of examination or treatment.

b) History given to the physician by the employee.

c) Detailed description of the physician's findings.

d) Results of x-rays, laboratory tests, etc.

e) Diagnosis.

f) Clinical course of treatment.

g) Physician's opinion as to whether the disease or illness was caused or aggravated by the employment, along with an explanation of the basis for this opinion. (Medical reports that do not explain the basis for the physician's opinion are given very little weight in adjudicating the claim.)

#### 3) Wage loss

If you have lost wages or used leave for this illness, Form CA-7 should also be submitted.

### Supervisor (or appropriate official in the employing agency)

At the time the form is received, complete the Receipt of Notice of Disease or Illness and give it to the employee. In addition to completing items 19 through 34, the supervisor is responsible for filling in the proper codes in shaded boxes a, b, and c on the front of the form. If medical expense or lost time is incurred or expected, the completed form must be sent to OWCP within ten working days after it is received. In a separate, narrative statement attached to the form, the supervisor must:

a) Describe in detail the work performed by the employee. Identify fumes, chemicals, or other irritants or situations that the employee was exposed to which allegedly caused the condition. State the nature, extent, and duration of the exposure, including hours per days and days per week, requested above.

b) Attach copies of all medical reports (including x-ray reports and laboratory data) on file for the employee.

c) Attach a record of the employee's absence from work caused by any similar disease or illness. Have the employee state the reason for each absence.

d) Attach statements from each co-worker who has first-hand knowledge about the employee's condition and its cause. (The co-workers should state how such knowledge was obtained.)

e) Review and comment on the accuracy of the employee's statement requested above.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

### Item Explanations. Some of the items on the form which may require further clarification are explained below.

#### 14. Nature of the disease or illness

Give a complete description of the disease or illness. Specify the left or right side if applicable (e.g., rash on left leg; carpal tunnel syndrome, right wrist).

#### 19. Agency name and address of reporting office

The name and address of the office to which correspondence from OWCP should be sent (if applicable, the address of the personnel or compensation office).

#### 20. Employee's duty station, street address and zip code

The street address and zip code of the establishment where the employee actually works.

#### 23. Name and address of physician first providing medical care

The name and address of the physician who first provided medical care for this injury. If initial care was given by a nurse or other health professional (not a physician) in the employing agency's health unit or clinic, indicate this on a separate sheet of paper.

#### 24. First date medical care received

The date of the first visit to the physician listed in item 23.

#### 32. Was the injury caused by third party?

A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the disease. For instance, manufacturer of a chemical to which an employee was exposed might be considered a third party if improper instructions were given by the manufacturer for use of the chemical.

### Employing Agency - Required Codes

#### Box a (Occupation Code), Box b (Type Code), Box c (Source Code), OSHA Site Code

The Occupational Safety and Health Administration (OSHA) requires all employing agencies to complete these items when reporting an injury. The proper codes may be found in OSHA Booklet 2014, Record Keeping and Reporting Guidelines.

#### OWCP Agency Code

This is a four digit (or four digit plus two letter) code used by OWCP to identify the employing agency. The proper code may be obtained from your personnel or compensation office, or by contacting OWCP.

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following general benefits for employment-related occupational disease or illness:

(1) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians of the employee's choice.

(2) Payment of compensation for total or partial wage loss.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

The first three days in a non-pay status are waiting days, and no compensation is paid for these days unless the period of disability exceeds 14 calendar days, or the employee has suffered a permanent disability. Compensation for total disability is generally paid at the rate of 2/3 of an employee's salary if there are no dependents, or 3/4 of salary if there are one or more dependents.

If an employee is in doubt about compensation benefits, the OWCP District Office servicing the employing agency should be contacted. (Obtain the address from your employing agency.)

For additional information review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

---

In accordance with the Privacy Act of 1974 (Public Law No. 93-579, 5 U.S.C. 552a), you are hereby notified that:

(1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.), is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the office receives and maintains personal information on claimants and their immediate families.

(2) This information will be used to determine eligibility for and the amount of benefits payable under the Act.

(3) The information may be used by other agencies or persons in matters relating directly or indirectly to the matter of the claim, so long as such agencies or persons have received the consent of the individual claimant, or compiled with the provisions of 20 CFR 10.

(4) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits (disclosure of a social security number is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled).

---

## Receipt of Notice of Occupational Disease or Illness

This acknowledges receipt of notice of disease or illness sustained by:
(Name of injured employee)

I was first notified about this condition on (Mo., Day, Yr.)

At (location)

Signature of Official Superior

This notice should be retained by the employee as a record that notice was filed.

Official Supervisor's Report of Occupational Disease. Please complete information requested below.

18. Agency name, and address of reporting office (include city, state, and zip code)

OWCP Agency Code

OSHA Site Code

Zip Code

20. Employee's city station (Street address and zip code)

Zip Code

21. Regular work hours: From ☐ a.m. ☐ p.m. To ☐ a.m. ☐ p.m.  22. Regular work schedule ☐ Sun. ☐ Mon. ☐ Tues. ☐ Wed. ☐ Thurs. ☐ Fri. ☐ Sat.

23. Name and address of physician first providing medical care (include city, state, zip code)

24. First date medical care received | Mo. | Day | Yr.

25. Do medical reports show employee is disabled for work for the physician's ☐ Yes ☐ No

26. Date employee first reported | Mo. | Day | Yr.  27. Date and hour employee stopped work | Mo. | Day | Yr. | Time : ☐ a.m. ☐ p.m.

28. [illegible]  29. Date employee was last exposed to conditions alleged to have caused disease or illness | Mo. | Day | Yr.

30. Date returned to work | Mo. | Day | Yr.

If the employee has returned to work and work assignment has changed, describe the new duties.

a) Describe the substances or work performed by the employee, identify times, chemicals, or other irritants or situations that the employee was exposed to or allegedly caused the condition. State the nature, extent, and duration of the exposure.

c) Attach a record of the employee's absence from work caused by any similar disease or illness. Give the actual or estimated reason for each absence.

d) Attach statements from each co-worker who has first-hand knowledge about the employee's condition and its cause.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

34. A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of facts, in respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of Supervisor (Type or print):   CHERIE  EDDIE

Signature of Supervisor

Supervisor's Title

Office phone

Attending Physician's Supplemental Report

U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs

OMB No. 1215-0103
Expires: 05-30-98

For Instructions See Reverse Side

1. Name of injured employee (Last, first, middle)
SHERIE, EDDIE S.

2. OWCP File Number, if known

3. Home mailing address (include Zip code)

4. Social Security Number
1 75 52 2023

5. Date of first examination
(Mo., day, year)
☐ AM
☐ PM

6. Period of compensation claimed (inclusive of dates on which treated)
From 1977     Through 2004

7. Date of most recent examination (Mo., day, year)

8. Is employee's present condition due to the injury for which compensation is claimed?
☐ Yes    ☐ No

9. Is employee totally disabled for usual work?
☐ Yes    ☐ No

10. Describe nature of present impairment

11. State diagnosis

12. What treatment is employee receiving and how often is it given?

13. What permanent effects, if any, are anticipated?

14. Describe any concurrent disability employee has which is unrelated to this injury

15. Will disability for regular work continue for 30 days or longer?
☐ Yes    ☐ No
If so, approximately what date will employee be able to return to work? (Mo., day, year)

16. If employee is able to resume regular work, has he or she been advised?    ☐ Yes    ☐ No
If Yes, show date employee was informed:
(Mo., day, year)

17. If employee is only partially disabled, show date he or she was able to perform some work and describe specific work restrictions. (i.e. limitations in stooping, bending, lifting, etc.)

18. If employee has been referred to another physician for consultation or treatment, give physician's name & address

19. Recommendations and Prognosis

20. Address (include Zip code)

21. If you specialize, indicate specialty

22. Signature of Physician. I certify that the statements on the reverse apply to this report and are made a part hereof.

23. Date of Report (Mo., day, year)

Form CA-20
Rev. Aug. 199

INSTRUCTIONS FOR COMPLETING ATTENDING PHYSICIAN'S REPORT

CERTIFICATION:   BY SIGNING BLOCK 22 ON THE FRONT OF THIS FORM, THE PHYSICIAN CERTIFIES
AS FOLLOWS:

I CERTIFY THAT ALL THE STATEMENTS IN RESPONSE TO THE QUESTIONS ASKED
IN THIS FORM CARDS ARE TRUE, COMPLETE AND CORRECT TO THE BEST OF MY
KNOWLEDGE. FURTHER, I UNDERSTAND THAT ANY KNOWINGLY FALSE OR
MISLEADING STATEMENT, OR MISREPRESENTATION, OR CONCEALMENT OF
MATERIAL FACT, MAY SUBJECT ME TO FELONY CRIMINAL PROSECUTION.

IMPORTANT:

A MEDICAL REPORT IS REQUIRED BY THE OFFICE OF WORKERS' COMPENSATION
PROGRAMS BEFORE PAYMENT OF COMPENSATION CAN BE MADE TO THE
EMPLOYEE.

IF YOU HAVE SUBMITTED A MEDICAL REPORT ON FORM CA-16, CA20 OR A
NARRATIVE REPORT TO THE OWCP WITHIN THE PAST 10 DAYS, YOU NEED NOT
SUBMIT THIS FORM CA-20a.

OWCP REQUIRES THAT MEDICAL BILLS, OTHER THAN HOSPITAL BILLS, BE
SUBMITTED ON THE AMERICAN MEDICAL ASSOCIATION HEALTH INSURANCE CLAIM
FORM, (HCFA-1500/OWCP 1500a.

1.   Complete the entries 7-23 on this report (and items 1-6 if not previously completed), and

2.   Forward the report directly by mail to the OWCP office indicated below.

3.



OFFICE OF WORKERS' COMPENSATION PROGRAMS

PRIVACY ACT

In accordance with the Privacy Act of 1974 (Public Law No. 93-679; 5 U.S.C. 559a), you are hereby notified that (1) The
Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers'
Compensation Programs of the U.S. Department of Labor, in accordance with this responsibility the Office receives and
maintains personal information on claimants and their immediate families. (2) The information will be used to determine
eligibility for and the amount of benefits payable under the Act. (3) The information may be used by other agencies or persons
in handling matters relating, directly or indirectly, to the subject matter of the claim, so long as such agencies or persons have
received the consent of the individual claimant, or have complied with the provisions of 20 CFR 10.11. Failure to furnish all
requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits (disclosure of
a social security number is voluntary, the failure to disclose such number will not result in the denial of any right, benefit or
privilege to which an individual may be entitled).

Claim For Continuing Compensation
On Account of Disability

Employment Standards Administration
Office of Workers' Compensation Programs

Statement of Injured Employee - See Instructions on Reverse Side

1. Name of Injured Employee (Last, first, middle)
CARTER EDDIE S

2. OWCP File Number, if known

3. Home Mailing Address (include zip code)

4. Social Security Number

5. Date and Hour of Injury
(Mon, day, year)
☐ AM
☐ PM

6. Period Compensation is Claimed (If a Period of Pay Loss (Mo, Day, year), pay includes return from, attach separate sheet showing dates and hours of pay loss.
From _____ Through _____

7. Have you received any leave pay during the period shown in item 6?
☐ Yes   ☐ No    Show Inclusive Dates:  From _____ Through _____
If leave use was intermittent, attach separate sheet showing dates and hours used.

8. Do you wish to repurchase leave?
☐ Yes   ☐ No

9. Complete this item if you worked during the period shown in item 6. Attach a separate sheet if needed.
a. Salaried Employment.

| Dates & Hours Worked | Pay Rate (Per hour, day or week) | Total Amount Earned | Type Work Performed | Name & Address of Employer |
|---|---|---|---|---|
| N/A | | | | |

b. Commission and Self-Employment. Show all activities whether or not income resulted from your efforts.

| Dates & Hours Worked | Name and Address of Business | Self Employed ☐ Commission ☐ | Type of Activity Performed | Income Derived (Attach Explanation if Needed) |
|---|---|---|---|---|
| N/A | | | | |

10. If you were only partially disabled and did not work, state reason for not working.
N/A

11. If, since filing your initial claim for compensation, you have applied for or received VA Benefits based on Military Service for the United States, give the following:
Claim No. _____   Date of Disability and Monthly Payment _____   Name and Address of Office Where Claim is Filed _____
N/A

12. If, since filing your initial claim for compensation, you have applied for or received an annuity under the Civil Service Retirement Act or other Federal retirement or disability law, give the following:
Claim No. _____   Amount of Monthly Payment _____   Name and Address of Office Where Claim is Filed _____
N/A

13. SIGNATURE OF EMPLOYEE OR PERSON ACTING ON EMPLOYEE'S BEHALF. (Any person who knowingly makes any false statement, misrepresentation, concealment, of fact, or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.)

14. Date (Mo, day, year)

Statement of Official Superior

15. If employee has returned to work, show date and time. (Mo., day, year)

☐ AM
☐ PM

16. Show employee's work week as it relates to duty, if other than Monday thru Friday.

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |

17. Has employee received any pay for work, leave, subsistence, quarters or other remuneration from your agency during the period shown in Item 5 on the reverse side?

☐ Yes    ☐ No

18. If answer to Item 17 is Yes, show:

Amount: $

Type of Payment:

Period: From _____ Through _____

19. If there has been any change in employee's health benefit enrollment, and/or optional insurance since previous claim for compensation was submitted, please explain. (I.e., change of plan or option, if additional deductions have been made by the agency, show amount and period.)

N/A

20. Remarks

See Attachment

21. A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge, with the following exception:

22. Signature of Official Superior          23. Title                    24. Date (mo., day, year)

Instructions for Injured Employee

a. Items 1 through 14 on the reverse side should be completed by the injured employee or by someone acting on the employee's behalf. The form should then be given to the official superior.

b. The injured employee should file Form CA-8 each two weeks during the period of disability unless otherwise notified by OWCP. Forms may be obtained from OWCP or the employing agency.

c. Employees are advised that fraudulent claims are punishable by a fine of not more than $10,000, or imprisonment for not more than five years, or both.

d. The employee is responsible for submitting, or arranging for the submission of medical evidence in support of this claim. The CA-20a is attached to form CA-8 for this purpose. The employee should complete Items 1-6 on form CA-20a. The attending physician should complete Items 7 through 23. The address of the appropriate OWCP office should be entered in Item 8 on the reverse of the CA-20a.

Instructions for Official Superior

a. The official superior must complete Items 15 through 24, and forward the form, and any accompanying medical report, to the appropriate OWCP office, within 5 working days of receipt from the employee.

If additional space is required for any reply, a separate sheet of paper may be used, numbering the answers to correspond with items on the form.

Note: Failure to submit this form properly completed with supporting medical evidence will delay payment of compensation.

# Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation

**U.S. Department · Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

**Employee:** Please complete all boxes 1 - 15 below.  Do not complete shaded areas.
**Witness:** Complete bottom section 16.
**Employing Agency (Supervisor or Compensation Specialist):** Complete shaded boxes a, b, and c.

## Employee Data

| | |
|---|---|
| 1. Name of employee (Last, First, Middle) CHERIS, EDDIE S | 2. Social Security Number 125 52 2023 |

| 3. Date of birth Mo. Day Yr. | 4. Sex ☐ Male ☐ Female | 5. Home telephone N/A | 6. Grade as of date of injury Level 6 Step 9 |
|---|---|---|---|

| 7. Employee's home mailing address (Include city, state, and ZIP code) 925 N. JACKSON ST ARLINGTON, VA 22201 | 8. Dependents NONE ☐ Wife, Husband ☐ Children under 18 years ☐ Other |
|---|---|

## Description of Injury

9. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine)
5TH FL — 1111-19TH STR, NW WASH DC 20520

| 10. Date injury occurred Mo. Day Yr. 7-7-2004 | Time ☐ a.m. ☐ p.m. | 11. Date of this notice Mo. Day Yr. 31 MAR 2004 | 12. Employee's occupation FILE CLERK INFORMATION ASSISTANT |
|---|---|---|---|

13. Cause of injury (Describe what happened and why)

SEE ATTACHMENT

14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg)

SEE ATTACHMENT

| | |
|---|---|
| | a. Occupation code |
| | b. Type Code    c. Source code |
| | OWCP Use - NDI Code |

## Employee Signature

15. I certify, under penalty of law, that the injury described above was sustained in performance of duty as an employee of the United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication.  I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☐ b.  Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues beyond 45 days.  If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☐ a.  Sick and/or Annual Leave

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government agency) to furnish any desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative).  This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

Signature of employee or person acting on his/her behalf _____    Date 30 Mar 04

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

**Have your supervisor complete the receipt attached to this form and return it to you for your records.**

## Witness Statement

Statement of witness (Describe what you saw, heard, or know about this injury)

| Name of witness | Signature of witness | | Date signed |
|---|---|---|---|
| Address | City | State | ZIP Code |

Form CA-1
Rev. Apr. 1999

## Benefits for Employees under the Federal Employees' Compensation act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following benefits for job-related traumatic injuries:

(1) Continuation of pay for disability resulting from traumatic, job-related injury, not to exceed 45 calendar days. (To be eligible for continuation of pay, the employee, or someone acting on his/her behalf, must file Form CA-1 within 30 days following the injury and provide medical evidence in support of disability within 10 days of submission of the CA-1. Where the employing agency continues the employee's pay, the pay must not be interrupted unless one of the provisions outlined in 20 CFR 10.222 apply.

(2) Payment of compensation for wage loss after the expiration of COP, if disability extends beyond such point, or if COP is not payable. If disability continues after COP expires, Form CA-7, with supporting medical evidence, must be filed with OWCP. To avoid interruption of income, the form should be filed on the 40th day of the COP period.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where directed by OWCP.

(5) All necessary medical care from qualified medical providers. The injured employee may choose the physician who provides initial medical care. Generally, 25 miles from the place of injury, place of employment, or employee's home is a reasonable distance to travel for medical care.

An employee may use sick or annual leave rather than LWOP while disabled. The employee may repurchase leave used for approved periods. Form CA-7b, available from the personnel office, should be studied BEFORE a decision is made to use leave.

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Chapter 20, Part 10) or pamphlet CA-810.

## Privacy Act

In accordance with the Privacy Act of 1974, as amended (5 U.S.C. 552a), you are hereby notified that: (1) The Federal Employees' Compensation Act, as amended and extended (5 U.S.C. 8101, et seq.) (FECA) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor, which receives and maintains personal information on claimants and their immediate families. (2) Information which the Office has will be used to determine eligibility for and the amount of benefits payable under the FECA, and may be verified through computer matches or other appropriate means. (3) Information may be given to the Federal agency which employed the claimant at the time of injury in order to verify statements made, answer questions concerning the status of the claim, verify billing, and to consider issues relating to retention, rehire, or other relevant matters. (4) Information may be given to other Federal agencies, other government entities, and to private-sector agencies and/or employers as part of rehabilitative and other return-to-work programs and services. (5) Information may be disclosed to physicians and other health care providers for use in providing treatment or medical/vocational rehabilitation, making evaluations for the Office, and for other purposes related to the medical management of the claim. (6) Information may be given to Federal, state and local agencies for law enforcement purposes, to obtain information relevant to a decision under the FECA, to determine whether benefits are being paid properly, including whether prohibited dual payments are being made, and, where appropriate, to pursue salary/administrative offset and debt collection actions required or permitted by the FECA and/or the Debt Collection Act. (7) Disclosure of the claimant's social security number (SSN) or tax identifying number (TIN) on this form is mandatory. The SSN and/or TIN, and other information maintained by the Office, may be used for identification, to support debt collection efforts carried on by the Federal government, and for other purposes required or authorized by law. (8) Failure to disclose all requested information may delay the processing of the claim or the payment of benefits, or may result in an unfavorable decision or reduced level of benefits.

**Note: This notice applies to all forms requesting information that you might receive from the Office in connection with the processing and adjudication of the claim you filed under the FECA.**

## Receipt of Notice of Injury

This acknowledges receipt of Notice of Injury sustained by
(Name of injured employee)

Which occurred on (Mo., Day, Yr.)

At (Location)

Signature of Official Superior                    Title                              Date (Mo., Day, Yr.)

*U.S. GPO: 1999-454-845/12704

Form CA-1
Rev. Apr. 1999

Official Supervisor's Report: Please complete information requested below:

## Supervisor's Report

17. Agency name and address of reporting office (include city, state, and zip code)

OWCP Agency Code

OSHA Site Code

ZIP Code

18. Employee's duty station (Street address and ZIP code)

19. Employee's retirement coverage    ☐ CSRS  ☐ FERS  ☐ Other, (identify)

20. Regular work hours  From: ☐ a.m.  ☐ p.m.  To: ☐ a.m.  ☐ p.m.

21. Regular work schedule  ☐ Sun.  ☐ Mon.  ☐ Tues.  ☐ Wed.  ☐ Thurs.  ☐ Fri.  ☐ Sat.

22. Date of Injury  Mo.  Day  Yr.

23. Date notice received  Mo.  Day  Yr.

24. Date stopped work  Mo.  Day  Yr.    Time:  ☐ a.m.  ☐ p.m.

25. Date pay stopped  Mo.  Day  Yr.

26. Date 45-day period began  Mo.  Day  Yr.

27. Date returned to work  Mo.  Day  Yr.    Time:  ☐ a.m.  ☐ p.m.

28. Was employee injured in performance of duty?  ☐ Yes  ☐ No (If "No," explain)

29. Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another?  ☐ Yes (If "Yes," explain)  ☐ No

30. Was injury caused by third party?  ☐ Yes  ☐ No (If "No," go to item 32.)

31. Name and address of third party (Include city, state, and ZIP code)

32. Name and address of physician first providing medical care (include city, state, ZIP code)

33. First date medical care received  Mo.  Day  Yr.

34. Do medical reports show employee is disabled for work?  ☐ Yes  ☐ No

35. Does your knowledge of the facts about this injury agree with statements of the employee and/or witnesses?  ☐ Yes  ☐ No  (If "No," explain)

36. If the employing agency controverts continuation of pay, state the reason in detail.

37. Pay rate when employee stopped work  $_____ Per _____

## Signature of Supervisor and Filing Instructions

38. A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of supervisor (Type or print)

Signature of supervisor                                Date

Supervisor's Title                                Office phone

39. Filing instructions
☐ No lost time and no medical expense: Place this form in employee's medical folder (SF-66-D)
☐ No lost time, medical expense incurred or expected: forward this form to OWCP
☐ Lost time covered by leave, LWOP, or COP: forward this form to OWCP
☐ First Aid Injury

Form CA-1.

Rev. Apr. 1999

## Instructions for Completing Form CA-1

Complete all items on your section of the form. If additional space is required to explain or clarify any point, attach a supplemental statement to the form. Some of the items on the form which may require further clarification are explained below.

### Employee (Or person acting on the employee's behalf)

**13) Cause of Injury**

Describe in detail how and why the injury occurred. Give appropriate details (e.g.: if you fell, how far did you fall and in what position did you land?)

**14) Nature of Injury**

Give a complete description of the condition(s) resulting from your injury. Specify the right or left side if applicable (e.g., fractured left leg; cut on right index finger).

**15) Election of COP/Leave**

If you are disabled for work as a result of this injury and filed CA-1 within thirty days of the injury, you may be entitled to receive continuation of pay (COP) from your employing agency. COP is paid for up to 45 calendar days of disability, and is not charged against sick or annual leave. If you elect sick or annual leave you may not claim compensation to repurchase leave used during the 45 days of COP entitlement.

### Supervisor

At the time the form is received, complete the receipt of notice of injury and give it to the employee. In addition to completing items 17 through 39, the supervisor is responsible for obtaining the witness statement in item 16 and for filling in the proper codes in shaded boxes a, b, and c on the front of the form. If medical expense or lost time is incurred or expected, the completed form should be sent to OWCP within 10 working days after it is received.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

If the employing agency controverts COP, the employee should be notified and the reason for controversion explained to him or her.

**17) Agency name and address of reporting office**

The name and address of the office to which correspondence from OWCP should be sent (if applicable, the address of the personnel or compensation office).

**18) Duty station street address and zip code**

The address and zip code of the establishment where the employee actually works.

**19) Employers Retirement Coverage.**

Indicate which retirement system the employee is covered under.

**30) Was injury caused by third party?**

A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the injury. For instance, the driver of a vehicle causing an accident in which an employee is injured, the owner of a building where unsafe conditions cause an employee to fall, and a manufacturer whose defective product causes an employee's injury, could all be considered third parties to the injury.

**32) Name and address of physician first providing medical care**

The name and address of the physician who first provided medical care for this injury. If initial care was given by a nurse or other health professional (not a physician) in the employing agency's health unit or clinic, indicate this on a separate sheet of paper.

**33) First date medical care received**

The date of the first visit to the physician listed in item 31.

**36) If the employing agency controverts continuation of pay, state the reason in detail.**

COP may be controverted (disputed) for any reason; however, the employing agency may refuse to pay COP only if the controversion is based upon one of the nine reasons given below:

a) The disability was not caused by a traumatic injury.

b) The employee is a volunteer working without pay or for nominal pay, or a member of the office staff of a former President;

c) The employee is not a citizen or a resident of the United States or Canada;

d) The injury occurred off the employing agency's premises and the employee was not involved in official "off premise" duties;

e) The injury was proximately caused by the employee's willful misconduct, intent to bring about injury or death to self or another person, or intoxication;

f) The injury was not reported on Form CA-1 within 30 days following the injury;

g) Work stoppage first occurred 45 days or more following the injury;

h) The employee initially reported the injury after his or her employment was terminated; or

i) The employee is enrolled in the Civil Air Patrol, Peace Corps, Youth Conservation Corps, Work Study Programs, or other similar groups.

### Employing Agency - Required Codes

**Box a (Occupation Code), Box b (Type Code), Box c (Source Code), OSHA Site Code**

The Occupational Safety and Health Administration (OSHA) requires all employing agencies to complete these items when reporting an injury. The proper codes may be found in OSHA Booklet 2014, "Recordkeeping and Reporting Guidelines.

**OWCP Agency Code**

This is a four-digit (four digit plus two letter) code used by OWCP to identify the employing agency. The proper code may be obtained from your personnel or compensation office, or by contacting OWCP.

Form CA-1
Rev. Apr. 1999



4/5/2004 2:53 PM

| QA Employee | Pay Period 4 | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUN | MON | TUE | WED | THU | FRI | SAT |
| | 2/22/2004 | 2/23/2004 | 2/24/2004 | 2/25/2004 | 2/26/2004 | 2/27/2004 | 2/28/2004 |
| **QA Team** | | | | | | | |
| Cheris, Eddie | | | | | 1.0AL | 2.0SL | |

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 2/29/2004 | 3/1/2004 | 3/2/2004 | 3/3/2004 | 3/4/2004 | 3/5/2004 | 3/6/2004 |
| | 2.5SL | | 8.0AL | 8.0AL | 8.0AL | |

| QA Employee | Pay Period 5 | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUN | MON | TUE | WED | THU | FRI | SAT |
| | 3/7/2004 | 3/8/2004 | 3/9/2004 | 3/10/2004 | 3/11/2004 | 3/12/2004 | 3/13/2004 |
| **QA Team** | | | | | | | |
| Cheris, Eddie | | 3.0SL | | | 4.25AL | 8.0AL | |

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 3/14/2004 | 3/15/2004 | 3/16/2004 | 3/17/2004 | 3/18/2004 | 3/19/2004 | 3/20/2004 |
| | | 2.0AL | 8.0AL | 5.5AL | 1.5AL | |

| QA Employee | Pay Period 6 | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUN | MON | TUE | WED | THU | FRI | SAT |
| | 3/21/2004 | 3/22/2004 | 3/23/2004 | 3/24/2004 | 3/25/2004 | 3/26/2004 | 3/27/2004 |
| **QA Team** | | | | | | 2.5SL | |
| Cheris, Eddie | | | 3.5AL | 1.5SL | | 1.0AL | |

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 3/28/2004 | 3/29/2004 | 3/30/2004 | 3/31/2004 | 4/1/2004 | 4/2/2004 | 4/3/2004 |
| | | | 2.0AL | | | |

Hi Corey

Wednesday, 7 April 2004 – this morning, when I awoke around 05:45; it felt like my right arm was a dead weight (no feeling). Once I turned on the light I then noticed that my right hand was swollen like a balloon with discoloration under the fingernails. There was nothing abnormal about the left hand or ankles and feet. I could extend my right hand fingers outward; but moving my fingers inward (into a grip/fist) was not possible.

I first began moving my right hand and arm to check if it was possibly broken and then checked the right shoulder and then left shoulder and arm. Nothing appeared broken and no pain was present in these areas. I then applied Ben Gay paste around my shoulders, shoulder blades, back pelvis area and just waited.

By 06:30-07:00, the swelling of my right hand disappeared.

I kind of figure that this right hand swelling is connected with the current sciatic condition.

I seriously hope this swelling does not keep re-occurring; because it will definitely prevent me from being able to do my data entry job.

For your information.

Thank you

Ed Cheris